UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOSEPH V. ELAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1557 (JDB) |
| | ) | |
| BOARD OF TRUSTEES OF THE | ) | |
| UNIVERSITY OF THE DISTRICT OF | ) | |
| COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Board of Trustees of the University of the District of Columbia, through counsel and pursuant to Fed. R. Civ. P. 56(b), respectfully moves this Court for summary judgment in defendant's favor on all claims in this matter. As grounds for this motion, defendant states as follows:

1.      Plaintiff cannot establish a prima facie case that he was denied promotion because of his race, color or national origin.

2.      Plaintiff cannot establish a prima facie case that he was denied promotion because of his age.

3.      Plaintiff cannot rebut defendant's legitimate, non-discriminatory reasons for his non-promotion.

4.      The statute of limitations bars plaintiff's hostile work environment claim.

5.      Plaintiff's evidence is insufficient to show that he suffered a hostile work environment.

A memorandum of points and authorities in support of this motion is attached hereto and incorporated by reference.

Respectfully submitted,

LINDA SINGER
Acting Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division


/s/ Phillip A. Lattimore, III /s/
PHILLIP A. LATTIMORE, III [422968]
Chief, General Litigation Section III


/s/ Carl J. Schifferle /s/
CARL J. SCHIFFERLE [463491]
Assistant Attorney General
Suite 600S
441 Fourth Street, N.W.
Washington, D.C. 20001
(202) 724-6624
(202) 727-3625 (fax)
Email: carl.schifferle@dc.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSEPH V. ELAM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 05-1557 (JBD) |
| | ) |
| BOARD OF TRUSTEES OF THE | ) |
| UNIVERSITY OF THE DISTRICT OF | ) |
| COLUMBIA, | ) |
| | ) |
| Defendant. | ) |
| | ) |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

I.    INTRODUCTION

Plaintiff brings claims against the Board of Trustees of the University of the District of
Columbia under the Equal Protection Clause of the Fourteenth Amendment,[1] pursuant to 42
U.S.C. § 1983, and under the D.C. Human Rights Act, D.C. Code § 2-1401 et seq. (2001).  His
suit alleges unlawful employment discrimination based on his "race, color or national origin"
(Asian Indian) and his age (approximately 65 years old).  Plaintiff claims that defendant
discriminatorily denied him a promotion to the rank of Full Professor in 2004 and has created a
hostile work environment for him since at least 1989.

---

[1] The Fourteenth Amendment is only applicable to the States, not the District of Columbia.
Propert v. District of Columbia, 948 F.2d 1327, 1330 n.5 (D.C. Cir. 1991).  Nevertheless,
because the Due Process Clause of the Fifth Amendment contains an equal protection
component, Boiling v. Sharpe, 347 U.S. 497, 499 (1954), this does not affect the analysis of
plaintiff's claim.

As argued in this motion, defendant is entitled to summary judgment on all plaintiff's claims.  First, plaintiff cannot raise a prima facie case of discrimination as to his non-promotion.  Plaintiff's prima facie case fails because he cannot show that he was qualified for the promotion or that there was disparate treatment of similarly-situated applicants.  With respect to his age discrimination claim, plaintiff also cannot meet his prima facie case because the decision-makers were not aware of the ages of the applicants.  Even assuming a prima facie case, plaintiff cannot rebut defendant's legitimate, non-discriminatory explanation for plaintiff's non-promotion – that plaintiff's application lacked sufficient evidence of scholarship.  Like his discriminatory non-promotion claim, plaintiff's hostile work environment also cannot survive summary judgment.  As an initial matter, the statute of limitations bars plaintiff's hostile work environment claim because that claim encompasses an alleged period of harassment that ended in 1999, which is several years outside the limitations period.  In addition, plaintiff lacks evidence that the alleged harassment was based on discriminatory animus and that it was sufficiently severe and pervasive to establish an actionable claim.

II.     STATEMENT OF FACTS

Plaintiff Joseph Elam is a journalism professor at the University of the District of Columbia (UDC).  He earned a Master's Degree from the Medill School of Journalism at Northwestern University in 1967 but never entered a Ph.D. program in journalism.  (Exh. A, Elam Depo. 29).  He joined UDC as an Assistant Professor of Journalism in 1976.  (Compl. ¶ 9). The University then promoted him in 1982 to the rank of Associate Professor.  (Compl. ¶ 9). Plaintiff has long served as the journalism program coordinator and, until recently, the only permanent journalism faculty member at UDC.  (Exh. A, Elam Depo. 40-44).  As the journalism

program coordinator, plaintiff is responsible for the journalism curriculum and updating journalism courses at UDC. (Exh. A, Elam Depo. 41). Plaintiff remains an Associate Professor within the Department of Mass Media, Visual and Performing Arts ("Department of Mass Media"). (Compl. ¶ 9). The Department of Mass Media is a department in the College of Arts and Sciences. (Compl. ¶ 9). The College of Arts and Sciences is one of three schools within the university; the other two schools are the School of Business and Public Administration and the School of Engineering and Applied Sciences. (Exh. B, Reuben-Cooke Depo. 19).

A.     <u>Plaintiff's application for promotion.</u>

In September 2002, plaintiff applied for promotion from Associate to Full Professor, which is the highest rank for a UDC professor. (Exh. C). Title 8 of the D.C. Municipal Regulations, as well as the collective bargaining agreement between the faculty and the university ("Fourth Master Agreement"), set forth the procedures and general criteria for promotions. Eligibility for promotion to any rank of professor includes among its criteria "earned degrees and other appropriate credentials" and "sustained scholarship and professional growth during the period of service at the current academic rank." 8 D.C.M.R. § 1441.6. A candidate's scholarship is evaluated "more stringently for each successively higher rank." 8 D.C.M.R. § 1441.3. The qualifications for Full Professor thus include the requirement of "significant and substantial contribution to scholarship in the [candidate's] field" and "demonstrated continuing professional attainment." 8 D.C.M.R. § 1413.1.

Pursuant to the established promotion procedures, the Department of Mass Media first considered plaintiff's application. The Chair of the Department, Yvonne Carter, strongly recommended the plaintiff's application for promotion. (Compl. ¶ 18). The Department's

3

Evaluation and Promotion Committee ("Department Committee") also reviewed plaintiff's application. (Exh. D). The Department Committee consisted of several Department faculty members. (Exh. E, Petty Depo. 41-42). Because the Department Committee consists of faculty in the applicant's own Department, Committee members recommend virtually all applicants for promotion as a matter of collegiality. (Exh. E, Petty Depo. 61 ln.13 – 62 ln.14). In this instance, three members of the Department Committee strongly recommended plaintiff's application for promotion, and one member of the Department Committee "recommended" his application "but not strongly." (Exh. D).

After review at the Department level, plaintiff's application went to the College of Arts and Sciences for consideration. In August 2003, the College's Evaluation and Promotion Committee ("College Committee") reviewed plaintiff's application, plus seven other applications for promotion from faculty within the College. (Compl. ¶ 9). The College Committee consisted of faculty members (the Chairs of each Department Committee within the College) who assigned points to each application. (Exh. E, Petty Depo. 45-46). The College Committee assigned points based on the quantity of an applicant's accomplishments with little or no critical judgment as to the quality of those accomplishments. (Exh. E, Petty Depo. 63 ln.21 – 65 ln.20). Based on these scores, the College Committee ranked the plaintiff second out of the eight applicants and gave him the Committee's strong recommendation. (Exh. F). The applications, along with the recommendations of the various Department Committees and the College Committee, then went to the Dean of the College of Arts and Sciences for her own independent assessment. (Exh. E, Petty Depo. 56-60).

Reviewing the applications in 2004, Dean Rachel Petty decided not to recommend plaintiff's promotion based on deficiencies in his scholarship. (Exh. G). Dean Petty determined

4

that plaintiff's application first showed "insufficient evidence that he has kept abreast of major changes in his field," which Dean Petty considered "especially significant since there have been so many changes in the field of journalism, including the use of technology" and the increasing "importance of legal and ethical issues."  (Exh. G; Exh. E, Petty Depo. 86 ln.19 – 87 ln.12). Plaintiff's failure to keep current in his field included his lack of leadership in curriculum review and development.  (Exh. E, Petty Depo. 87-89).  Many years ago, plaintiff recognized the need for substantial upgrading of the journalism curriculum through the proposed addition of several new courses, including ethics of journalism and computer-assisted reporting.  (Exh. A, Elam Depo. 221-22, 245-46, 264; Exh. A2; Exh. E, Petty Depo. 94 ln. 16 – 98 ln.18).  Plaintiff, however, never submitted the syllabi for any of these new courses to the Curriculum Committee so that the courses could be approved and added to the regular curriculum.  (Exh. A, Elam Depo. 226 ln. 15-19, 239-41, 267; Exh. A7).

