1

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

Civil Division

```
- - - - - - - - - - - - - - x
                              :
JOSEPH V. ELAM,               :
                              :
        Plaintiff,            :
                              :
        vs.                   : Civil Action
                              : No. 05-0003651
BOARD OF TRUSTEES OF THE      :
UNIVERSITY OF THE DISTRICT    :
OF COLUMBIA,                  :
                              :
        Defendant.            :
                              :
- - - - - - - - - - - - - - x
```

Washington, D.C.

Wednesday, July 12, 2006

The deposition of RACHEL M. PETTY,

called for examination by counsel for Plaintiff in

the above-entitled matter, pursuant to Notice, in the

offices of Gebhardt and Associates, 1101 17th Street,

N.W., Washington, D.C., convened at 10:30 a.m.,

before Paula J. Eastes, a notary public in and for

the District of Columbia, when were present on behalf

of the parties:

JARDIM REPORTING ASSOCIATES
(703) 867-0396

for my office, but I also am responsible for
determining budget allocations within what is given
to me as a college to the different units.

Personnel.  Budget.

Space, which is an evil word, I am
responsible for working with Chairs to assure that as
much as possible -- we are always short of space,
there is never enough of it, there is never enough --
that it is allocated as equitably as it possibly can
given program needs.

I am responsible for long-range planning,
which is to assure that there is a vision for the
college and that we are actually moving to implement
plans that we have, strategic plans.

We have yearly goals.  We actually really
are working to really address those and implement
those.

I work a lot through the Chairs.  I have
Chairs for each of my departments.

So, the college also includes in addition
to, I said eleven academic departments, actually
there are ten academic departments, there are three

41

it or deviate from it, or they can send it forward

silent without a recommendation.

Q.    I see.

So, at this point it goes to the Department

Committee; is that correct?

A.    At which point?

Q.    After the Chair?

A.    After the Chair does a review just to see

whether or not it meets the minimum qualifications.

Q.    The Chair then forwards it on to a

Department Committee?

A.    Right.

Q.    And this Department Committee is comprised

of four members; is that correct?

A.    It varies by departments.

The Master Agreement specifies the size of

the DEPC, which is the Department Evaluation

Promotion Committee, depending upon the number of

faculty in the Department.

Q.    And the Department makes a recommendation?

A.    Yes.

Q.    Do you know --

42

A.    The Department Committee.  Not the Department.

Q.    The Committee makes a recommendation?

A.    Right.

Q.    Do you know the process that the Committee goes through in order to make this recommendation?

A.    It varies by departments.  The departments are able to establish that for themselves because there are some disciplinary differences within departments.  And so they are able really to establish their guidelines themselves.

But everybody has to use the Master Agreement guidelines and DCMR 8.  The guidelines that are in there for evaluating faculty are there also.  But, of course, the Master Agreement takes precedence.

Q.    Certainly.

The Department Committee, are they evaluating for minimal qualification or for something else?

A.    No.  They are evaluating the full portfolio as to whether or not the person merits evaluation.

documentation.  If something is in the public domain,
like publications, sometimes they are just cited and
if they are cited, I can find it.

  Do you see what I am saying?

Q. Certainly.

A. It depends on what it is.

  If it is something that, you know, a Dean or
the Committee might not know about, then there is a
need for documentation.  But not if it is something
that is done at the university and everybody knows
about it.

  Like if I presented a portfolio and said I
was Dean, I wouldn't have to document that I am Dean
by putting my appointment papers behind it because,
you know, it is just known that I am Dean.  So, I
don't have to document that.  Why would I need to
document that?

Q. In your experience do most applicants submit
supporting documents or does it vary?

A. It varies.

Q. Now, at the point that it leaves the
Department Committee it goes to a College-Wide

46

Committee?

    A.    That is right.

    Q.    Does this Committee consider the entire portfolio of each applicant?

    A.    Yes.

    Q.    And in assessing the portfolios what is this Committee looking for and what is their recommendation?

    A.    In an academic setting it is a professional courtesy not to question a Committee's procedures other than that they have to document what they do.

    The Committee at the college level has for a while used a very, very, very involved point system of assigning points and so they evaluate each.  It is not the full Committee that does it.  They divide into groups and take certain things and assign points and then they come back together and tally points and make decisions based upon the points assigned by the individual members who are assigned certain portfolios and they make recommendations for promotion and they rank based upon the points that are accrued.

JARDIM REPORTING ASSOCIATES
(703) 867-0396

The instructions are they are supposed to rank by rank.  In other words, they are supposed to rank Professors and Associates and Assistants separately.  But rarely does a Committee.  They tend to just kind of use their points.  And if you look, they are ranked one if they have the highest number of points reported there.

Q.  I see.

So, the ranking simply is ranked in terms of which applicant accumulated the highest number of points?

A.  Yes.

Q.  And then the second highest and then the third highest and so on and so forth?

A.  That is my observation from looking at what is transmitted to me.  Yes.

Q.  What weight do you give the recommendation that comes from the College-Wide Committee?

A.  I give it considerable weight.

Q.  And when you say you give it considerable weight, do you typically adopt the recommendation coming out of the College-Wide Committee?

57

A.   No.

I very often do an independent assessment of the portfolio.

Q.   I see.

A.   Because that is what the Master Agreement requires that I do.

And I make an independent recommendation. Very often it coincides or reflects that of the Committee.  Sometimes it doesn't because sometimes I have information that the Committee may not have.

