1

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

Civil Division

- - - - - - - - - - - - - - - x
                                :
JOSEPH V. ELAM,                 :
                                :
   Plaintiff,                   :
                                :
      Vs.            : Civil Action
                  : No. 05-0003651
BOARD OF TRUSTEES OF THE        :
UNIVERSITY OF THE DISTRICT      :
OF COLUMBIA,                    :
                                :
   Defendant.                   :
                                :
- - - - - - - - - - - - - - - x

Washington, D.C.
June 27, 2006

The deposition of BEVERLY ANDERSON,

called for examination by counsel for Plaintiff in

the above-entitled matter, pursuant to Notice, in the

offices of Gebhardt and Associates, 1101 17th Street,

N.W., Washington, D.C., convened at 10:12 a.m.,

before Sarah Harple, a notary public in and for the

District of Columbia, when were present on behalf of

the parties:

14

1   A.   A university Self-Study is essentially a
2   reaffirmation of accreditation.  You have the
3   accrediting body look at the university every so many
4   years, sometimes every 5years.  In our case we got a
5   10 year reaffirmation which meant that we didn't
6   really have to go through the big process for 10
7   years, but you have a periodic review at the
8   midpoint.  After 5 years we have a periodic review.
9   So that's what essentially that is.
10         So in 1994 the president, you know,
11  appointed me to the position of dean of the College
12  of Arts and Sciences at UDC, and I stayed in that
13  position until '97 and then you know that I became
14  provost in '97.  I stayed in the position until 2000,
15  the beginning of 2000, then I was hired by the
16  Department of Defense, the chancellor for civilian
17  education and development.  I was hired first as a
18  consultant there and then stayed on as senior
19  research fellow with the Department of Defense.
20         I did that for a couple of years on leave
21  from the university, but this time I was paid by the
22  Department of Defense and not through the university,

38

1   that I hadn't known and I had been working at the

2   university since '69.

3         So the Living Legend piece could have

4   been one piece that we learned about and I shared

5   with Professor Elam. I'm not sure if I shared it as

6   dean or as provost. I really am not sure of the

7   timeline there.

8     Q.  Do you recall having meetings with Mr. Elam

9   about the program being unauthorized?

10    A.  The question is -- Mr. Elam would walk into

11  my office. I don't necessarily refer to that as a

12  meeting. He would come into my office for

13  information or for some service or for consideration

14  or for whatever, and I spoke frankly to him at

15  anytime he came into my office. I don't remember

16  ever saying schedule Mr. Elam for 10 o'clock, we're

17  going to discuss so and so, it wasn't that kind of

18  thing as I remember.

19    Q.  Certainly. Let's assume that he just walked

20  into your office. Can you recall a situation where

21  he may have walked in and you advised him that his

22  program was unauthorized and that you had concerns

39

1  about the program?

2    A.  I think that what I would have said or what

3  I could have said to Professor Elam was that I

4  learned that the program was never authorized, could

5  you tell me more about how this program got started.

6  This is what I had to do as I walked from one unit to

7  the other, creations of faculty members that were

8  unauthorized, and I would ask them how did this come

9  about, who provided the authority for this, where are

10  we getting the funding for this, how does this

11  funding impact the university, is there an

12  interference with this and some other programs that

13  we're having at the university that are bona fide

14  awards programs.  I think I would have done that.  I

15  think any dean would have done that or any provost

16  would do that.  I think that that could have been the

17  nature of our conversation.

18    Q.  Can you recall if you ever determined that

19  the program was in fact authorized?

20    A.  I don't remember that.

21    Q.  Can you recall the situation that we're now

22  describing?

42

1  Award is a program that's still functioning in the
2  journalism department?
3     A.  I don't know.
4     Q.  Do you recall whether you sought to cancel
5  that particular program?
6     A.  Cancel the program?
7     Q.  The Living Legend program?
8     A.  No, I don't remember that at all.
9     Q.  Are you familiar with the program entitled
10 the Literacy Through Journalism program?  I believe
11 it would have been started by Mr. Elam at UDC.
12    A.  No, I don't remember Literacy Through
13 Journalism.
14    Q.  And it's okay if you need a few minutes to
15 think.  I think you would have been dean during that
16 time period.
17    A.  You see, individuals at the university don't
18 really develop programs, and this has been a little
19 bit of a problem at the university because some
20 individuals believe that they can develop programs.
21 University programs go through a process of being
22 approved by the university.  We have rules governing

43

1  how programs come about.
2      An individual could initiate or propose
3  that there be a program, and if it's a department
4  effort and not program in the real sense of program,
5  the department could say, okay, the department wishes
6  to endorse and so we will offer this activity. It's
7  a department, it's not Beverly's. Imagine at the
8  time 600 faculty members, each of whom feel they can
9  develop programs under the name of the university.
10     So no, I don't remember, you know, but
11 keep in mind at that time I had hundreds of faculty
12 members, many of whom were initiating efforts that
13 may not have been approved by the appropriate units
14 at the university or trying to initiate efforts.
15    Q. Assuming that a program approved a
16 particular initiative -- I'm sorry, let me rephrase
17 that. Assuming that a department approved a certain
18 program or initiative, how would it get terminated?
19 What's the process for terminating the program?
20     MR. SCHIFFERLE: Objection to form.
21     THE WITNESS: I don't even see the
22 possibility of that happening, and it would be