        In addition, Dean Petty found that plaintiff's application lacked "evidence of peer-reviewed research [or] writing or of writing awards or critical acclaim by other professional writers" or organizations in his field.  (Exh. G; Exh. E, Petty Depo. 120 ln.3 – 121 ln.13). Although plaintiff has written newspaper articles, plaintiff's application notably lacked any published writings about the field of journalism.  (Exh. A, Elam Depo. 286-87).  Plaintiff also presented no evidence of formal research related to his discipline.  (Exh. E, Petty Depo. 169-70). Additionally, plaintiff's application did not show that he had received any awards or critical acclaim for his writings from professionals in his field.  (Exh. G; Exh. E, Petty Depo. 120-21). Dean Petty concluded that more "evidence of scholarship and/or journalistic excellence is required" before she could recommend his application.  (Exh. G).  Thereafter, plaintiff's entire

application for promotion, along with the recommendations of the Dean and others, was

forwarded to the University's Provost and Vice President for Academic Affairs.

The Provost and Vice President for Academic Affairs, Wilhelmina Reuben-Cooke, then

considered plaintiff's application and decided against plaintiff's promotion.  (Exh. H).  Provost

Reuben-Cooke reviewed promotion applications from across the university, not just from the

College of Arts and Sciences.  (Exh. B, Reuben-Cooke Depo. 18 ln.14 – 21 ln.9).  Giving weight

to the Dean's recommendation, Provost Reuben-Cooke reviewed the plaintiff's application to

determine if it supported the Dean's recommendation not to promote him.  (Exh. B, Reuben-

Cooke Depo. 48 ln.11 – 50 ln.4, 52 ln.19 - 54 ln.2).  Upon review, Provost Reuben-Cooke agreed

that plaintiff's application needed "evidence of scholarship and research that is not evidenced

presently."  (Exh. H).  Like Dean Petty, Provost Reuben-Cooke found that plaintiff's application

was deficient in the area of scholarship because plaintiff lacked writings or research that

analyzed issues in journalism.  (Exh. B, Reuben-Cooke Depo. 54 ln. 3-20, 105 ln.7 – 107 ln.16).

Plaintiff then filed a written appeal with the President of the University, Dr. William

Pollard.  Following a meeting with plaintiff, President Pollard decided not to promote him.

President Pollard agreed with Provost Reuben-Cooke's determination that plaintiff lacked

sufficient evidence of scholarship and research.  (Exh. I, Pollard Depo. 77-79).  Like Dean Petty

and Provost Reuben-Cooke before him, Dr. Pollard found plaintiff's application lacking proof of

scholarly works that have "undergone the scrutiny of peers in one's profession."  (Exh. I, Pollard

Depo. 57).  In regard to scholarship, President Pollard stressed the difference between a

professional journal article and a newspaper article.  (Exh. I, Pollard Depo. 57-59).  Giving

strong consideration to the determinations of the Dean and Provost, President Pollard saw no

basis to overturn their recommendations and promote the plaintiff.  (Exh. I, Pollard Depo. 64).

Meanwhile, three other applicants -- Shiela Harmon Martin, Nelda Ormond, and Abiose Adebayo – were promoted to the rank of Full Professor in this promotional cycle.  (Compl. ¶ 22). Professor Harmon-Martin taught political science.  In terms of scholarship, she earned a Ph.D. in 1996.  (Exh. E, Petty Depo. 133).  She published a research note ("Black Women in Politics") in a book in her field.  (Exh. E, Petty Depo. 136).  She also did several research projects and written studies at the Center for Applied Research and Urban Policy.  (Exh. E, Petty Depo. 136-38, 140-42).  As further evidence of her scholarship, Dr. Harmon-Martin attended annual conferences of the American Political Science Association, where she presented papers; the National Conference of Black Political Scientists, in which she was an Executive Council Member; and the Association for the Study of African-American Life and History, serving as a Chair and panel organizer.  (Exh. E, Petty Depo. 134-36).  In addition, she served on the Dissertation Committee for Howard University's political science doctorate program.  (Exh. E, Petty Depo. 138).  Dean Petty strongly recommended Dr. Harmon-Martin for promotion, and the Provost Reuben-Cooke concurred with the Dean's recommendation.  (Exh. G; Compl. ¶ 22).

Another applicant promoted, Nelda Ormond, taught vocal performance.  She had applied for promotion to Full Professor in September 2000, two years before the plaintiff applied.  (Exh. E, Petty Depo. 76).  Acting Dean Bertha Minus recommended her for promotion, (Exh. J), but Acting Provost Petty (who would soon return to her Dean position) held up the application because there was no funding for promotions at the time.  (Exh. E, Petty Depo. 75-76).  As a result, Professor Ormond's application was later integrated back into the 2002 group of promotion applicants at the college level.  (Exh. E, Petty Depo. 76-77).  Evaluating Professor Ormond's application as part of that group, Dean Petty recommended her for promotion.  In terms of scholarship, Professor Ormond recently entered a doctoral program and completed some

coursework.  (Exh. E, Petty Depo. 151 ln.12 – 152 ln.12).  Critics had recognized the

professional quality of her performances in several Washington Post reviews.  (Exh. E, Petty

Depo. 147 ln.19 – 148 ln.16; Exh. B, Reuben-Cooke Depo. 63 ln.11 -64 ln.11, 71 ln.8-16).

Professor Ormond had private studies with many vocal, opera and drama coaches.  (Exh. E, Petty

Depo. 146 ln.10 – 147 ln.2).  She also participated in full-time opera study programs as well as

national and international professional conferences.  (Exh. E, Petty Depo. 145 ln.6 – 146 ln.6).

In terms of additional scholarship, she had an unpublished paper, "The relationship between

Afro-American Music and European Culture," and completed a research project on Pan-African-

American Composers.  (Exh. E, Petty Depo. 147 ln.3-10).  She also revised the music

curriculum, including a unit on the Physical Aspects of Singing and the Psychological Aspects of

Singing.  (Exh. E, Petty Depo. 147 ln.12-18, 149 ln.7-12).  Provost Reuben-Cooke concurred

with Dean Petty's recommendation to promote Professor Ormond.  (Compl. ¶ 22).

    Abiose Adebayo, who was also promoted to Full Professor, taught aerospace engineering

in the School of Engineering and Applied Sciences.  The Dean of the School of Engineering, Dr.

Ben Latigo, recommended Professor Adebayo for promotion.  (Exh. K).  In terms of his

scholarship, Dr. Adebayo had a Ph.D. from the Massachusetts Institute of Technology.  (Exh. L).

He had several unpublished manuscripts or works in progress, which in the determination of the

Dean constituted original research of high quality.  (Exh. B, Reuben-Cooke Depo. 75-76).  In

reviewing the materials, Provost Reuben-Cooke was able to determine that Dr. Adebayo's papers

represented scholarship, in that he identified an issue in his discipline, developed a thesis,

conducted research, and carried it through to a finished product.  (Exh. B, Reuben-Cooke Depo.

76-78).  Dr. Adebayo's application also demonstrated his work as a research fellow, his

participation in several NASA workshops, and his many reports involving grant applications and grant activity.  (Exh. B, Reuben-Cooke Depo. 78).

Plaintiff never heard any of the individuals involved in his promotional decision – including Dean Petty, Provost Reuben-Cooke or President Pollard – make any discriminatory or derogatory comments based on his Asian-Indian origin.  (Exh. A, Elam Depo. 332-34).  Plaintiff similarly heard no discriminatory or derogatory remarks from these individuals regarding his age.  (Id.)  Moreover, Dean Petty and the other decision-makers did not know the ages of the applicants.  (Exh. E, Petty Depo. 86).

      B.        <u>Plaintiff's hostile work environment allegations</u>.

Plaintiff's complaint makes a number of allegations of hostile work environment, as follows: that from 1994 until recently he was not given a key to the Departmental office; that the journalism lab has been moved several times since 1989; that his current office, which he has had since 1998, is small and irregularly shaped; that in 1997 former Dean Beverly Anderson asked him to change a student's grade from an "F" to a "C"; that Beverly Anderson, when later Provost in 1999, suggested that he change the name of one of his programs from the Living Legend Award to the Literacy Through Journalism Award; and that Beverly Anderson, in the same conversation, called him a maverick with a hidden agenda who was misleading his students.  In none of these contexts or at any other time, though, did plaintiff ever hear any discriminatory or derogatory comments by anyone based on his national origin or age.  (Exh. A, Elam Depo. 342, 345-46).

Plaintiff first requested the key to the Departmental office from Yvonne Carter, when she became the Department Chair in 1994.  (Exh. A, Elam Depo. 187-88).  Plaintiff wanted the key

so he could access the Departmental office outside of normal business hours without relying upon building security to let him in. (Exh. A, Elam Depo. 193 1n.5-21). Since plaintiff was known for allowing students full use of his own office, though, Professor Carter was apparently concerned that plaintiff might share the key with his students, which would allow them access to the student records contained in the Departmental office. (Exh. A, Elam Depo. 343 ln.1 – 344 ln.10, 186). After Professor Belanger became Department Chair in 2004, though, he provided plaintiff the key. (Exh. A, Elam Depo. 186). Although plaintiff has the key, many other Department faculty members do not have a key, to plaintiff's knowledge. (Exh. A, Elam Depo. 194 ln.17 – 201 ln.16).