Q.   I see.

This would be information that did not come through the application or through the supporting documents of the applicant?

A.   No.  It has nothing to do with the applicant.  I have information about program quality, program needs, university direction, et cetera, that have a bearing on promotion decisions.

Q.   I see.

So, the areas that we talked about earlier, those are not the only items that one looks at to determine whether the applicant will be promoted; is

that correct?

A.   No.  They are not.

Q.   I see.

You stated program quality, program needs. Are there any other things that you might consider that the College-Wide might not have knowledge of?

A.   University direction.

Q.   I see.

Anything else?

A.   Quality of the program.

They are programmatic issues basically. That is what they are.

Q.   You stated that you do an independent assessment.

We have talked about what the Department Committee does and we have talked about what the College-Wide Committee does in their assessment of the portfolios.  We talked about the separate areas that they evaluate the applicant.

Can you tell me what your independent assessment encompasses?

A.   My independent assessment is an assessment

59

of the same areas.  We all assess the same areas.

The College Committee, the Departmental Committee,

the Chairperson, the Dean, the Provost, everybody

evaluates teaching, research, college and community

service.

    Q.   And so when you do your independent

assessment you are looking through the application

and supporting documents for evidence in those four

areas?

    A.   Yes.

    Q.   And then you also look at programming needs?

    A.   Well, you do that at the very end of the

process.  You look at that at the very end of the

process.

        Do you see what I am saying?

        When you are evaluating portfolios you are

concerned with the merits of each candidate, but at

the end of the process when you are making your

decisions about ranking particularly, you look at

program needs and issues.

        If you have a program that has a stellar

faculty member who is critical to that area, and you

have another, they are equal in terms of teaching,

research, service, I have two professors and I have

one who is in a program that actually is very poorly

enrolled, you know, lacks accreditation, and I have

another that is a strong program, in making the call

in terms of ranking those two equal candidates, equal

in terms of their teaching, research, service, they

are both excellent candidates, then that is when you

make the decision as to whether or not this promotion

or that one is actually better for the university.

       Remember you have only a limited number of

promotions by contract and by budget.  By budget

basically.

   Q.   I see.

       Explain what you mean by that, a limited

number of positions by contract and budget.

       Does the budget set out each year how many

persons can be promoted?

   A.   Well, it did.  In the Master Agreement there

is actually defined what percentage of the faculty

total -- what is it called -- expenditures, the total

budget that you have for faculty.  A certain

percentage of that is supposed to be set aside for

promotion.  But because of the university's fiscal

difficulties it has not been able to guarantee that

minimum total amount that is actually mandated by

contract for promotions.

        We just were able to do it again.  We did it

early on.  But when we hit the fiscal year it was

only possible to set aside that amount of money

beginning when Dr. Pollard came on as President.  The

year after that he mandated that we actually identify

in every budget the amount that is mandated by the

Master Agreement for promotions.

    Q.   So, as Dean is it your responsibility to

promote the number of persons as identified by the

Master Agreement or the number of persons that the

President advises should be promoted?

        I am trying to understand how you determine

the numbers.

    A.   Well, you have routinely the Committee

ranking.  They recommend for promotion.  If they rank

you, then you are recommended.  So, they recommend a

lot of people, almost everybody.  Almost everybody is

recommended.  It is rare that they aren't really
recommended when they go through the Committee
process because it is a peer system.

Q.  I see.

A.  And it is a peer system without any quotas.
So, people don't make the hard calls.  To be
collegial they recommend everybody.

With the ranking they use the points to
determine the assignment of ranks, but there are very
few critical judgments made.  Somebody has to make
the critical judgments if you don't have enough
funding to promote a pool of ten people.  So, very
often it is the Provost and the Dean who make the
critical calls.

Q.  I see.

I am still trying to get an understanding of
how you determine the numbers.  I understand you have
to make the critical call.

What is the basis for determining the
numbers of that listing that you get that will
actually be promoted?

A.  Basically you go about five percent of

63

faculty.  And the faculty in the college is about

100 people.  So, you have about four to five

promotions a year.  That is generally what we do.

    Q.    I see.

        And that is based on the budget; is that

correct?

    A.    That is based upon the budget.  Yes.

    Q.    Is that four to five promotions for Full

Professor?

    A.    No.  For all ranks.

    Q.    So, that includes Assistant, Associate, as

well as Full Professor?

    A.    Yes.

    Q.    Would you like to take a break?

    A.    Yes.

    MS. RAINEY:  Why don't we take a short

break?

    (Recess.)

    MS. RAINEY:  We are back on the record.

    BY MS. RAINEY:

    Q.    Dean Petty, before we took our break we were

discussing the evaluation process and the system and

one of the statements you made is that it is a peer

system, this is the evaluation by the College-Wide

and the Department Committees, that it is a peer

system and that there are very few critical

judgments.

       What did you mean by that?

    A.  Well, in reviewing portfolios the Committees

very often assign points without reference to

necessarily the quality of an accomplishment.  It is

documented or not documented.  That is what I mean by

peer systems and the critical judgments.

       For example, there is college service and

there is college service and there is college

service, but all of them may be assigned.  For

example, membership on a Committee is assigned the

same number of points, but a critical judgment would

involve that membership on a regional accrediting

self-study Committee for me, as a Dean, I know that

that involves a lot more work and the Committee's

work is more critical to university mission than

would be let's say a Facility Committee that reviews.