44

1   activity. If the department developed a proposal for
2   a program, then the university senate acts on that
3   proposal and it goes through the chain, ultimately
4   ending up in the president's office for the sign off
5   on the program. If that's done, then it's not likely
6   that anybody -- likewise the administrator wouldn't
7   -- couldn't slash that program just because I want to
8   slash it. It sort of has to be sanctioned by --
9   elimination of programs must be sanctioned by the
10  board, and it could be upon the recommendation of the
11  provost, but the provost wouldn't eliminate that
12  program -- would take that issue to the board, that
13  recommendation to the board and -- because the board
14  ultimately establishes the program upon the
15  recommendation from the appropriate officers and the
16  board eliminates programs as well.
17          BY MS. RAINEY:
18  Q.  So one person can't terminate or --
19  A.  No, that can't happen. One person could
20  make that recommendation to the board. I never did.
21  Q.  You never made a recommendation that any of
22  Mr. Elam's programs –

51

1   Q. Dr. Anderson, would it have been part of
2   your responsibilities to relocate different divisions
3   or departments there at UDC?
4   A. Yes. What happened during my tenure -- let
5   me just say yes, I did have that as a responsibility.
6   Just to be clear on the fact that we lost a lot of
7   space at the university. We had to come out of the
8   largest -- I think the largest office and
9   instructional building we had at the university. We
10  had building 48 which housed most of the faculty from
11  Arts and Sciences and a lot of the laboratories were
12  in 48. We had to come out of 48 and we had to find
13  space on the Van Ness campus for all of those
14  individuals and all of those labs.
15  Q. Do you have a recollection of relocating the
16  journalism department and Mr. Elam's department?
17  A. I had to relocate everything there, and we
18  had to find appropriate space. Let me say before we
19  lost thousands of square feet of space, individuals
20  could maybe have an independent office or individuals
21  could have a bigger lab. We didn't have that luxury
22  anymore. We had to put approximately 200 people --

52

1  take them out of a building and find space for them
2  on the Van Ness campus proper and the same thing for
3  the laboratories. So labs that were formerly larger
4  were in spaces that may have been significantly
5  smaller.
6    Q. Do you have -- I'm sorry, continue.
7    A. I remember us having to consolidate the labs
8  in the math department, that's my department.
9  We were really in a very, very tight situation.
10   Q. Do you have a specific recollection of
11  relocating the journalism department?
12   A. No, ma'am. Remember, I had hundreds of
13  people. Notice also, those folks who were already on
14  the Van Ness campus were affected too because we had
15  to make room for and they had the room, they had the
16  space. So their space -- a lot of times their space
17  was cut back, sometimes we even realized that their
18  labs couldn't even exist. We had a case, you know,
19  labs could not exist. It was a hard situation for
20  everybody, but we did not have the space so people
21  could not have the luxury of what they were used to
22  after out budget was cut by almost 50 percent. We

53

1  lost a lot.

2    Q.  Was this one of your responsibilities as

3  dean or as provost or acting?

4    A.  Both.

5    Q.  Would others have been in on that decision

6  with you?

7    A.  Absolutely.  As dean we generally got the

8  directives from the provost's office what we had to

9  do.  Of course, my college -- we had only two

10 colleges at that time.  My college was affected more

11 than the other college.  I got the directive of what

12 I had to do, and unfortunately all of us were hurt as

13 a result of it in terms of space.

14   Q.  When you were provost, who would have also

15 made the decision, if anyone?

16   A.  If we had a space crunch, then it would rest

17 in my office, and James and I would -- the decision

18 ultimately rested with me, but my associate provost

19 handled the space allocation.  We would meet and

20 decide what had to be done regarding space.  It's

21 important to note that every year that budget was cut

22 more and more, more was taken from the university.

54

1  So with that happening we couldn't -- we wanted to

2  protect the integrity of the university, the academic

3  piece, and so some, you know, some other pieces were

4  minimized.  Unfortunately we couldn't do it all.

5     Q.  What was Mr. Preer's title?

6     A.  Associate provost for academic affairs.

7     Q.  He worked beneath you when you were provost?

8     A.  Uh-huh.

9     Q.  So in that capacity did you have the sole

10  decision making power to move departments and

11  programs and divisions?

12    A.  Sure, yeah, not in isolation.

13    Q.  Would someone have to approve that decision?

14    A.  No, not for -- we were in crisis at that

15  point.  It's important to note that as provost I met

16  with my deans on a weekly basis.  We didn't impose

17  anything, we all worked this out together.  We all

18  knew what had to be done, and we all contributed to

19  the decision making.  I made the ultimate -- I made

20  the final decision, but it was not in isolation.

21    Q.  I want to go back to Mr. Elam being faculty

22  editor of the Free Voice.  Can you recall when he was