The journalism lab has moved several times since 1989 – sometimes with plaintiff's approval and sometimes with his disapproval. When the journalism program relocated to the Van Ness campus in 1989, the journalism lab moved to a good location but a small space. (Exh. A, Elam Depo. 81-82). At Professor Elam's request, the journalism lab space was expanded in 1992. (Exh. A, Elam Depo. 83-84). In 1995, the physics department lost its downtown location and had to move into the journalism lab space to maintain a major grant program. (Exh. E, Petty Depo. 105-06). The journalism lab relocated to another "fairly good space." (Exh. A, Elam Depo. 85-86). Then in 1998, the Architecture Program lost its space at the Carnegie Library and had to move into the journalism lab space to maintain its accreditation. (Exh. E, Petty Depo. 106). Although the journalism lab initially relocated to a small space, the journalism lab moved in 2000 to "a nice open space." (Exh. A, Elam Depo. 91-92). In 2004, based on an internal review and consultant recommendation, the journalism lab then moved into a smaller space next to the graphics lab to take advantage of the technologies integrating the two fields. (Exh. E,

Petty Depo. 106-08; Exh. A, Elam Depo. 102 ln. 8-21).  At the end of 2006, the journalism lab

expanded into an "ample" space with upgraded equipment.  (Exh. A, Elam Depo. 79-81).

Moreover, university space is very limited.  From 1994 to 2000, in particular, the

university lost thousands of square feet of building space as certain buildings were closed, and

departments had to be relocated onto the Van Ness campus.  (Exh. M, Anderson Depo. 14 ln.10-

15, 51-54).  The entire university was affected, and many university labs had to be scaled down

in size or eliminated altogether.  (Exh. M, Anderson Depo. 51-52).  During this period also, the

university budget was repeatedly cut, and the university was operating essentially "in crisis."

(Exh. M, Anderson Depo. 53-54).  As a result, even now, the university "is always short of

space, [and] there is never enough of it."  (Exh. E, Petty Depo. 22 ln.5-10).   Plaintiff's allegation

that he has had a small, irregularly shaped office since 1998 is thus simply another reflection of

the limited building space available throughout the university campus.

Regarding the grade change allegation, a female student made a complaint against

plaintiff for giving her a failing grade in the journalism course that produces the student

newspaper.  Plaintiff gave her an "F" in 1997 for resigning the editorship position of the student

newspaper, (Exh. A, Elam Depo. 107-08), but the student claimed that plaintiff unfairly singled

her out from the other students.  (Exh. A, Elam Depo. 115 ln.16 – 116 ln.5).  Beverly Anderson,

who was the Dean of the College of Arts and Sciences at the time, met with plaintiff and

allegedly asked him to reconsider the failing grade.  (Exh. A, Elam Depo. 109-10).  Plaintiff

agreed to "think about it," and met with the Department Chair and the student.  (Exh. A, Elam

Depo. 111).  Plaintiff suggested that the student write an apology letter to the entire class.  (Exh.

A, Elam Depo. 111-12).  After the student wrote the letter and the entire class accepted the

apology, plaintiff changed her grade from an "F" to a "C."  (Exh. A, Elam Depo. 112).  Plaintiff,

though, is still "haunted" by the fact he changed the student's grade and was so upset at Dean Anderson for asking that he reconsider the grade that he "wanted to slap her" but "controlled myself." (Exh. A, Elam Depo. 112-14).

Plaintiff's displeasure at Beverly Anderson continued. In April 1999, plaintiff created a university-sponsored "Literacy Through Journalism" project and to kick-off the project designed a Living Legend Award program. (Exh. A, Elam Depo. 131-33). Beverly Anderson, who had become the Provost and Vice President for Academic Affairs, asked plaintiff about the authorization for the Living Legend Award program. (Exh. A, Elam Depo. 135). Plaintiff responded that the award had been given several years ago, (Exh. A, Elam Depo. 135-36, 146 ln. 4-7), but Provost Anderson stated that she had no records of university approval for such an award program. (Exh. A, Elam Depo. 136). Provost Anderson reminded plaintiff that any university program required her approval as Provost as well as approval by the University Senate and, ultimately, the Board of Trustees. (Exh. A, Elam Depo. 136; Exh. M, Anderson Depo. 38 ln.19 – 39 ln.17, 42 ln.9 – 44 ln.16). Plaintiff considered it sufficient that he invite these university officials to the program, and then "if they want to stop it . . . that is the time they have to stop it." (Exh. A, Elam Depo. 143). To avoid the problem of authorization, Provost Anderson suggested that the name of the award be changed to the Literacy Through Journalism Award, but plaintiff refused. (Exh. A, Elam Depo. 140 ln.16 – 141 ln.3). Plaintiff claims that during this meeting, Provost Anderson called him a maverick professor with a hidden agenda who was misleading his students. Plaintiff told Provost Anderson, "if you want to cancel [the award program], you cancel it," and he walked out. (Exh. A, Elam Depo. 139). The Living Legend Award program was not canceled, and plaintiff held the award program as scheduled. (Exh. A, Elam Depo. 139-40).

Plaintiff's complaint also raised some additional allegations, which he appears to have now abandoned. Although plaintiff claimed that he had been "forced out" as faculty editor of the student newspaper, (Compl. ¶ 25), plaintiff acknowledges that in January 1999 he asked the Department Chair to remove him as faculty editor and name Professor Vassell as his replacement. (Exh. A, Elam Depo. 163-65). While his complaint also alleged that since leaving the faculty editor position he has been "forced" to teach four courses each semester, (Compl. ¶ 26), plaintiff admitted in his deposition that he has not taught four courses each semester. (Exh. A, Elam Depo. 220 ln.4-18). The complaint also claimed that he was excluded from the budgeting process, (Compl. ¶ 31), but plaintiff acknowledged that the Department Chairs did ask him to list supplies and other needs for the journalism program. (Exh. A, Elam Depo. 210-15). Moreover, the university recently upgraded the journalism lab by purchasing new computers, phones, and a fax machine and widescreen television. (Exh. A, Elam Depo. 80-81).

## III.    ARGUMENT

Summary judgment should be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A moving party is 'entitled to judgment as a matter of law' against 'a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Waterhouse v. District of Columbia, 298 F.3d 989, 992 (D.C. Cir. 2002), quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[C]onclusory allegations by the nonmoving party are insufficient to establish a genuine issue of material fact or to defeat the entry of summary judgment." Hollins v. Fannie Mae, 760 A.2d

563, 570 (D.C. 2000).  Applying this standard, this Court should grant the defendant Board of

Trustees summary judgment for the reasons explained below.


      A.     <u>Plaintiff Cannot Establish a Prima Facie Case That He Was Denied Promotion Because of His Race, Color or National Origin</u>.


     Plaintiff cannot establish even a prima facie case of discriminatory non-promotion.

Under the familiar <u>McDonnell</u> <u>Douglas</u> framework for evaluating claims of employment

discrimination, "the plaintiff must [first] establish a prima facie case of discrimination." <u>Reeves</u>

<u>v. Sanderson Plumbing Prods.</u>, 530 U.S. 133, 142 (2000), citing <u>St. Mary's Honor Ctr. v. Hicks</u>,

509 U.S. 502, 506 (1993).  If the plaintiff makes a prima facie case, then the defendant has the

burden of producing evidence of a legitimate, non-discriminatory reason for the adverse

employment action.  <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

Once the defendant satisfies this burden, the plaintiff then has the opportunity to demonstrate

that the employer's proffered reason is merely pretext for unlawful discrimination.  <u>Id.</u>[2]

     To state a prima facie claim of discrimination, a plaintiff must establish that: "(1) [he] is a

member of a protected class; (2) [he] suffered an adverse employment action; and (3) the

unfavorable action gives rise to an inference of discrimination."  <u>Stella v. Mineta</u>, 284 F.3d 135,

145 (D.C. Cir. 2002), quoting <u>Brown v. Brody</u>, 199 F.3d 446, 452 (D.C. Cir. 1999).  Where the

alleged adverse action is a non-promotion, plaintiff must show as part of his prima facie case that

"he applied for and was qualified for an available position."  <u>Lanthram v. Snow</u>, 336 F.3d 1085,

---

[2] The <u>McDonnell</u> <u>Douglas</u> burden shifting analysis applies to equal protection claims under 42
U.S.C. § 1983.  <u>Randle v. City of Aurora</u>, 69 F.3d 441, 450 (10th Cir. 1995).  The same analysis
also applies to claims under the D.C. Human Rights Act.  <u>Blackman v. Visiting Nurses Assoc.</u>,
694 A.2d 865, 868-69 & n.3 (D.C. 1997).

1088 (D.C. Cir. 2003). Here, plaintiff cannot meet his prima facie case because he can neither show that he was qualified for the promotion nor establish an inference of discrimination.