The Facility Committee is important, but its

importance to the university and the amount of work
that goes into membership on that Committee, they are
different.  And I am saying that is what I mean by
critical judgments.

There are publications in peer review
journals of very high prestige and then there are
publications in journals that are self-published or
that are proceedings from a conference where there is
no critical review by an editorial board.  So, that
is what I mean.

But the Committee, if you look at the
worksheets that we used when I was on the Committee
at least, everybody gets 30 points for a publication,
so there is no critical judgments.

You wouldn't expect that by a Faculty
Committee because very often they are from a variety
of disciplines and they don't always have knowledge
of the more critical publications on more prestigious
or the different levels of publication within a
discipline, for example.

Q.   Are these Professors not publishing as well?

A.   They are all from different fields remember.

75

would have submitted his particular application and portfolio, as well as others.

It is my understanding that when the Department-Wide Committee made their recommendation that they strongly recommended Mr. Elam for promotion to Full Professor.

Is that your understanding?

MR. SCHIFFERLE:  Objection to form.

Go ahead.

THE WITNESS:  Yes.

BY MS. RAINEY:

Q.    And that they recommended Nelda Ormond for promotion?

MR. SCHIFFERLE:  Same objection.

Go ahead.

THE WITNESS:  Well, they were not presented to the College Curriculum Committee, the Departmental Committee, the same year.  That is an important point.

BY MS. RAINEY:

Q.    Okay.

Explain that to me.

A.    Professor Ormond was recommended for promotion and reviewed at the college level in 2000, 2000/2001, the year that I was on leave from the college in the Provost office.

That year there was no funding for promotion and I made a decision as Acting Provost not to move forward with the promotion process because I didn't want to promote people that we couldn't pay because I knew how it felt.

So, Professor Ormond was evaluated by a Committee at the college level that was Chaired by Professor Tony Hawkins.  And if you look at the date of her application, it is 2000.

Q.    Okay.

A.    So, in 2001 there was no action.

Q.    Okay.

A.    Her application sat to the side for a full year and she was integrated into this group at the very end of the process.

Q.    What do you mean she was integrated into the group?

A.    She was integrated and forwarded with the

77

2002 group of promotion applicants.

Q.    I see.

In the year 2000, when she initially started the process, I believe the Department Committee gave her a recommendation; is that correct?

A.    I did not receive that.

Q.    I see.

A.    I was not Dean at that time.

Q.    I see.

At the point where you were Dean and that you received this packet of information from each of the applicants, including Ms. Ormond, would you have seen the recommendation at that time?

A.    Yes.

Q.    Do you recall that the recommendation that they gave Nelda Ormond was recommendation, as opposed to strong recommendation?

A.    Yes.

MR. SCHIFFERLE:  Objection to form.

Go ahead.

THE WITNESS:  Yes.

BY MS. RAINEY:

Dr. Adebayo is an engineering professor.

Q.   Engineering Department?

A.   Yes.

Q.   Can you tell me the race of Nelda Ormond?

A.   She is an African-American.

Q.   Shiela Harmon Martin?

A.   She is an African-American.

Q.   Joseph Elam?

A.   Indian.

Q.   I don't know if you know the answer to this.

Do you know the age of Shiela Harmon Martin?

A.   No.  Not absolutely.

I suppose she is 50 something.  I don't know what.

Q.   Nelda Ormond?

A.   I have no idea.

Q.   Joseph Elam?

A.   I have no idea.

Q.   Dean Petty, once you completed your analysis of the portfolios, it seemed that you decided against the recommendation of the College-Wide Committee with respect to Mr. Elam; is that correct?

87

A.   I made an independent judgment.  I didn't decide against the recommendation.  The recommendation of the Committee was forwarded.

Q.   Tell me why you disagreed with the Committee's recommendation to promote Mr. Elam.

A.   My recommendation to the Provost regarding Mr. Elam's portfolio was that he not be recommended because I was concerned about his portfolio's lack of evidence of currency, that he had kept current in his field, particularly as it relates to the major changes that occurred in journalism in the area of technology and in legal and ethical issues.

Q.   Was that the basis for not recommending that Mr. Elam be promoted?

A.   That is the basis.

Q.   That he was not current in his field, particularly in the area of technology and legal and ethical issues?

A.   That cuts to the base of the major responsibility of a faculty member is to teach in a manner that keeps students current and able to be at the forefront of their fields.

88

Q.   And you felt that his portfolio suggested that he was not teaching in that manner?

A.   I felt that his portfolio, as well as the curriculum of the Department, suggested that.  There had not been modifications in the curriculum in that field that I could find since the 60s.

Q.   How did you come to this conclusion?

A.   I consulted with the Dean of Communications at Howard.

I talked with another Dean at Florida A & M.

I talked to someone from the Association of Black Journalists.

I did a lot of reading about journalism on my own.

I had knowledge that the Chair had worked some time in talking about the need for curriculum revision in that area and her inability to get movement in that area.

Q.   Who was the Chair?

A.   Yvonne Carter was the Chair at that time.

Q.   Did she explain the reason why there had not been movement in that direction?

89

A.   Well, there are lots of reasons for not
movement, but basically a curriculum is driven by
your faculty and we had a number of adjunct faculty
in that area, but there was only one full time, there
is still only one full time Dean to be tenured
faculty, and that is Professor Elam.