As further explained in the following section (see infra at 19-20), plaintiff was not qualified for promotion because he lacked the necessary scholarship. First, plaintiff did not show he kept current with changes in the journalism field, especially with the new developments in technology and the growing importance of ethical issues. (Exh. G; Exh. E, Petty Depo. 86 ln.19 – 87 ln.12). Plaintiff's failure to revise the journalism curriculum – by adding, for example, proposed courses on ethics in journalism or computer-assisted reporting – also demonstrated his lack of currency. (Exh. E, Petty Depo. 87-89). Second, plaintiff had not submitted evidence of peer-reviewed research or writing or of writing awards or critical acclaim by other professional writers or organizations in his field. (Exh. G; Petty Depo. 120 ln.3 – 121 ln.13). Although plaintiff had written newspaper articles, plaintiff's application lacked any scholarly writings about the field of journalism or formal research related to his discipline. (Exh. A, Elam Depo. 286-87; Exh. E, Petty Depo. 169-70). For these reasons, plaintiff cannot show that he was qualified for promotion, and thus he cannot prove his prima facie case.

Plaintiff's prima facie case also fails because he cannot raise an inference of discrimination based on his Asian-Indian origin.[3] To raise such an inference, plaintiff would have to prove disparate treatment, which is "the very essence" of an employment discrimination claim. Neuren v. Adduci, 43 F.3d 1507, 1514 (D.C. Cir. 1995). To show disparate treatment, "[i]t is plaintiff's task to demonstrate that similarly situated employees were not treated equally." Burdine, 450 U.S. at 258. To satisfy this burden, the plaintiff must show that "all of the relevant

---

[3] Plaintiff does not specify his "race, color and/or national origin" beyond reference to his Asian-Indian origin. Thus, at least for the sake of convenience, defendant will use the term national origin to refer broadly to the category of race, color or national origin.

aspects of [his] employment situation were <u>nearly identical</u>" to those of the other employees to whom he compares himself.  <u>Barbour v. Browner</u>, 181 F.3d 1342, 1345 (D.C. Cir. 1999), quoting <u>Mungin v. Katten Munchin & Zavis</u>, 116 F.3d 1549, 1554 (D.C. Cir. 1997) (emphasis added).  In this case, plaintiff presumably would attempt to show that the three applicants promoted to Full Professor – all African-American – were similarly situated to him.

Based on even a cursory examination, though, the three applicants promoted to Full Professor were not similarly situated to the plaintiff.  The three promoted are in quite different disciplines – Dr. Harmon-Martin teaches political science, Professor Ormond teaches vocal performance, and Dr. Adebayo teaches aerospace engineering.   Each of these professional fields is, of course, unrelated to the field of journalism.  The meaning of scholarship also differs across the disciplines.  (Exh. E, Petty Depo. 116-19).  In the case of a music professor like Professor Ormond, scholarship would more involve creative works and performances rather than formal written publication.   (Exh. E, Petty Depo. 116-17; Exh. B, Reuben-Cooke Depo. 62 ln.5 – 63 ln.10, 65 ln. 4-13, 72 ln.11 – 73 ln.9).  Thus, even though both plaintiff and Professor Ormond had never published a scholarly work, they are not similarly situated because of the difference in their disciplines.  In <u>Dasgupta v. University of Wisconsin Bd. of Regents</u>, 121 F.3d 1138, 1141 (7th Cir. 1997), for example, the Court held that plaintiff, a psychology professor, could not allege discriminatory non-promotion by comparing himself to a theater professor who had been promoted, even though both of them had not published an article in a professional journal.  The Court declared that plaintiff "might as well complain about the promotion of the basketball coach for having a winning season, though the coach had never written a scholarly article."  <u>Id.</u>

Many other relevant differences existed between plaintiff and the three applicants who were promoted to Full Professor.  Dr. Harmon-Martin and Dr. Adebayo both had doctorates in

their fields, and Nelda Ormond was in a Ph.D. program.  (Exh. E, Petty Depo. 133, 151 ln.12 –

152 ln.12; Exh. L).  Professor Ormond's application had been pending two years longer than

plaintiff's application because of funding constraints, (Exh. E, Petty Depo. 75-76), and Acting

Bertha Minus, not Dean Petty, had originally recommended Professor Ormond for promotion.

(Exh. J).  Professor Ormond received favorable critical reviews of her performances, while

plaintiff's newspaper articles had not received such critical acclaim.  (Exh. E, Petty Depo. 147

ln.19 – 148 ln.16; Exh. B, Reuben-Cooke Depo. 63 ln.11 – 64 ln.11, 71 ln.8-16).  Professor

Ormond also upgraded the music curriculum, while plaintiff had not done so for the journalism

curriculum despite the changes in his field.  (Exh. E, Petty Depo. 147 ln.12-18, 149 ln.7-12).  Dr.

Adebayo taught in a different school – the School of Engineering rather than the College of Arts

and Sciences – and thus his own Dean, not Dean Petty, recommended his promotion.  (Exh. K).

Unlike plaintiff, Dr. Adebayo had also presented evidence of formal research in his field,

through various scientific papers and grant activities.  (Exh. B, Reuben-Cooke Depo. 75-78).

Because plaintiff was not qualified for the promotion and cannot identify a similarly-

situated professor whose promotion application was "nearly identical" to his own in all relevant

aspects, plaintiff cannot prove a prima facie case of discrimination.


B.    Plaintiff Cannot Establish a Prima Facie Case That He Was Denied Promotion
      Because of His Age.

Plaintiff also cannot make out a prima facie case of age discrimination.  The D.C. Human

Rights Act prohibits discrimination on the basis of age, defining age as "18 years of age or

older."  D.C. Code § 2-1401.02, § 2-1402.11 (2001).[4]  Plaintiff's prima facie case of age

discrimination fails for the same two reasons as his prima facie case of national origin

discrimination:  (1) plaintiff was not qualified for the position, and (2) there was no disparate

treatment of similarly-situated professors.  There is also a third reason precluding a prima facie

case of age discrimination – plaintiff cannot show that the promotional decision-makers even

knew the ages of the applicants.  Dean Petty, for example, testified that she "supposed" Dr.

Harmon-Martin "is 50 something" but "I don't know what," and that she did not know the age of

plaintiff or Professor Ormond.  (Exh. E, Petty Depo. 86).  Because the promotional decision-

makers did not know the applicants' ages, they could not have discriminated on that basis.  For

this additional reason, plaintiff has no prima facie case of age discrimination.


       C.    <u>Plaintiff Cannot Rebut Defendant's Legitimate, Non-Discriminatory Reasons for His Non-Promotion</u>.

Even assuming <u>arguendo</u> that plaintiff has raised a prima facie case of discrimination,

plaintiff cannot rebut defendant's legitimate reasons for his non-promotion.  To meet his ultimate

burden of proving discrimination, the plaintiff may attempt to show that the employer's proffered

reason is pretextual and not the "true reason" for the employment decision.  <u>Burdine</u>, 450 U.S. at

256.  To do so, a plaintiff must show "that the employer's proffered explanation is unworthy of

credence."  <u>Waterhouse v. District of Columbia</u>, 298 F.3d 989, 993 (D.C. Cir. 2002), quoting

<u>Reeves</u>, 530 U.S. at 143.  Because plaintiff in this case cannot show that the defendant's

---

[4] Although plaintiff alleges age discrimination is a violation of constitutional equal protection principles, "age is not a suspect classification under the Equal Protection Clause." <u>Kimel v. Florida Bd. of Regents</u>, 528 U.S. 62, 83 (2000).

legitimate reasons for its decision are "unworthy of credence," plaintiff cannot meet his ultimate burden of proving discrimination based on his age or Asian-Indian origin.

Defendant did not promote plaintiff because of two fundamental failings related to scholarship. First, plaintiff's application did not show sufficient evidence that he had maintained currency in his field. (Exh. G). There had been significant changes in the journalism field including new developments in technology and the increasing importance of legal and ethical issues. (Exh. G; Exh. E, Petty Depo. 86 ln.19 – 87 ln.12). As the journalism program coordinator, plaintiff was responsible for upgrading the journalism curriculum to keep abreast of these changes. (Exh. A, Elam Depo. 41; Exh. E, Petty Depo. 87-89). Around 2000, plaintiff recognized the need to upgrade the journalism curriculum and proposed several new courses – including ethics of journalism and computer-assisted reporting. (Exh. A, Elam Depo. 221-22, 245-46, 264; Exh. A2). Despite the need to upgrade the journalism curriculum, however, plaintiff never submitted a syllabus for any proposed new course to the Curriculum Committee so that the course could be approved. (Exh. A, Elam Depo. 239-41, 267; Exh. A7). As a result, none of these courses was ever added to the regular journalism curriculum. (Exh. A, Elam Depo. 226 ln.15-19).

Second, plaintiff's application lacked evidence of scholarly writing or research. Although plaintiff has written many newspaper articles as a paid journalist, plaintiff's application notably lacked any writings about issues in the field of journalism. (Exh. A, Elam Depo. 286-87; Exh. B, Reuben-Cooke Depo. 54 ln.3-20, 105 ln.7 – 107 ln.16; Exh. G). He had no scholarly works or publications in a professional journal. (Id.) Plaintiff also presented no evidence of formal research in his discipline. (Exh. E, Petty Depo. 169-70). Even considering his newspaper articles, plaintiff's application did not show that he had received any awards or critical acclaim

for these articles from professional writers or organizations in his field.  (Exh. G; Exh. E, Petty Depo. 120-21).