Q.   And every other Professor is adjunct; is
that correct?

A.   We are hiring.  We have a recruit out now
and we are in the process of recruiting for a second
position in journalism that we just managed to find
the funding for.

Well, the funding has actually been there
for a year.  The position has not been filled because
the faculty haven't identified and set forward a
recommendation.  But we have had a position
identified in that area since two years now.

Q.   You consulted with a Dean at Howard
University and did you say A & M?

A.   Florida A & M.

Q.   Florida A & M?

A.   A & M.

A.    And there is a program in Mass Media with two concentrations, radio and TV and journalism.

Q.    I see.

A.    And she is in the journalism area.

Q.    I see.

So, with respect to technology, what is it that you would have liked to have seen at UDC in the Journalism or Mass Media Department?

A.    It is not what I wanted to see.

Students needed a curriculum that prepared them to work in a newsroom that utilized technology to develop and publish.

They also needed lots of exposure to using software packages that are designed for newspaper layout communications, publication, et cetera.

Q.    So, you would like to see or, as Dean, in order to have promoted Mr. Elam, Professor Elam, you needed to see a curriculum that utilized software packages?

A.    I needed to see evidence that Professor Elam was able to develop and deliver a curriculum that prepared students to be current in the field of

95

journalism.

    Q.    And if we could just develop that a little bit, with respect to technology, can you tell me the kinds of things that you would need to see as Dean of the university in order to have promoted Professor Elam with respect to technology?

    A.    Okay.

        Professor Elam prepared, and that is one of the documents I brought in this morning, a sample syllabus for the 2000 review that included many of those elements himself.

    Q.    You will have to direct me to what you would like me to review unless it is the entire page and then I will look at that.

    A.    I would like to give you the topic review for the sessions.

        This is a course outline, and this would just be the first course, the very rudimentary course, Introduction to Computer Assisted Reporting Syllabus.

        Okay?

    Q.    Yes.

96

A.   And these are the elements that are
identified here as elements that are even a first
level student.  This is supposed to be a course at
the 200 level I believe, which is a sophomore level.
And, of course, the curriculum needs to have that
straight through.

These are new journalism proposed courses
for the review team.  This is the actual review that
was prepared by the journalism faculty.  I think
mainly by Professor Elam since he is a major faculty
member there.

He is proposing eight courses to upgrade the
curriculum.  I'm sorry.  He is calling them 300/400
level courses.

Introduction to the Computer Assisted
Reporting, 300 level, which most universities have
them at the very beginning, not 300 level.  300 is
junior level.  You wouldn't introduce students to
that at the 300 level.  You would actually be
expecting them to know that by the time they got to
the 300 level.

Q.   So, this course is okay.  You would just

97

want it at the 100 level?

A.   No.

These courses don't exist in the curriculum.
They are proposed courses.

Q.   I see.

A.   This is nothing like that.  These courses
are not in the curriculum.  These are courses that
when you do a self-study, and programs are supposed
to be self-studied if they are accredited programs,
at least every seven or eight years, but this was
journalism's first review in maybe, I don't know, but
at least since I have had them.

But the program review, in program review
faculty look at their curriculum and determine
whether or not it is adequate and they make
recommendations as to what needs to be done in terms
of making it adequate.

Q.   I see.

A.   My point is you have seen in the documents
in Professor Elam's promotion portfolio the response
to some of the documents.  I am not certain it is in
his portfolio.  But some of the documents I reviewed

98

for his promotion, there is a self-study report from a Committee that reviewed the program.  But this is the report that the faculty prepared to brief the Committee on its program.

Q.    I see.

A.    And in it Professor Elam and the faculty of journalism are proposing eight course to upgrade its curriculum.

Q.    Okay.

A.    So, they are admitting that the curriculum is not current.  The same thing that I concluded.

Do you see what I am saying?

The same thing that I concluded in my review of his promotion portfolio.  They are saying to the Review Committee it is not current, we need to add these to make it current.

Q.    Were they ever added?

A.    No.

Q.    Who would have to add them?

A.    The faculty has to take them through the Curriculum Committee.  They have to develop a syllabi for them, present them to the College Curriculum

105

whole bunch of professional accreditations that are quite difficult.  But we have done it by handling resources and putting them where they needed to go to make programs work.  But programs only work if faculty within them work and keep current.

Q.   It is your testimony that you have had financial problems, major financial problems, space and resource limitations, that the Journalism Lab has been moved numerous times, but also that you could have implemented the computers and software and technology with no problem?

A.   They have been moved numerous times, but there has always been a Journalism Laboratory.  There has always been a Journalism Laboratory.  And there has always been technology in the Journalism Laboratory.

It moved.  It was in the B level of Building 38 and Physics had to vacate 13th and H and they had no research space.

We had a funded program of Dr. Morgan's that we were getting indirect costs that the university was very dependent on because it was something like

106

an $800,000 grant program.  It required a celoscope, a large piece of equipment.  And in order to keep that grant running we had to put Dr. Morgan into the space that Professor Elam's Journalism Laboratory was in.

They were moved to Building 42, a space in Building 42.  But when Architecture had to vacate the Carnegie Library, they had to go there because Architecture has to have for its accreditation daylight space.  We only had daylight space in certain strategic locations on campus because the buildings there are largely concrete and there is not a whole lot of natural light.  So, they had to go into the Building 42 space.  So, they were moved to a space still in Building 42, but on the B level.