Defendant properly exercised its academic judgment in deciding against plaintiff's promotion.  "The court must respect the employer's unfettered discretion to choose among qualified candidates."  Fischbach v. District of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996).  Even if a court suspects that an employer's selection was unwise, "it may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'"  Id., quoting Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir. 1982).  "Consistent with the courts' reluctance to become involved in micro-management of everyday employment decisions, the question before the court is limited to whether [plaintiff] produced sufficient evidence of . . . discrimination, not whether he was treated fairly . . . ."  Waterhouse, 298 F.3d at 995, quoting Forman v. Small, 271 F.3d 285, 291 (D.C. Cir. 2001).  Thus, to rebut an employer's explanation, "it is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible."  Fischbach, 86 F.3d at 1183, quoting Pignato v. American Trans Air, Inc., 14 F.3d 342, 349 (7th Cir. 1994).

Courts have been especially reluctant to second-guess academic decisions regarding promotion of university professors.  "We are mindful of the singular nature of academic decision-making, and we lack the expertise to evaluate tenure decisions or to pass on the merits of a candidate's scholarship."  Okruhlik v. University of Arkansas, 395 F.3d 872, 879 (8th Cir. 2005).  "The Supreme Court has made it clear that 'when judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment.'"  Id., quoting Regents of Univ. of Michigan v. Ewing, 474 U.S. 214, 225 (1985).  Cases in this jurisdiction have also reiterated that in the university context, "concepts of

academic freedom and academic judgment are so important that courts generally give deference to the discretion exercised by university officials." Allworth v. Howard Univ., 890 A.2d 194, 202 (D.C. 2006). "[C]ourts should not invade, and only rarely assume academic oversight, except with the greatest caution and restraint, in such sensitive areas as faculty appointment, promotion, and tenure, especially in institutions of higher learning." Brown v. George Washington Univ., 802 A.2d 382, 385 (D.C. 2002). Accordingly, this Court should not second-guess the university's decision to deny plaintiff's application for promotion.

Plaintiff also cannot rebut the legitimacy of defendant's reasons by offering his own personal assessment of his qualifications. Even if, for example, plaintiff makes a plausible argument that his newspaper articles are equivalent to scholarly works for purposes of evaluating his scholarship, this fails to show pretext or that defendant could not have legitimately believed in the soundness of its rationale. "It is the perception of the decision-maker which is relevant," not the plaintiff's own subjective evaluation of his qualifications. Waterhouse v. District of Columbia, 124 F. Supp. 2d 1, 7-8 (D.D.C. 2000); accord Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 41 (1st Cir. 2001) ("In assessing pretext, our focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible." (internal quotes omitted)). Given the weaknesses in plaintiff's application with regard to scholarship as identified by the Dean, Provost and President, the fact that plaintiff might assess his qualifications differently than these decision-makers did is simply irrelevant.

In addition to failing to rebut defendant's reasons for its decision, plaintiff offers no further evidence that could meet his ultimate burden of proving discrimination. Waterhouse, 298 F.3d at 992-93. Plaintiff, for example, offers no evidence such as discriminatory statements that would support his burden. Id. Plaintiff acknowledges that he never heard at any time any

inappropriate comments based on his national origin or age from anyone involved in his promotional decision.  (Exh. A, Elam Depo. 332-34).

Under all these circumstances, no reasonable jury could find that the decision not to promote plaintiff was based on unlawful discrimination.

D.    The Statute of Limitations Bars Plaintiff's Hostile Work Environment Claim.

Plaintiff's hostile work environment claim falls outside the statute of limitations.  The statute of limitations for D.C. Human Rights Act claims is one year, D.C. Code § 2-1403.16, while a claim under 42 U.S.C. § 1983 has a three-year statute of limitations.  D.C. Code § 12-301 (8); Carney v. American Univ., 151 F.3d 1090, 1096 (D.C. Cir. 1998).  The period within the three-year limitations period would extend from May 2002 until May 2005, when plaintiff filed his complaint.  Although plaintiff allegedly suffered a hostile work environment "throughout his employment," (Compl. ¶ 24), his specific hostile work environment allegations effectively concluded in 1999.  Any hostile work environment that might be claimed thereafter merely constitutes lingering effects of alleged harassing acts occurring in or before 1999.  Alternatively, any alleged harassment occurring after 1999 is not part of the same hostile work environment claim as the alleged harassment that occurred previously.

The alleged acts giving rise to plaintiff's hostile work environment only occurred up through and including 1999.  Again, in particular, plaintiff alleges that from 1994 until recently, he was not given a key to the Departmental office; that the journalism lab has been moved several times since 1989; that his current office, which he has had since 1998, is small and irregularly shaped; that in 1997 former Dean Beverly Anderson asked him to change a student's grade; and that Beverly Anderson, when later Provost in 1999, suggested that he change the

name of one of his programs from the Living Legend Award to the Literacy Through Journalism Award.  Any alleged harassment occurring after 1999 is thus merely the lingering effect of a discrete act that occurred before.  For example, although plaintiff did not receive the Departmental office key until after 2004, his first request for the key had been denied in 1994. (Exh. A, Elam Depo. 187-88).  Likewise, although plaintiff is unhappy with his current office, he had been moved to that office back in 1998.  (Exh. A, Elam Depo. 201-02).  See Shea v. Rice, 409 F.3d 448, (D.C. Cir. 2005) (noting that a plaintiff cannot "breathe new life into discriminatory acts that occurred outside the limitations period . . .  by relying on their lingering effects in the present"), citing Elmenayer v. ABF Freight System, Inc., 318 F.3d 130 (4th Cir. 2003) (holding that employer's rejection of a requested religious accommodation is "a completed action when taken" even though "the effect of the rejection continues to be felt by the employee").

Alternatively, even if plaintiff can prove a harassing act that truly arose within the limitations period, that alleged harassing act would not be part of the same hostile work environment claim.  In National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 122 (2002), the Supreme Court considered whether an EEO charge alleging a hostile work environment had been timely filed, where some events giving rise to the claim fell outside the filing period.  The Court held that a "charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."  Id. at 122.  The Supreme Court clarified, however, that its holding did not preclude the application of "equitable doctrines that may toll or limit the time period."  Id.  Moreover, as the Court noted, the acts constituting the hostile work environment claim must be part of the "same unlawful employment practice" in order to take

advantage of the Court's holding.  The Court thus cautioned, "if an act [within the limitations period] had no relation to the acts [outside the limitations period], or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts" that fall outside the limitations period.  Id. at 118.

In this case, assuming any alleged harassment occurred within the limitations period, it would not be part of the same employment practice as the conduct occurring outside the period.  The alleged harassment that occurred outside the limitations period would be a separate and distinct employment practice.  This earlier period of harassment has no relation to any alleged acts occurring subsequently.  At least three years separate this earlier period of alleged harassment, culminating in 1999, from any alleged harassment falling within the limitations period, which begins at the earliest in May 2002.   In addition to this temporal discontinuity, the alleged source of the earlier period of alleged harassment is different from any subsequent period.  Plaintiff directs his ire and blame for the earlier period of harassment against Beverly Anderson, who served as Dean from 1994 to 1997 and Provost from 1997 to 2000.  (Exh. M, Anderson Depo. 14).  It was Beverly Anderson who plaintiff contends took the lead in moving the journalism lab in 1998, (Exh. A, Elam Depo. 87); and of course it was Beverly Anderson whom plaintiff accuses of "forcing" him in 1997 to change a student's grade and asking him in 1999 to change the name of his awards program.  The departure of Provost Anderson from the university in early 2000 marks the end of this period of alleged harassment.  Because this period of alleged harassment is both temporally and casually distinct from any subsequent conduct within the limitations period, it is a separate employment practice that is not part of any hostile work environment claim that falls within the statute of limitations period.

The statute of limitations therefore bars plaintiff's hostile work environment claim, in whole or otherwise in part.

      E.      <u>Plaintiff's Evidence Is Insufficient to Show That He Suffered a Hostile Work Environment</u>.

Plaintiff's hostile work environment claim fails because the alleged harassment was not based on his Asian Indian origin or age and because it was not severe and pervasive. Anti-discrimination law[5] "does not prohibit all forms of workplace harassment," only harassment motivated by an impermissible criterion, such as national origin. <u>Stewart v. Evans</u>, 275 F.3d 1126, 1133 (D.C. Cir. 2002). Moreover, "not all abusive behavior, even when it is motivated by discriminatory animus, is actionable." <u>Barbour v. Browner</u>, 181 F.3d 1342, 1347-48 (D.C. Cir. 1999). Anti-discrimination law "is not a 'general civility code for the American workplace,' nor does it serve as a remedy for all instances of verbal or physical harassment." <u>Stewart</u>, 375 F.3d at 133 (citation omitted), quoting <u>Oncale v. Sundowner Offshore Serv., Inc.</u>, 523 U.S. 75, 80 (1998). "Rather a workplace environment becomes hostile for the purposes of [anti-discrimination law] only when offensive conduct 'permeates [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" <u>Barbour</u>, 181 F.3d at 1347-48, quoting <u>Oncale</u>, 523 U.S. at 78.