When Professor Carter and the Graphic Communications and Graphic Arts faculty did their self-study -- we had a consultant in and we did a self-study -- they recommended merging all of those graphic, communications, journalism, together into the same lab space to reflect what is happening in the industry.

107

That is, you know, if you read USA Today, it
has a whole bunch of graphics in it.  It doesn't just
have text.  Newspapers don't have text.  They have
graphic representation.  It is communications now and
you communicate using a whole bunch of media
simultaneously and it is called merging media.

Nowadays the Rochester Institute of
Technology just called its department the New Media
because you can't distinguish journalism from graphic
communication, which is what used to be printing.
You don't print anymore.  You image now.  Radio and
TV also communicate using technology.  Technology is
what is pulling all of those together into new forms
of communication.

So, now there is on the drawing board, and
we are feverishly looking for funds for it, money to
retrofit a space on the B level for all those
departments to be together, trying to create a center
to really get movement towards a more integrated kind
of media, media offerings.

Just this year we went on-line with an
electronic version of a newspaper.  Professor Vassell

108

and Professor Interdonato, who is the graphic

communication faculty, worked together and the Free

Voice is published totally on-line.  We don't have a

print version of it any more.

So, there is an electronically produced

newspaper now and we can publish more often and it

gives students the kind of experience they need.  It

is posted on the Internet.  It is distributed

electronically only.  There is no prep paper.

Q.  You have identified a document, and we will

get this marked as an exhibit so the record is clear

as to what we are referencing, several courses that I

believe Professor Elam and others have suggested be

implemented.

Is that accurate?

A.  Well, I had never seen this because it was

done the year that I was Provost and I saw the report

that came as a result of this program review, but I

hadn't seen the initial document.

When I read through this quite recently it

struck me that they had recommended these courses.

But I have not seen any evidence that they have been

help.  But before I recommend any candidate to the

Provost I really try and do, you know, a fair amount

of research to really find out what is going on

nationally in the field and how competitive our

faculty member is.

Q.   And Professor Ormond, what resources did you

look to to evaluate her portfolio?

A.   Okay.

Vocal performance is something that I talked

to the music faculty at Howard.  And CCAS has a fine

arts area of its website to look at because there is

a lot of discussion about how you evaluate fine art

faculty because fine art faculty are kind of

different from the traditional kind of faculty.

Their scholarship is different in that it is largely

performance scholarship.

So, I went and I perused that section of the

website that looked at the evaluation of fine art

faculty and I pulled up a couple of Chronicle

articles that looked at evaluation issues with fine

art faculty.

Basically I reviewed that and I talked to,

117

I believe it was a Morgan vocal person, a vocal
person at Morgan.  She has been in choral music and
Morgan has a well-known choir and a music program
that is probably similar to ours.

Somebody suggested North Carolina Central
because they have the jazz component also, but Nelda
is not involved in the jazz component.

I did that when I reviewed Calvin's
portfolio.  A few years earlier Calvin Jones was
promoted.  He has been promoted since I was in the
college.  So, I think it was North Carolina Central
that I went to them when I was reviewing Calvin's
because jazz programs are a bit different from, you
know, vocal music programs.

Q.   You stated that in the Performing Arts
Department their scholarship is a bit different, that
it is performance based.

A.   Yes.

Q.   Does that come from the Fourth Master
Agreement?

A.   No.  The scholarship differs by discipline.

Q.   I see.

118

A.    My science disciplines scholarship is doing bench research and publishing the results.

In the social science areas it probably is field research, as well as some demonstration projects.

In nursing it is research related to practice, best practices in the field.  It is evidence based research where they actually are looking at disease models.

So, the research differs by field and scholarship differs by field somewhat.

When you are in engineering, it is easy because all engineers have the same kind of scholarship when you are in business, but when you are arts and science where you have an amalgam of programs you have to really look at what is defined as scholarship in different areas.

That is the reason that probably more than the Engineering Dean, I have to call on other Deans and talk to Deans who are from that discipline in order to know how to evaluate their scholarship.

I am a psychologist and in psychology, which

is very much aligned to the biological sciences, we tend to do laboratory research or field research that follows a very, very experimental kind of model.  But there is a different kind of research done in music.  You do research over different performances of operas and how they have been adapted over time.  Your professional work may involve scoring.  It may involve the performance.  Some people perform.

I have people in music.  For example, Professor Corey.  Her scholarship is in the area of scoring and doing electronic, whatever you call it.  You know she actually -- what is it when you write the different pieces for the orchestra?

What do you call that?  Is it scoring?  What is it called?

I don't know.  But anyway she does that.

Calvin Wright's music.  Calvin is dead now, but he was a composer.  Judy very often scored the things he wrote.

Do you see what I am saying?

Q.    I see.

A.    So, you have to find out what their

120

particular area is and then find out how you assess

performance in that particular area or sub-area.

    Q.    In the area of journalism how do you assess

scholarship?

    A.    That is what I didn't know.  That is why I

called.

        I called this person at the Association of

Black Journalists and he suggested that I talk to the

guy at Florida A & M and that I really talk to some

of the Deans at schools of journalism.

        He mentioned the guy that was at Hampton.  I

left several messages and was never able to get to

him.

        They suggested that the assessment of a

journalist, a journalism professor, should be based

upon their continued writing in the field, but they

shouldn't just be writing to write.  They should

actually write to get critical acclaim so their

writing is actually adjudged as excellent by their

peers.  And they should also write for other writers

to cite.  You know, if what you write is good and

credible, other writers will cite you.  And so you

121

can Google for the number of times they have been
cited, et cetera.