With regard to his present claim of hostile work environment, plaintiff first cannot prove that the allegedly harassing conduct was motivated by discriminatory animus. Plaintiff simply

---

[5] Defendant assumes <u>arguendo</u> that the analysis of a hostile work environment claim is the same whether the claim is brought under Title VII or constitutional equal protection principles. Likewise, a hostile work environment claim under the D.C. Human Rights Act follows the same analysis used under Title VII. <u>Lively v. Flexible Packaging Assoc.</u>, 830 A.2d 874, 889 (D.C. 2003).

has no evidence that his Asian Indian origin or age played any role in the alleged incidents.  At no time did plaintiff ever hear any discriminatory or derogatory comments by anyone based on his national origin or age.  (Exh. A, Elam Depo. 342, 345-46).  Moreover, there are legitimate explanations for the conduct that plaintiff deems hostile.  The relocations of the journalism lab and the size of plaintiff's office were based on space constraints throughout the university, especially at certain times when university buildings closed and departments had be moved onto the Van Ness campus.  (Exh. E, Petty Depo. 105-06; Exh. M, Anderson Depo. 51-54).  Moreover, the journalism lab was often moved with plaintiff's approval.  (Exh. A, Elam Depo. 79-81, 83-86, 91-92).  With regard to the Departmental office key that plaintiff recently received, many other professors still do not have the key, (Exh. A, Elam Depo. 194 ln.17 – 201 ln.16), the Departmental office can always be accessed by faculty without a key, (Exh. A, Elam Depo. 193 ln.5-21), and the previous Department Chair had some concern that plaintiff might share the key with his students.  (Exh. A, Elam Depo. 343 ln.1 – 344 ln.10).  The plaintiff changed the grade of a student himself, after she wrote a letter of apology as he suggested and after then-Dean Anderson merely asked him to reconsider the grade in light of the student's complaint of unfair treatment.  (Exh. A, Elam Depo. 107-116).  With regard to the Living Legend Award program, then-Provost Anderson informed plaintiff that she had no record of university approval of the program, and simply requested (without success) that plaintiff change the name of the award program to resolve the issue.  (Exh. A, Elam Depo. 136, 140 ln.16 – 141 ln.3).

        In addition to lack of discriminatory animus, plaintiff's hostile work environment claim also fails for lack of "severe and pervasive" conduct.  "In determining whether harassment rises to this level, courts should consider the frequency of the harassing conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an

employee's work performance." Stewart, 275 F.3d at 1133-34, citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-23 (1993). "Except in extreme circumstances, courts have refused to hold that one incident is so severe [as] to constitute a hostile work environment." Id. at 1134. "Even a few isolated incidents of offensive conduct do not amount to actionable harassment." Id., citing Hopkins v. Baltimore Gas & Electric Co., 77 F.3d 745, 753 (4th Cir. 1996) (holding that harassment was not sufficiently pervasive to establish liability where the alleged incidents were spread over a seven-year period), and Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995) (holding that nine incidents spread over seven months were not sufficiently severe or pervasive to constitute sexual harassment).

Plaintiff does not allege harassing conduct that was severe and pervasive. In terms of its frequency, plaintiff alleges only several isolated incidents that occurred irregularly over the course of a decade or more. As the Court stated in Hopkins, the fact that the alleged harassment conduct "occurred intermittently over a seven-year period, with gaps between incidents as great as a year . . . suggests the absence of a condition sufficiently pervasive" to establish liability. 77 F.3d at 753. The particular incidents plaintiff alleges were also not severe. The alleged harassment was never physically threatening or humiliating. Plaintiff's complaints about the size of his office and his previous lack of a departmental office key are relatively minor matters. His personal dislike of Beverly Anderson's inquiries about a failing grade he gave a student and his authorization for a particular awards program are typical of the tensions that arise in any employer-employee relationship. Even assuming that Provost Anderson called plaintiff a maverick and accused him of misleading his students, plaintiff merely complains of "ordinary tribulations of the workplace." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). The Supreme Court has "made it clear that conduct must be extreme" to constitute a change in the

27

terms or conditions of employment.  Id.  As a result, plaintiff cannot show severe and pervasive

conduct sufficient to establish a hostile work environment claim.

Without proof of severe and pervasive conduct and with only conclusory allegations of a

discriminatory motive, plaintiff's hostile work environment claim cannot survive summary

judgment.

IV.    CONCLUSION

For the foregoing reasons, defendant Board of Trustees of the University of the District

of Columbia respectfully requests that this Court enter summary judgment in defendant's favor

on all claims in this matter.

> Respectfully submitted,
>
> LINDA SINGER
> Acting Attorney General for the District of Columbia
>
> GEORGE C. VALENTINE
> Deputy Attorney General, Civil Litigation Division
>
>
> /s/ Phillip A. Lattimore, III /s/
> PHILLIP A. LATTIMORE, III [422968]
> Chief, General Litigation Section III
>
>
> /s/ Carl J. Schifferle /s/
> CARL J. SCHIFFERLE [463491]
> Assistant Attorney General
> Suite 600S
> 441 Fourth Street, N.W.
> Washington, D.C. 20001
> (202) 724-6624
> (202) 727-3625 (fax)
> Email:  carl.schifferle@dc.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOSEPH V. ELAM,                          )
                                         )
              Plaintiff,                 )
                                         )
       v.                                )  Civil Action No. 05-1557 (JBD)
                                         )
BOARD OF TRUSTEES OF THE                 )
UNIVERSITY OF THE DISTRICT OF            )
COLUMBIA,                                )
                                         )
              Defendant.                 )
_____)

DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO
GENUINE ISSUE

Introduction

1.    Plaintiff joined the University of the District of Columbia (UDC) as an Assistant

Professor of journalism in 1976.  (Compl. ¶ 9).

2.    The University promoted plaintiff to the rank of Associate Professor in 1982.

(Compl. ¶ 9).

3.    Plaintiff earned a Master's Degree in Journalism from Medill School of

Journalism at Northwestern University in 1967.  (Compl. ¶ 5).

4.    Plaintiff never entered in a Ph.D. program in journalism.  (Exh. A, Elam Depo.

29).

5.    Plaintiff has been the Journalism Program Coordinator at UDC since 1978.  (Exh.

A, Elam Depo. 40-41).

6.    At all relevant times, plaintiff has been the only permanent journalism faculty

member at UDC.  (Exh. A, Elam Depo. 42-44).

7.     The Journalism Program is within the Department of Mass Media, Visual and Performing Arts.  (Compl. ¶ 9).

8.     The Department of Mass Media, Visual and Performing Arts is within the College of Arts and Sciences at UDC.  (Compl. ¶ 9).

9.     The University of the District of Columbia has three schools, which are the College of Arts and Sciences, the School of Business and Public Administration, and the School of Engineering and Applied Sciences.  (Exh. B, Reuben-Cooke Depo. 19).

<u>Failure to Promote</u>

10.    Plaintiff applied for promotion from Associate to Full Professor in September 2002.  (Exh. C).

11.    The Department Chair, Yvonne Carter, strongly recommended the plaintiff's application for promotion.  (Compl. ¶ 18).

12.    The Department Evaluation and Promotion Committee ("Department Committee") reviewed plaintiff's application.  (Exh. D).

13.    The Department Committee consists of several faculty from within the Department.  (Exh. E, Petty Depo. 41-42).

14.    Because the Department Committee consists of faculty within the applicant's department, Department Committee members recommend virtually all applicants for promotion as a matter of collegiality.  (Exh. E, Petty Depo. 61 ln.13 – 62 ln.14).

15.    Three members of the Department Committee strongly recommended plaintiff's application for promotion, and one member of the Department "recommended" his application "but not strongly."  (Exh. D).

16.     The College Evaluation and Promotion Committee ("College Committee") reviewed plaintiff's application, plus seven other applications for promotion from faculty within the College.  (Compl. ¶ 19).

17.     The College Committee consisted of faculty members (the Chairs of each Department Committee within the College) who assigned points to each application.  (Exh. E, Petty Depo. 45-46).

18.     The College Committee assigned points based on the quantity of an applicant's accomplishments with little or no critical judgment as to the quality of those accomplishments. (Petty Depo. 63 ln.21 – 65 ln.20).

19.     Based on these scores, the College Committee ranked plaintiff second out of the eight applicants and gave him the Committee's strong recommendation.  (Exh. F).

20.     The applications, along with the recommendations of the various Department Committees and the College Committee, then went to the Dean of the College of Arts and Sciences for her own independent assessment.  (Exh. E, Petty Depo. 56-60).