They also mentioned that continuing
education in the field is essential.  So,
participation in conferences.  There are a lot of
national conferences and workshops for journalists
that are held annually and there should be
involvement in those fields because journalism is a
very rapidly changing field.

Some fields change more than others.  Over
the last 20 years journalism has changed and is
probably one of the most rapidly changing
professional fields that there is.

Q.    Did you write to Mr. Elam once you decided
that you would not recommend that he be promoted?

A.    Yes.  I did.

Q.    Did you inform him of that?

A.    Yes.  I did.

Q.    When did you send the letter to him?

A.    I write to every faculty member.  And the
reason I know that I write to them is because very
often right after they get my letter they make

133

A.    (Witness complies.)

Okay.

Q.    Let's begin with Professor Shiela Harmon
Martin.  You have her application for promotion in
front of you.  I believe it is dated October of 2002.

Would you tell me, as you understood it,
what Professor Shiela Harmon Martin's scholarship is?

A.    Professor Shiela Harmon Martin's application
actually includes documentation of a scholarship that
includes the doctorate.  She earned her doctorate.

Faculty members are able to provide on their
promotion applications any accomplishments in the
scholarship and professional development area that
have occurred since their last promotion.  Her
promotion to Associate Professor was in 1994.  She
received her Ph.D. in 1996.  So, that would be
scholarship.  Her dissertation and the degree itself
would be evidence of continuing scholarship.

Q.    Is that the terminal degree in her
particular discipline?

A.    Yes.  It is.

Q.    So, that degree is required in order for her

134

to be promoted to Full Professor?

    A.   No.  You could be promoted -- yes.  It is.
Yes.  You are right.  To Full Professor, yes.  To
Associate, no.

      She also presented evidence of paper
presentations at the American Political Science
Association in August of 2002 and the Association for
the Study of African American Life & History.  She
was a panel organizer and Chair in October 2002.

      She participated at the National Conference
of Black Political Scientists.  She is actually an
Executive Council member there and she attended their
conference in 2002.

      She also was Co-Chair of the dinner and made
local arrangements.  She was actually the host
Committee for the 6th Conference of the International
Association of Black Professionals in International
Affairs in 2002.

      I think annually she has attended every year
since she came out of the Mayor's Office in 19 -- she
was on an IPA assignment to the Mayor and I can't
remember the exact date.

135

Q.   What type of assignment?

A.   IPA.  It stands for -- what does that stand
for?  I don't know what it stands for.  But people
who work for government agencies can come to the
university or university faculty can go to agencies.
And it is a --

Q.   A detailed position?

A.   It is not detailed.  They actually compete
for the position.  We have had several faculty take
them.

We have had IPAs.  We are getting an IPA in
the jazz studies area from the archives to help us
with the archiving.

Somebody who is a public employee can get
permission from their agency to work at the
university and they are paid by their agency.  They
are just on loan to us kind of.  She was on loan to
the Mayor's Office.

Q.   I see.

A.   It is in here.  She was on loan to the
Mayor's Office from '96 to '99.

So, since her return to the university she

has annually attended professional conferences of the

American Political Science Association, the National

Conference of Black Political Scientists and the

Association for the Study of African American Life &

History.

Q.   Okay.

A.   She also has done research at the Center for

Applied Research and Urban Policy.  She has had

several projects there.

　　　The most recent one that is covered by this

period is an assessment of healthcare needs.  It was

a study done under an MOU for the District's

Department of Health.

Q.   Okay.

A.   She has a publication and an authored book,

Black Women in Politics: A Research Note, a

publication by Praeger Publishers.

Q.   Now, the study you mentioned, was that done

in conjunction with another person?

A.   Which study?

Q.   You mentioned that she had done a study.

A.   At the Center she had a research staff, but

137

she was Director of the project.  She had a research

staff that probably included some students.

     Students are almost always involved.  I was

a Center Fellow and I know you always involve

students.

     And there is some staff in the Center,

employees of the Center, to help you with the

projects, but a faculty member directs the project.

     Q.   Are you looking at page -- well, there is

not a page number.  Are you looking at B,

Authorships?

     A.   Yes.

     Q.   The fourth column there, does it indicate

that there was a co-author, a Dr. LarSi Claiborne?

     A.   Yes.  She is with the Public Health Agency

in the city.

     Q.   Okay.

     A.   The Anacostia Urban River Issues Study was

also one that was through a CARUP project and she did

that.

     Julius was an Adjunct Professor in her

Department at the time and Cynthia Warren was staff

138

of the CARUP.  So, they worked together with that.

She also had an unpublished paper.

Her mentor was Jewel Prestage, who was a very well known African-American political scientist who I think taught her originally at Southern University and they did a session at the American Political Science Convention on her and Shiela participated in that.

She also has another CARUP project, A Study of the Changing Face of Poverty in the District of Columbia for the Department of Health, Family Services Administration.  That is a Center project there that she did an annual report for.  It wasn't a publication.  It was a summary report for the project.

She served on the Dissertation Committee, a Committee for a person getting their doctorate in the Political Science Department at Howard.  She was the external panel member on the Dissertation Exam Committee for that person.

Q.    And is that still scholarship activity?

A.    That is scholarship activity.  Yes.

139

She was on the Committee on the Status of Blacks in the profession, which is the political science profession, a Committee actually that was appointed by the American Political Science Association to look at blacks as political scientists.