21.     Dean Rachel Petty decided not to recommend plaintiff's promotion.  (Exh. G).

22.     Dean Petty determined that plaintiff's application first showed "insufficient evidence that he has kept abreast of major changes in his field," which Dean Petty considered "especially significant since there have been so many changes in the field of journalism, including the use of technology" and the increasing "importance of legal and ethical issues." (Exh. G; Exh. E, Petty Depo. 86 ln.19 – 87 ln.12).

23.     Plaintiff's failure to keep current in his field included his lack of leadership in curriculum review and development.  (Exh. E, Petty Depo. 87-89).

24.    As the Journalism Program Coordinator, the plaintiff is responsible for the journalism curriculum and updating journalism courses at UDC.  (Exh. A, Elam Depo. 41).

25.    Among her goals and objectives for the Academic Year 1999-2000, the Department Chair sought "substantial upgrading and revamping" of the journalism curriculum. (Exh. A, Elam Depo. 245).

26.    Plaintiff agreed with the need for "substantial upgrading and revamping" of the journalism curriculum.  (Exh. A, Elam Depo. 246).

27.    Plaintiff recognized the need to complete a revision of the journalism curriculum by the summer of 2000.  (Exh. A, Elam Depo. 264).

28.    To update the journalism curriculum, plaintiff proposed eight new journalism courses.  (Exh. A, Elam Depo. 221-22, Exh. A2).

29.    Plaintiff knew that syllabi for the proposed journalism courses had to be submitted to the Curriculum Committee by July 15, 2000.  (Exh. A, Elam Depo. 265; Exh. A7).

30.    An ethics of journalism course was among the proposed courses.  (Exh. A, Elam Depo. 221-22, Exh. A2).

31.    An ethics of journalism course was to be an important addition to journalism curriculum.  (Exh. A, Elam Depo. 238 ln.22 – 239 ln. 16).

32.    Plaintiff was responsible for preparing the syllabus for the proposed ethics for journalism course.  (Exh. A, Elam Depo. 270-71).

33.    Plaintiff did not submit a syllabus for the ethics of journalism course to the Curriculum Committee.  (Exh. A, Elam Depo. 267).

34.    A computer-assisted reporting course was also among the eight proposed journalism courses.  (Exh. A, Elam Depo. 221-22, Exh. A2).

35.    Plaintiff did not submit a syllabus for the computer-assisted reporting course to the Curriculum Committee.  (Exh. A, Elam Depo. 239-41).

36.    Because plaintiff did not submit syllabi to the Curriculum Committee, none of the eight proposed journalism courses became part of the regular journalism curriculum.  (Exh. A, Elam Depo. 226 ln. 15-19).

37.    Since 1994, plaintiff has never submitted any proposed new course to the Curriculum Committee.  (Exh. A, Elam Depo. 239-41).

38.    In addition, Dean Petty found that plaintiff's application lacked "evidence of peer-reviewed research [or] writing or of writing awards or critical acclaim by other professional writers" or organizations in his field.  (Exh. G; Exh. E, Petty Depo. 120 ln.3 – 121 ln.13).

39.    Although plaintiff has written many newspaper articles as a paid journalist, he has no published writings about the field of journalism.  (Exh. A, Elam Depo. 286-87).

40.    Plaintiff's application presented no evidence of formal research in his discipline. (Exh. E, Petty Depo. 169-70).

41.    Plaintiff has not received any awards or critical acclaim for his writings by professional writers or organizations in his field.  (Exh. G; Exh. E, Petty Depo. 120-21).

42.    Dean Petty concluded that more "evidence of scholarship and/or journalistic excellence is required" before she could recommend his application.  (Exh. G).

43.    Provost and Vice President for Academic Affairs Wilhelmina Reuben-Cooke decided against plaintiff's promotion.  (Exh. H).

44.    Provost Reuben-Cooke reviewed promotion applications from across the university, not just from the College of Arts and Sciences.  (Exh. B, Reuben-Cooke Depo. 18 ln.14 – 21 ln.9).

45.     Giving weight to the Dean's recommendation, Provost Reuben-Cooke reviewed the plaintiff's application to determine if it supported the Dean's recommendation not to promote plaintiff.  (Exh. B, Reuben-Cooke Depo. 48 ln.11 – 50 ln.4, 52 ln.19 - 54 ln.2).

46.     Upon review, Provost Reuben-Cooke agreed that plaintiff's application needed "evidence of scholarship and research that is not evidenced presently."  (Exh. H).

47.     Like Dean Petty, Provost Reuben-Cooke found that plaintiff's application was deficient in the area of scholarship because plaintiff lacked writings or research that analyzed issues in journalism.  (Exh. B, Reuben-Cooke Depo. 54 ln.3-20, 105 ln.7 – 107 ln.16).

48.     Plaintiff then filed a written appeal with the President of the University, Dr. William Pollard.  (Compl. ¶ 23).

49.     Following a meeting with plaintiff, President Pollard decided not to promote him. (Compl. ¶ 23).

50.     President Pollard agreed with Provost Reuben-Cooke's determination that plaintiff lacked sufficient evidence of scholarship and research.  (Exh. I, Pollard Depo. 77-79).

51.     Like Dean Petty and Provost Reuben-Cooke before him, Dr. Pollard found plaintiff's application lacking proof of scholarly works that have "undergone the scrutiny of peers in one's profession."  (Exh. I, Pollard Depo. 57).

52.     In regard to scholarship, President Pollard stressed the difference between a professional journal article and a newspaper article.  (Exh. I, Pollard Depo. 57-59).

53.     Giving strong consideration to the determinations of the Dean and Provost, President Pollard saw no basis to overturn their recommendations and promote the plaintiff. (Exh. I, Pollard Depo. 64).

54.     Meanwhile, three other applicants -- Shiela Harmon Martin, Nelda Ormond, and Abiose Adebayo – were promoted to the rank of Full Professor in this promotional cycle. (Compl. ¶ 22).

55.     Professor Harmon-Martin, who taught political science, earned a Ph.D. in 1996. (Exh. E, Petty Depo. 133).

56.     Dr. Harmon-Martin published a research note ("Black Women in Politics") in a book in her field.  (Exh. E, Petty Depo. 136).

57.     Dr. Harmon-Martin also did several research projects and written studies at the Center for Applied Research and Urban Policy.  (Exh. E, Petty Depo. 136-38, 140-42).

58.     Dr. Harmon-Martin attended annual conferences of the American Political Science Association, where she presented papers; the National Conference of Black Political Scientists, in which she was an Executive Council Member; and the Association for the Study of African-American Life and History, serving as a Chair and panel organizer.  (Exh. E, Petty Depo. 134-36).

59.     Dr. Harmon-Martin served on the Dissertation Committee for Howard University's political science doctorate program.  (Exh. E, Petty Depo. 138).

60.     Dean Petty strongly recommended Dr. Harmon-Martin for promotion, and Provost Reuben-Cooke concurred with the Dean's recommendation.  (Exh. G; Compl. ¶ 22).

61.     Nelda Ormond, who taught vocal performance, applied for promotion to Full Professor in September 2000, two years before the plaintiff applied.  (Exh. E, Petty Depo. 76).

62.     Acting Dean Bertha Minus recommended Professor Ormond for promotion. (Exh. J).

63.    Acting Provost Petty (who would soon return to her Dean position) held up Professor Ormond's application because there was no funding for promotions at the time.  (Exh. E, Petty Depo. 75-76).

64.    Professor Ormond's application was later integrated back into the 2002 group of promotion applicants at the college level.  (Exh. E, Petty Depo. 76-77).

65.    Evaluating Professor Ormond's application as part of that group, Dean Petty recommended her for promotion.  (Exh. G).

66.    In terms of scholarship, Professor Ormond recently entered a doctoral program and completed some coursework.  (Exh. E, Petty Depo. 151 ln.12 – 152 ln.12).

67.    Critics had recognized the professional quality of Professor Ormond's performances in several Washington Post reviews.  (Exh. E, Petty Depo. 147 ln.19 – 148 ln.16; Exh. B, Reuben-Cooke Depo. 63 ln.11 – 64 ln.11, 71 ln.8-16).

68.    Professor Ormond had private studies with many vocal, opera and drama coaches. (Exh. E, Petty Depo. 146 ln.10 – 147 ln.2).

69.    Professor Ormond also participated in full-time opera study programs as well as national and international professional conferences.  (Exh. E, Petty Depo. 145 ln.6 – 146 ln.6).

70.    Professor Ormond had an unpublished paper, "The relationship between Afro-American Music and European Culture," and completed a research project on Pan-African-American Composers.  (Exh. E, Petty Depo. 147 ln.3-10).

71.    Professor Ormond also revised the music curriculum, including a unit on the Physical Aspects of Singing and the Psychological Aspects of Singing.  (Exh. E, Petty Depo. 147 ln.12-18, 149 ln.7-12).

72.    Provost Reuben-Cooke concurred with Dean Petty's recommendation to promote Professor Ormond.  (Compl. ¶ 22).

73.    The Dean of the School of Engineering and Applied Sciences, Dr. Ben Latigo, recommended for promotion Professor Abiose Adebayo, who taught aerospace engineering. (Exh. K).