Q.   Does that represent the total of her scholarship that was submitted on her application?

A.   Yes.  I think I did everything here.  Yes.

Q.   So, if I could summarize what you just stated, and you can look at the application just to make sure I am correctly summarizing, it seems that she annually attended a conference?

A.   Three conferences.

Q.   She annually attended three conferences?

A.   At least three.  American Political Science Association.  Association for the Study of African American Life & History.  And the National Conference of Black Political Scientists.  Those are three separate organizations.

She has also the International Association of Black Professionals in International Affairs.

140

That is a fourth one.

    Q.   It seems that in addition that she has co-authored a study along with a Dr. LarSi Claiborne.

    A.   Yes.

    Q.   This was at it appears to be a government agency, the Center for Applied Research and Urban Policy.

    A.   It is not a government agency.

    Q.   It is not a government agency?

    A.   That is UDC research.  It is a research unit at UDC that conducts research for the city.

    Q.   I see.

    So, this is actually a part of UDC, a part of the university?

    A.   CARUP is.  Yes.

    Q.   Also she has a note that was published by Praeger Publishers; is that correct?

    A.   That is right.

    There are two other studies of CARUP also. I went over those.

    The July 2002 to October 2002, A Study of the Changing Face of Poverty, that is another CARUP

141

study.

       She was a Fellow in the Center for Applied
Research and Urban Policy and there were at least
three studies here that were done as a part of that.

       The Anacostia River Study.

   Q.   That is part of this one study that you are
referencing?

   A.   No.  That is a separate study.  There are
three separate studies here at different points.

       There is the April 2001 project that
resulted in a paper.

   Q.   Yes.

   A.   There is a project, the Anacostia Urban
River Issues Study, with Julius Ndumbe.

   Q.   And the date of that one?

   A.   September 2000.

   Q.   Okay.

   A.   Then there is the project that ran from
July '02 to October '02, The Changing Face of Poverty
in the District of Columbia, a study done for Family
and Child Services Administration and the Department
of Health.

142

Q.   Okay.

Now, the last one you just mentioned, does she have that under a title of Research in Progress?

A.   Yes.

Q.   And you mentioned I believe three prior to that.

Does she have those under the category of Completed Unpublished Papers and Articles?

A.   Well, one is under Published Papers Articles and Reports, the one with LarSi Claiborne.

Q.   Yes.

A.   Also she has two publications.

Q.   Yes.

A.   She has three projects here that she did that resulted in papers or articles that were not published.

Q.   That is correct.

A.   And she has work in progress.

This is completed and published now.  I just know that because I read it fairly recently.

But this one was in progress at the time of her application.

143

Q.   Does that represent the total of her
scholarship that you evaluated?

A.   For this period.

Q.   For this time period?

A.   Remember that her's was a fairly short time
period because she actually was promoted in '94.  So,
her application could only cover '94 to 2002, eight
years.

Q.   And that is the time period that she has put
there and she has identified for you her scholarship
during that time period?

A.   Exactly.

Q.   And that is what you evaluated?

A.   Right.

Q.   Could you just put that to the side for a
second?  We will come back to that in just a moment.

Can you tell me what you evaluated as
Professor Ormond's scholarship?

A.   Okay.

Q.   You have Exhibit 2.

A.   Professor Ormond's last promotion was in
'77.

144

Q.    Just so the record is clear, you have in front of you I believe Exhibit 2 that you are referring to.

A.    Exhibit 2.  Yes.

So, her application actually covered a 23 year period.

Is that right?

A 23 year period.  So, there is a longer period.

Under Continuing Education she presented evidence of courses at Juilliard, which I could not consider because they were actually considered in her '77 application.

Q.    Now we are going to talk about her scholarship.

A.    That is scholarship.

Remember we talked about Professor Harmon Martin's dissertation being scholarship.

Q.    That is correct.

I just wanted to make sure you weren't just referencing her continuing education, as opposed to her scholarship.

145

A.  Well, continuing education is under
professional development.  It is in the same category
for us.

Q.  I understand.

A.  Okay.

She presents evidence of development of a
program, Opera in the Afternoon, for the continuing
education unit at UDC.

Participation in the National Association
for the Study and Performance of African-American
Music in '99.

A Conference on Africa and the Diospora in
'99.

A role as a Clinician in an April in Paris
workshop, a music focused conference, in '96.

Her participation in a National Endowment
Program at New York University, which was an In Depth
Study of the Operas of Verdi in '80.  That Verdi
thing was an eight week program, a full time program,
in the summer of '80.

The New Music Theater Project, a theater
project in 1994.

146

Her participation in a five week program in -- I guess it is '88 or '83. I don't know. It is cut off kind of here. I don't know whether that is an 8 or 3. I'm sorry. Maybe her resume might show it more fully, the date. But is an Italian Opera program in Italy.

Again, the Metropolitan Opera Program were since the dates of her last promotion. So, that couldn't be considered.

She also has studied with private studies with a bunch of vocalists and vocal coaches and all of the coaches on her application could be considered.

The period for the Emmy Hauser one went back further than the last promotion, but it extended to '90.

So, she has worked with a number of vocal coaches, opera coaches, drama coaches, during that period.

Q.   Now, is that under the category of Private Studies?

A.   Well, for a vocalist that is continuing

education when you work with a coach.  It is
continuing professional development.