74.    Dr. Adebayo had a Ph.D. from the Massachusetts Institute of Technology.  (Exh. L).

75.    He had several unpublished manuscripts or works in progress, which in the determination of the Dean constituted original research of high quality.  (Exh. B, Reuben-Cooke Depo. 75-76).

76.    In reviewing the materials, Provost Reuben-Cooke was able to determine that Dr. Adebayo's papers represented scholarship, in that he identified an issue in his discipline, developed a thesis, conducted research, and carried it through to a finished product.  (Exh. B, Reuben-Cooke Depo. 76-78).

77.    Dr. Adebayo's application also demonstrated his work as a research fellow, his participation in several NASA workshops, and his many reports involving grant applications and grant activity.  (Exh. B, Reuben-Cooke Depo. 78).

78.    Dean Petty and the others involved in plaintiff's promotional decision did not know the ages of the applicants.  (Exh. E, Petty Depo. 86)

79.    Dean Petty has never made any discriminatory or derogatory comments based on race or national origin.  (Exh. A, Elam Depo. 332-33).

80.    Dean Petty has never made any discriminatory or derogatory comments based on age.  (Exh. A, Elam Depo. 334).

81.    Provost Reuben-Cooke has never made any discriminatory or derogatory comments based on race or national origin.  (Exh. A, Elam Depo. 334).

82.    Dean Petty has never made any discriminatory or derogatory comments based on age.  (Exh. A, Elam Depo. 334).

83.    President Pollard has never made any discriminatory or derogatory comments based on race or national origin.  (Exh. A, Elam Depo. 334).

84.    President Pollard has never made any discriminatory or derogatory comments based on age.  (Exh. A, Elam Depo. 334).


Hostile Work Environment

85.    Plaintiff first requested the key to the Departmental office from Yvonne Carter, when she became the Department Chair in 1994.  (Exh. A, Elam Depo. 187-88).

86.    Plaintiff wanted the key so he could access the Departmental office outside of normal business hours without relying upon building security to let him in.  (Exh. A, Elam Depo. 193 1n.5-21).

87.    Since plaintiff was known for allowing students full use of his own office, though, Department Chair Carter was apparently concerned that plaintiff might share the key with his students, which would allow them access to the student records contained in the Departmental office.  (Exh. A, Elam Depo. 343 ln.1 – 344 ln.10, 186).

88.    After Professor Belanger became Department Chair in 2004, he provided plaintiff the key.  (Exh. A, Elam Depo. 186).

89.    Although plaintiff has the key, many other Department faculty members do not have a key, to plaintiff's knowledge.  (Exh. A, Elam Depo. 194 ln.17 – 201 ln.16).

90.    When the journalism program relocated to the Van Ness campus in 1989, the journalism lab moved to a good location but a small space.  (Exh. A, Elam Depo. 81-82).

91.    At Professor Elam's request, the journalism lab space was expanded in 1992. (Exh. A, Elam Depo. 83-84).

92.    In 1995, the physics department lost its downtown location and had to move into the journalism lab space to maintain a major grant program.  (Exh. E, Petty Depo. 105-06).

93.    The journalism lab relocated to another "fairly good space."  (Exh. A, Elam Depo. 85-86).

94.    Then in 1998, the Architecture Program lost its space at the Carnegie Library and had to move into the journalism lab space to maintain its accreditation.  (Exh. E, Petty Depo. 106).

95.    Although the journalism lab initially relocated to a small space, the journalism lab moved in 2000 to "a nice open space."  (Exh. A, Elam Depo. 91-92).

96.    In 2004, based on an internal review and consultant recommendation, the journalism lab then moved into a smaller space next to the graphics lab to take advantage of the technologies integrating the two fields.  (Exh. E, Petty Depo. 106-08; Exh. A, Elam Depo. 102 ln. 8-21).

97.    At the end of 2006, the journalism lab expanded into an "ample" space with upgraded equipment.  (Exh. A, Elam Depo. 79-81).

98.    From 1994 to 2000, the university lost thousands of square feet of building space as certain buildings were closed, and departments had to be relocated onto the Van Ness campus. (Exh. M, Anderson Depo. 14 ln.10-15, 51-54).

99.    The entire university was affected, and many university labs had to be scaled down in size or eliminated altogether.  (Exh. M, Anderson Depo. 51-52).

100.    During this period also, the university budget was repeatedly cut, and the university was operating essentially "in crisis."  (Exh. M, Anderson Depo. 53-54).

101.    Even now, the university "is always short of space, [and] there is never enough of it."  (Exh. E, Petty Depo. 22 ln.5-10).

102.    Plaintiff gave a female student an an "F" in 1997 for a journalism course because she resigned the editorship position of the student newspaper.  (Exh. A, Elam Depo. 107-08).

103.    The female student claimed that plaintiff unfairly singled her out from the other students.  (Exh. A, Elam Depo. 115 ln.16 – 116 ln.5).

104.    Beverly Anderson, who was the Dean of the College of Arts and Sciences at the time, met with plaintiff and allegedly asked him to reconsider the failing grade.  (Exh. A, Elam Depo. 109-10).

105.    Plaintiff agreed to "think about it," and met with the Department Chair and the student.  (Exh. A, Elam Depo. 111).

106.    Plaintiff suggested that the student write an apology letter to the entire class. (Exh. A, Elam Depo. 111-12).

107.    After the student wrote the letter and the entire class accepted the apology, plaintiff changed her grade from an "F" to a "C."  (Exh. A, Elam Depo. 112).

108.    Plaintiff, though, is still "haunted" by the fact he changed the student's grade and was so upset at Dean Anderson for asking that he reconsider the grade that he "wanted to slap her" but "controlled myself."  (Exh. A, Elam Depo. 112-14).

109.    In April 1999, plaintiff created a university-sponsored "Literacy Through Journalism" project and to kick-off the project designed a Living Legend Award program.  (Exh. A, Elam Depo. 131-33).

110.    Beverly Anderson, who had become the Provost and Vice President for Academic Affairs, asked plaintiff about the authorization for the Living Legend Award program.  (Exh. A, Elam Depo. 135).

111.    Plaintiff responded that the award had been given several years ago.  (Exh. A, Elam Depo. 135-36, 146 ln. 4-7).

112.    Provost Anderson stated that she had no records of university approval for such an award program.  (Exh. A, Elam Depo. 136).

113.    Provost Anderson reminded plaintiff that any university program required her approval as Provost as well as approval by the University Senate and, ultimately, the Board of Trustees.  (Exh. A, Elam Depo. 136; Exh. M, Anderson Depo. 38 ln.19 – 39 ln.17, 42 ln.9 – 44 ln.16).

114.    Plaintiff considered it sufficient that he invite these university officials to the program, and then "if they want to stop it . . . that is the time they have to stop it."  (Exh. A, Elam Depo. 143).

115.    To avoid the problem of authorization, Provost Anderson suggested that the name of the award be changed to the Literacy Through Journalism Award, but plaintiff refused.  (Exh. A, Elam Depo. 140 ln.16 – 141 ln.3).

116.    Plaintiff told Provost Anderson, "if you want to cancel [the award program], you cancel it," and he walked out.  (Exh. A, Elam Depo. 139).

13

117.    The Living Legend Award program was not canceled, and plaintiff held the award program as scheduled.  (Exh. A, Elam Depo. 139-40).

118.    Previously, in January 1999, plaintiff asked the Department Chair to remove him as faculty editor and name Professor Vassell as his replacement.  (Exh. A, Elam Depo. 163-65).

119.    Plaintiff has not taught four courses each semester.  (Exh. A, Elam Depo. 220 ln.4-18).

120.    As part of the budgeting process, the Department Chairs have asked plaintiff to list supplies and other needs for the journalism program.  (Exh. A, Elam Depo. 210-15).

121.    The university recently upgraded the journalism lab by purchasing new computers, phones, and a fax machine and widescreen television.  (Exh. A, Elam Depo. 80-81).

122.    Former Dean and Provost Beverly Anderson has never made any discriminatory or derogatory comments based on race or national origin.  (Exh. A, Elam Depo. 342).

123.    Former Dean and Provost Beverly Anderson did not discriminate against plaintiff on the basis of age.  (Exh. A, Elam Depo. 342).

124.    Department Chair Yvonne Carter never made any discriminatory or derogatory comments based on race or national origin.  (Exh. A, Elam Depo. 345).

125.    Department Chair Yvonne Carter did not discriminate against plaintiff on the basis of age.  (Exh. A, Elam Depo. 346).


                                        Respectfully submitted,

                                        LINDA SINGER
                                        Acting Attorney General for the District of Columbia

                                        GEORGE C. VALENTINE
                                        Deputy Attorney General, Civil Litigation Division

/s/ Phillip A. Lattimore, III /s/
PHILLIP A. LATTIMORE, III [422968]
Chief, General Litigation Section III


/s/ Carl J. Schifferle /s/
CARL J. SCHIFFERLE [463491]
Assistant Attorney General
Suite 600S
441 Fourth Street, N.W.
Washington, D.C. 20001
(202) 724-6624
(202) 727-3625 (fax)
Email: carl.schifferle@dc.gov

15