   She has an unpublished paper, The
Relationship Between Afro-American Music and the
European Culture, in '95.

   She has a research project on
Pan/African-American Composers that was completed in
'96.

  Q. That is a proposal; is that correct?

  A. That is research activity.

  Q. Okay.

  A. She presented evidence that she had revised
the curriculum, including a unit on The Physical
Aspects of Singing and The Psychological Aspects of
Singing, for courses she teaches.  They are modules
in courses that she teaches.

   So, that is considered professional
activities.

   She presents reviews from The Washington
Post of her performances in '78, '79, '85 and '99.

   I'm sorry.  '99 is actually a program, a
creative performance I think.

148

Q.    So, that is one performance and two reviews
of other's performances?

A.    No.  Her performances by the Post.

Q.    So, each of these are actually her
performances?

A.    Yes.

There is a whole list.  I don't know whether
they are on here somewhere.  But there is appended to
her application a list of professional performances
that is three or four pages long.

But this was actually one that was reviewed.

Do you see what I am saying?

Q.    Yes.  Certainly.

A.    So, you present that as evidence that you
don't just perform, but it is evaluated by somebody
and said to be of a certain quality.

She also has these other professional
activities.

She is on the Board of Directors for the
Prince George's Civic Opera.  She was on that from
'82 to '87.

She was managed by the Torney/Lieberman

149

Agency as an artist from '81 to '82 or '85 or

something.  I don't remember the dates, but some

period in the 80s she was managed by them.

There are a lot of other workshops and short

courses that she has listed here.

Opera Workshop.

She actually worked on and developed a new

Best of Music and Vocal Performance in '81 and a new

syllabi for the following courses.  She revised her

syllabi for these courses to include components of

Italian literature, vocal literature, French

literature.

These are actually professional development

related to teaching.

Q.    Okay.

A.    She has a number of Research in Progress

listed here.

Q.    How many Research in Progress?

A.    This application was actually typed.  A lot

of faculty do that.  They actually give you a typed

thing and then they fill this in in pencil.

Like she went in and filled this in, but she

has her stuff in another script and for Professor

Ormond there were two or three typed pages, several

typed pages, in another part of her application.

   It is in the portfolio that I reviewed in

Legal last week.  It is a typed listing of activities

that is more easily read than this.

  Q. Let me just make sure I understand.

   Are you saying that there is something in

addition to the application that you have in front of

you?

  A. Well, it is here, but it is in more detail.

   Do you see what I am saying?

   Like her performances for the period that

could be covered by this application they run several

pages.

  Q. But it is captured here in the application;

is that correct?

  A. Not all of it is.

  Q. So, there is some information that is not in

this application?

  A. Not in this part right here.  It is in the

application that I reviewed when I reviewed it.

151

Q.    Is it in the application that you have in front of you now?

A.    No.

Q.    So, there is some information that you have evaluated that is not in the application in front of you?

A.    Yes.

Q.    Then possibly you can get that to us just so we will have the complete application that you evaluated.

A.    Right.

Q.    Is there anything else there in that application with respect to scholarship?

A.    Well, not in this application, but there is something else that came in after.

As I indicated, you see the date of this application is 2000, September 8th, 2000.

Q.    That is correct.

A.    And I indicated that it was acted on and reviewed by her Departmental Committee in 2000 and the University Committee in the spring of 2001, but it was not actually reviewed again until when these

152

2002 applications came in and when the college level

review came.  It didn't go back to the Department for

review because they already reviewed it.  But when

the 2002 applications came in and moved to the

college level it was moved in with those

applications.

Q.   I see.

A.   So, she was asked if she had additional

information for this application and it was at that

time that she presented documentation of having

entered a doctoral program and completed some course

work.

Q.   She was asked by the College-Wide Committee

whether she had additional information?

A.   Yes.

Q.   And she submitted it only to the

College-Wide Committee?

A.   Well, that is where the application was.  It

did not go back to the Department level.

Q.   I just want to be sure that this is

information that the Department did not evaluate or

did not review.

169

Like he has articles from a couple of different papers. The Informer. I believe he had a Times article, a Washington Times article, in there. I try to get a sample of the different types of writing that he has done.

Q.    In evaluating Mr. Elam's portfolio, as you go through each item that is submitted as scholarship, do you evaluate that or did you evaluate that as scholarship?

A.    Cumulatively do you mean do I evaluate to say this is good scholarship or bad scholarship?

That is not my role.

Q.    No.  And let me just clarify the question.

The question is for each of the entries that are submitted in the 29 page submission, did you include each of those as scholarship or in the category of scholarship?

A.    Most of the published material is scholarship.  Yes.  It is evidence of professional activity.

I can't say it is not published scholarship in the sense that it is not research.  Journalists do

research.  Lots of journalists do research.  They do

a lot of different kinds of research, research for an

article, but they also do research to look at

questions and issues in their field.

        Professor Elam doesn't present any evidence

of formal research related to his discipline.  He

actually presents evidence of writing that may have

involved research, but it is not really published in

their journals for journalists that publish research

about journalism.

        What kind of articles keep people's

attention, how long they read certain things, how

much coverage there was of certain issues during a

certain time period, those are examples of scholarly

articles related to journalism.

    Q.   Now let's focus on Professor Elam's

submission as you look through the articles.  And I

just want to understand your testimony because I

think you are saying that you did credit the articles

as being scholarship.

        A.   Right.

        Evidence of professional activity is a