**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOSEPH V. ELAM,           )
                           )
        Plaintiff,     )
                           )
    v.                 )   Civil Action No. 05-1557 (JDB)
                           )
BOARD OF TRUSTEES OF    )
THE UNIVERSITY          )
OF THE DISTRICT OF COLUMBIA, )
                           )
        Defendant.    )

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Joseph V. Elam, by and through undersigned counsel, hereby files his Opposition to Defendant's Motion for Summary Judgment and submits that Defendant's Motion should be denied because there are genuine issues of material fact in this case and because Plaintiff has stated claims that should be tried before a jury. See the attached Plaintiff's Statement of Material Facts in Genuine Dispute ("Plaintiff's Statement of Facts").

**THE ISSUE**

This case challenges Defendant UDC's discriminatory decision denying promotion to Plaintiff Joseph V. Elam to the higher paying, tenured position of Full Professor at UDC. Associate Professor Elam maintains that UDC denied his promotion to Full Professor because he is Asian Indian and not African American and that UDC has subjected him to a continuous hostile work environment for nearly two decades. (Plaintiff is no longer pursuing his age

discrimination claim.)

## KEY FACTS

In 2004, Defendant UDC selected three Associate Professors for promotion to the position of Full Professor.  All three selectees are African Americans (or African), as are the three relevant decision-makers for the promotions at issue.  Two of the three selectees applied for promotion.  Associate Professor Elam (who was formally ranked number 2 on his College's applicant list) also applied, while one of the three selectees chose not to apply.

This case reveals blatant prejudice and unequal treatment against Asian Indian Joseph Elam by Rachel Petty, UDC's Dean of the College of Arts and Sciences; Mrs. Wilhelmina Reuben-Cooke, UDC Provost and Vice President, who made the decision; and recently fired UDC President William Pollard, who rubber-stamped the discriminatory decision and ruled against Plaintiff's appeal.

## 1.   JOSEPH ELAM'S APPLICATION AND BACKGROUND

### A.   Joseph Elam's Application

In September 2002, Associate Professor Elam timely submitted his application for Full Professor to Harvey Van Buren, Chair of the Department of Mass Media, Visual and Performing Arts. Exh. 1. His application packet included a 29-page list of research, published papers and articles, service awards received, and outstanding evaluations, along with five folders of supporting

-2-

academic materials.  His published works include:

1.  *Endless Ellington Era*, <u>DAWN Magazine</u>, 1974.  This researched article traces the evolution of Jazz through the life and career of Duke Ellington.  (After the selection process at issue here, this article was republished in <u>The King Maker Magazine</u> in 2005 as a Black Legacy (historic) researched article.)

2.  *Board of Trade Predicts the Future of the National Capital Area*, <u>The American</u> magazine, March 1986.  This is an in-depth researched article on the Home Rule Movement in the District of Columbia.

3.  *Washington of the Late 60's and Early 70's*, <u>The WASHINGTON *Informer*</u>, October 20, 1988.  This is a researched, published magazine feature article on the turbulent sixties and its undercurrents of protest movements.

4.  *Interview with Councilwoman Polly Shackleton*, <u>The American</u> magazine, June 1986.  This is a researched interview with the Councilwoman who predicts the future of self-government and Home Rule issues in Washington, D.C.

5.  *NEA's Futrell Trumpets Triumph for Teachers, Children and Schools*, <u>METRO Magazine</u>, November 1983.  This is a researched interview with Mary Futrell, the first Black President of the National Education Association, on the state of American public education, with a historical perspective.

6. *Nation at Risk: The Imperative for Education Reform*, The American magazine, November 1983. This was a comprehensive research analysis of the Reagan Administration's Education Report: A Nation At Risk, and highlights a Black perspective on public education.

Professor Elam's application demonstrated that he had published extensively for decades. Exh. 1, 2, & 3.

**B.  Further Background of Joseph Elam**

Associate Professor Joseph Elam is a well known personality at UDC.  Though not expressed in his application, he is known on campus as a friendly, outgoing, and unfailingly courteous colleague and mentor.  Joseph Elam was born in Kerala, India, and thus his race and nationality are denominated as Asian Indian.  He earned his Master's of Science degree in Journalism from the Medill School of Journalism, Northwestern University, in 1967.[1] By virtue of his role in boosting the profile of UDC through timely news articles about the University, his long-running UDC Journalism program which focuses on African American personalities and interests, he is ubiquitous throughout D.C.  Through his leadership and service on the College faculty, Joseph Elam has earned the appreciation of all

---

[1]  The Master's degree is the terminal degree (minimum required degree) for UDC's Journalism Program as it is for the Music Program where Master's degree holder, Nelda Ormond, worked when she was promoted to Full Professor.  Both Programs are under the Department of Mass Media, Visual and Performing Arts.

his colleagues and superiors at UDC.  Indeed, all the people who discriminatorily rejected his candidacy for Full Professor know him well and benefit from his ongoing publicity promoting the accomplishments of UDC as well as issues of interest to the African American community in D.C.  Exh. 7, Elam Dep. at 73-74.

Associate Professor Elam has provided Defendant UDC exceptional service and loyalty for over 34 years, dating back to 1971, when Defendant was known as Federal City College.  In fact, he has singlehandedly taught all of UDC's core journalism courses since 1982.  He introduced almost all of the core journalism courses at UDC and helped to develop the University's journalism curriculum.  Since 1978, he has been the head of the Journalism program, holding the title of Journalism Area Coordinator.  In this capacity, he instituted the annual UDC-Capital Press Club ("CPC") journalism and public relations workshops at UDC.  Moreover, because of Associate Professor Elam's personal and extensive professional connections, his guests all appear pro bono.  Id. Despite his infectious energy and plethora of accomplishments for the University and the greater Washington community for decades, Defendant UDC has never treated Joseph Elam in an equitable, nondiscriminatory manner.  Foreshadowing the current controversy, in 1979, Defendant UDC treated Joseph Elam discriminatorily with respect to his previous promotion from Assistant Professor to

-5-

Associate Professor.  Initially, UDC had refused to promote him in a selection process for Associate Professor under facts that appeared to be discriminatory; but eventually in 1982, he received the Associate Professor promotion and back pay to 1979 after the University conducted an investigation and reversed itself. Exh. 5. The egregiousness of this inequity was so transparent that Defendant UDC entered into a Conciliation Agreement with Joseph Elam stating among other conditions, that the University would not discriminate or retaliate against him in the future. Exh. 5.

Not only has Defendant UDC discriminated against Associate Professor Elam twice with regard to faculty promotions (in 1979 and 2004), it has created a long-runnning hostile work environment for him, ongoing for decades, which has included disparagement bordering on defamation.  A superior has called him to his students a maverick with a hidden agenda who misleads and misguides his students. Exh. 9, Elam Dep. at 114, 121. No other UDC faculty member has been subjected to such blatant vilification and this clearly gives rise to an inference of bias against an Asian Indian, non-African American professor.  He has been falsely accused of not keeping abreast of technology and other journalism issues and failing to revise the journalism curriculum. Exh. 19.  Further, his superiors have moved the Journalism Lab where he teaches and does his research to a substandard location without his input or consent

-6-

several times since 1989. Exh. 9, Elam Dep. at 79.  Unlike other UDC faculty, he was not allowed to have a Departmental Office key from 1994 to 2005 (until after this suit was filed), a period of 11 years. Exh. 9, Elam Dep. at 186-188.  He has not been allowed to move offices since he was given his small, irregularly shaped office with a 18" x 18" hole in the wall, nine years ago in 1998 which serves as an egress for rodents, Exh. 7, Elam Dep. at 109-112.  His superiors have forced him to change journalism programs that he instituted, as well as student grades he issued. See Exh. 7-A, Elam Dep. at 127-139 and 106-112.  Joseph Elam, a stalwart UDC professor, has demonstrated exceptional work and continued to publish, organize programs and journalism conferences, even while Defendant UDC was engulfed in controversy and near financial ruin. All of this demonstrates that Associate Professor Elam has kept current in the area of journalism.  Defendant UDC should be ashamed of how it has treated one of its most loyal and accomplished members, but instead the institution apparently believes that this type of behavior towards Joseph Elam is all he deserves, as is made manifest by its Motion for Summary Judgment and its unwillingness at any time to voluntarily resolve the issues raised in this case.

**2.   BACKGROUND AND APPLICATION OF SHEILA HARMON-MARTIN, SELECTEE FOR FULL PROFESSOR**

At the time of the selection at issue, Sheila Harmon-Martin

-7-

was an Associate Professor in UDC's College of Arts and Sciences, teaching in the Department of Social Work.  She had worked at UDC for several years, and is African American.

In September 2002, Sheila Harmon-Martin submitted a timely application for the Full Professor position. According to her application, she had written a note entitled, "On the Needs of Children for the Office of Maternal and Child Care."  She also co-authored a note entitled, "Black Women in Politics." <u>See</u> Exh. 10, Harmon-Martin Dep. at 56, 58.

**3.    BACKGROUND AND APPLICATION OF ADIYOSE ADEBAYO, SELECTEE FOR FULL PROFESSOR**

At the time of selection, Adiyose Adebayo was an Associate Professor in UDC's College of Engineering.  He is of African descent.  In September 2002, Adiyose Adebayo submitted a timely application for Full Professor. Adebayo Dep. at 28. His application packet consisted of an application and 10 proposals that he had written. <u>Id.</u>

**4.    BACKGROUND OF NELDA ORMOND, NON-APPLICANT AND YET SELECTEE FOR FULL PROFESSOR**

Nelda Ormond, at the time of this selection process, was an Associate Professor in UDC's College of Arts and Sciences, in the same Department of Mass Media, Visual and Performing Arts.  She taught courses in the Music Program.  Nelda Ormond did not file an application in this selection process.  Though she had previously

-8-

been considered for promotion by UDC, she had not been promoted.
Nelda Ormond is African American. See Exh. 8, Ormond Dep. at 71-72.

5.    **THE SELECTION PROCESS**

There are several levels of evaluation in UDC's Full Professor
promotion process.  After the candidates submit their applications
(except for Nelda Ormond who did not apply in this case), their
respective Department Chairs determine whether the applicants are
qualified to be promoted.  The Department Chair evaluates whether
promotion is warranted and, if so, forwards the application to the
Department Evaluation and Promotion Committee (DEPC).  The DEPC
then evaluates the applications, makes a recommendation of whether
the promotion criteria are met, and forwards the applicant packets
to the College Promotion and Evaluation Committee ("CPEC").  Next,
CPEC reviews the applications under a detailed promotion criteria
standard.  The CPEC assigns a point value to the applicants in four
separate categories — (1) teaching and job related
responsibilities, (2) scholarship and professional growth, (3)
University service, and (4) public service. See Fourth Master
Agreement at 24 - Exh. 14. For example, organizing a conference or
workshop, receiving an award, or publishing a paper, are each
assigned a point value, depending on the nature of the conference,
etc.  Finally, the CPEC numerically ranks the applicants according
to the quality and extensiveness of their submissions. See Exh. 14.

The candidates herein were evaluated as follows:

**Department Chair:**

Associate Professor Harmon-Martin:  Strongly Recommended.

Associate Professor Elam:  Strongly Recommended.

Associate Professor Nelda Ormond:  Recommended.

**Department Evaluation and Promotion Committee (DPEC):**

Associate Professor Harmon-Martin:  Strongly Recommended.

Associate Professor Elam:  Strongly Recommended.

Associate Professor Nelda Ormond:  Recommended.

**College Promotion and Evaluation Committee Department Chair:**

Associate Professor Harmon-Martin:  Ranked number one.

Associate Professor Elam:  Ranked number two.

Assistant Professor Belton: Ranked number three (for Associate Professor).

Associate Professor Nelda Ormond:  Ranked number four. <u>See</u> Exh. 7, Elam, Dep. at 323.

The College Promotion and Evaluation Committee (CPEC) from the College of Arts and Sciences forwarded its candidate ranking list to Dean Rachel Petty, Dean of that College.  As set forth above, Associate Professor Harmon-Martin was ranked number one, Associate Professor Elam was ranked number two, and Associate Professor Ormond was ranked number four.

Dean Rachel Petty received the list of ranked candidates and

their application materials from the CPEC.  Upon realizing that Associate Professor Elam was ranked number two, Dean Petty re-ranked the candidates given to her.  Dean Petty kept Associate Professor Harmon-Martin at the number one position.  She dropped Associate Professor Elam from number two to number four, and she moved Associate Professor Ormond from number four to number two (Elam's ranking).[2] See Exh. 7, Elam Dep. at 323.

The final promotion decision was made by Provost and Vice President Mrs. Wilhelmina Reuben-Cooke.  Dean Petty forwarded her re-ranked list to Mrs. Reuben-Cooke. Despite Associate Professor Elam's exemplary record of accomplishments, she requested that the Provost not promote him.  The Provost complied with this request and denied his promotion. See Exh. 16.  Note that both Mrs. Reuben-Cooke and Dean Petty are African Americans.

## 6.  THE APPEAL PROCESS

Associate Professor Elam filed an appeal to then President William Pollard.[3]  President Pollard (also African American) rubber-stamped the prior decisions, denying Associate Professor Elam's appeal without any review of his application or published

---

[2]    The candidate ranked number three from the College of Arts and Sciences was seeking an Associate Professor position, not the Full Professor position.

[3]    President Pollard was fired by UDC for other reasons in July 2007. See Washington Post, July 29, 2007.

research.  At Associate Professor Elam's request, President Pollard met with him.  President Pollard stated that he did not see evidence of scholarship.  He could not give any authority for his definition of scholarship and stated that it was his working definition. Exh. 13, Pollard Dep. at 27-28; 60-62.  After fully exhausting the process determined by Defendant UDC, Associate Professor Elam was left with no recourse but to seek justice from the courts.

## APPLICABLE LAW

1.  **Plaintiff's <u>Prima Facie</u> Case**

Plaintiff has set forth a <u>prima facie</u> case of discrimination for non-promotion.  Defendant agrees that Plaintiff must show that (1) he is a member of a protected class, (2) that he suffered an adverse action, and (3) the action gives rise to an inference of discrimination. <u>Stella v. Mineta</u>, 284 F.3d 135, 145 (D.C. Cir. 2002), quoting <u>Brown v. Brody</u>, 199 F.3d 446, 452 (D.C. Cir. 1999). Where the adverse action is a non-promotion, plaintiff must show as part of his <u>prima facie</u> case that "he applied for and was qualified for an available position." <u>Lathram v. Snow</u>, 336 F.3d 1085, 1088 (D.C. Cir. 2003).

Defendant does not contest many elements of Associate Professor Elam's <u>prima facie</u> case that he was discriminated against when Defendant failed to promote him. <u>See Carter v. George</u>

-12-

Washington Univ., 180 F.Supp.2d 97, 104 (D.D.C. 2001).  There is no dispute that Joseph Elam is a member of a protected class (Asian Indian).  See id.  Also, Defendant does not contest that the position was filled by persons that were not in Joseph Elam's protected class.  See also Mitchell v. Baldrige, 759 F.2d 80, 84 (D.C. Cir. 1985).  Likewise, Defendant does not contest that the failure to promote Joseph Elam is an adverse employment action because it has "objective, tangible, and 'materially adverse con-sequences [for] the terms, conditions, or privileges'" of Associate Professor Elam's employment by denying him "the opportunity to advance within the hierarchy." See Stewart v. Ashcroft, 352 F.3d 422, 426-27 (D.C. Cir. 2003) (quoting Brown v. Brody, 199 F.3d at 457).

However, Defendant disputes that (A) Associate Professor Elam was qualified for promotion, and (B) there is an inference of discrimination.

**A. Joseph Elam was well qualified for promotion.**

Associate Professor Elam is qualified to be promoted to tenured Full Professor.  The criteria for promotion to Full Professor is set forth in The Fourth Master Agreement, Exh. 14, (and Title 8 of the D.C. Municipal Regulations).  According to the Fourth Master Agreement, candidates are to submit an application by a certain deadline EACH year, and will be judged in the following,

four categories: (1) teaching and job related responsibilities, (2) scholarship and professional growth, (3) University service, and (4) public service. <u>See</u> Exh. 14. With respect to number (2), scholarship and professional growth, Associate Professor Elam has published more than all three selected Full Professors combined. He has published in <u>The American</u> magazine on several occasions, the <u>METRO Magazine</u>, and <u>DAWN Magazine</u> among others. He submitted a 29-page list of research, published papers and articles, service awards received, and outstanding evaluations, along with five folders of supporting documentation. <u>See</u> Exh. 2. In his application he submitted his work as a published journalist over 34 years.

As further evidence of his qualifications, Associate Professor Elam's exemplary work has repeatedly earned him an "Excellent" in his performance evaluations, and he is well-respected among his colleagues, students, and the community at-large. He achieved the rating of "Outstanding" for classroom performance both as a teacher and mentor to his students. <u>See</u> Exh. 7-A, Elam Dep. at 317.

In anticipation of accreditation, an external committee conducted an External Review of the Television and Journalism Programs. The Review concluded that Associate Professor Elam has "performed a Herculean job" and had done so while the Department was woefully underfunded. <u>See</u> Exh. 7-A, Elam Dep. at 390-391.

-14-

Every Committee and evaluator, until Dean Petty's involvement, has highly ranked Joseph Elam for promotion to Full Professor.  His Department Chair strongly recommended that he be promoted to Full Professor.  The Department Committee STRONGLY RECOMMENDED that he be promoted to Full Professor, and most importantly, the College Promotion and Evaluation Committee ranked him as the number two candidate and recommended that he be promoted.  There is no question that Joseph Elam was deemed qualified for promotion to Full Professor.

Defendant claims that Associate Professor Elam is not qualified because he does not have sufficient scholarship and has not kept current in the field of journalism. This argument ignores Associate Professor Elam's journalistic research and publications and numerous publications in DAWN Magazine, The American magazine, METRO Magazine, The Washington New Observer, the Washington Afro-American, and The WASHINGTON Informer, as well as his research on the history and development of the Black Media.  These works are in addition to his countless journalist articles and publications. Exh. 1, 2, and 3.

Defendant's argument further ignores the following: (1) Associate Professor Elam's decades of research, scholarship, and academic qualifications, (2) the College Promotion and Evaluation Committee's analysis and conclusion that Joseph Elam is qualified

and should be promoted to Full Professor, (3) the College Promotion
and Evaluation Committee's candidate evaluation, ranking Joseph
Elam as the number two candidate, (4) facts indicating that Dean
Petty subverted the Committee's authority and re-ranked the
candidates plainly to Joseph Elam's detriment, (5) facts indicating
that Dean Petty promoted an individual (Nelda Ormond) who failed to
apply, (6) facts indicating that Joseph Elam continued to publish,
engage in University and community service, and bring prestige and
credibility to the University and himself, even when UDC was near
financial and academic ruin.  It is disheartening that Defendant
UDC in its Summary Judgment arguments ignores that Associate
Professor Elam is a prolific writer, has published extensively, and
has received many awards. In addition, Defendant UDC further
ignores the category heading of "Scholarship and Professional
Growth" — thereby "picking and choosing" from this category to fit
its discriminatory purpose because Joseph Elam has also excelled in
the area of professional growth, the other half of the category "of
scholarship and professional growth."  Associate Professor Elam
received a fellowship and training at the Wall Street Journal in
1994 under a Dow Jones Newspaper Fund (DJNF) Scholarship, and they
bestowed upon him the prestigious Journalism Special Educator
Award. Associate Professor Elam also received the Excellence in
Teaching Award for teaching Literacy through Journalism at Mary

Terrell Elementary School.  He received an appreciation Award from the Capital Press Club (CPC) for coordinating the 2nd annual UDC-CPC Press Institute.  He received certificates for participating in management and public relations workshops. Exh. 2, 3. This is overwhelming evidence of his scholarship and professional growth, qualifications for promotion, and prima facie case.

Moreover, where, as here, the defendant's proffered evidence for showing that a plaintiff was not meeting the employer's expectations mirrors the nondiscriminatory reason associated by the employer, courts will often assume a prima facie case and proceed to the pretext inquiry in the interests of fairness and efficiency. See Mastro v. Pepco, 398 F.Supp.2d 67, 75 (D.D.C. 2005) (reversed on other grounds, Mastro v. Pepco, 447 F.3d 843 (D.C. Cir. 2006)). Jones v. Giant Foods, Inc., et al., 2000 WL 1835393 *2 (D.Md. Nov. 27, 2000) (citing Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 245 (4th Cir. 1982)).[4]

**B. The facts indicate an inference of discrimination.**

---

[4] See also Siegel v. Alpha Wire Corp., 894 F.2d 50, 54 (3d Cir. 1990) ("This argument ... goes to the issue of whether [plaintiff] can demonstrate [defendant's] reason is pretextual, not to the initial question of whether [plaintiff] made out a prima facie case"), cert. denied, 496 U.S. 906 (1990); Bienkowski v. American Airlines, Inc., 851 F.2d 1503, 1505 (5th Cir. 1988) (analyzing plaintiff's qualifications "at both the prima facie case and pretext stages of a termination case is an unnecessary redundancy"); Yarbrough v. Tower Oldsmobile, Inc., 789 F.2d 508, 512 (7th Cir. 1986); MacDonald v. Eastern Wyo. Mental Health Ctr., 941 F.2d 1115, 1119-21 (10th Cir. 1991).

Examination of the facts gives rise to an inference of discrimination in this case. An inference of discrimination as well as pretext can be shown by demonstrating that the adverse action is not attributable to an absolute or relative lack of qualifications. George v. Leavitt, 407 F.3d 405, 413 (D.C. Cir. 2005). As shown above, the non-promotion was not attributable to an absolute or relative lack of qualifications in that Associate Professor Elam is viewed as highly qualified by UDC superiors and leaders and is objectively well qualified based upon the record.

Defendant UDC misstates the standard for a prima facie case of non-promotion. Defendant argues the outdated "similarly situated" test. Defendant states that to raise an inference of discrimination, plaintiff would have to "prove disparate treatment, which is "the very essence" of an employment discrimination claim, citing Neuren v. Adduci, 43 F.3d 1507, 1514 (D.C. Cir. 1995). Defendant continues, "that [t]o show disparate treatment, "[i]t is plaintiff's task to demonstrate that similarly situated employees were not treated equally," and that to satisfy this burden, plaintiff must show that "all of the relevant aspects of [his] employment situation were nearly identical" to those of the other employees to whom he compares himself, and that finally, all three applicants promoted to Full Professor, were similarly situated to him.

-18-

However, in <u>George v. Leavitt</u>, the D.C. Circuit "made clear" that this rigid approach to discrimination cases is legally flawed. <u>See</u> <u>George</u>, 407 F.3d at 412.  The Court continued that defendant's argument that plaintiffs must show they were treated differently than similarly situated employees "is not a correct statement of the law."  While Plaintiffs can raise an inference of discrimination by demonstrating they were treated differently from similarly situated employees from outside their protected class, "this is not the only way." <u>Id.</u> (discussing <u>Teneyck v. Omni Shoreham Hotel</u>, 365 F.3d 1139, 1150-51 (D.C. Cir. 2004)).  For example, discrimination might also be shown by the fact that the employer's asserted reasons are suspect - which they are in this case. <u>Id.</u>  Thus, Plaintiff need only demonstrate facts sufficient to show that he is qualified and that Defendant's reasons are suspect.

Moreover, where defendant's proffered evidence for showing that a plaintiff was not meeting the employer's expectations mirrors the nondiscriminatory reason asserted by the employer, courts have assumed a <u>prima facie</u> case and proceeded to the pretext inquiry in the interests of fairness and efficiency." <u>See</u> <u>Mastro v. Pepco</u>, 398 F.Supp.2d 67, 75 (D.D.C. 2005) (reversed on other grounds, <u>Mastro v. Pepco</u>, 447 F.3d 843 (D.C. Cir. 2006)). <u>Jones v. Giant Foods, Inc., et al.</u>, 2000 WL 1835393 *2 (D.Md. Nov. 27, 2000) (citing <u>Lovelace v. Sherwin-Williams Co.</u>, 681 F.2d 230, 245 (4th

Cir. 1982)).  Therefore, not only can Plaintiff prove a prima facie case, it is presumed under the facts.

## 2.  DEFENDANT'S ASSERTED LEGITIMATE, NONDISCRIMINATORY REASONS

Defendant UDC states that Associate Professor Elam is not qualified to be promoted because he does not have sufficient scholarship, i.e., peer-reviewed published works, and has not kept current in the field of journalism.  Dean Petty stated this in her recommendation to Mrs. Rueben-Cooke, the Provost and Vice President, who repeated this to Joseph Elam. Exh. 15, 16.  Former UDC President William Pollard parroted this same reason. Exh. 17.

Dean Petty testified that she consulted outside sources including an unknown person from the Association of Black Journalists and spoke with her daughter, a student. Petty Dep. at 87-90, 120.  In sum, Defendant has proffered the following two reasons for rejecting Joseph Elam for promotion to Full Professor — that he does not have peer-reviewed published submissions, and secondly, has not kept current with technology and has not updated the curriculum.

## 3.  PRETEXT FOR DISCRIMINATION

Defendant's asserted legitimate, nondiscriminatory reasons for not promoting Associate Professor Elam to the position of Full Professor are clearly pretextual.  Nelda Ormond was promoted to Full Professor even though she did not even apply when Associate

-20-

Professor Elam and the other candidates did.  Associate Professor Ormond did not apply as required by the Fourth Master Agreement, and thus her ensuing promotion is in violation of UDC's process.

Dean Petty re-ranked the candidates without justification to predetermine Associate Professor Elam's rejection and non-applicant Professor Ormand's promotion.  Dean Petty said she consulted her daughter, a student at Northwestern, about Plaintiff's qualifications. Id. at 87.  Moreover, Defendant UDC has a history of discrimination against Associate Professor Elam.

This Circuit has consistently ruled that a demonstration of a plaintiff's substantial qualifications for the position contravenes the defendant's position that the plaintiff is not qualified and is thus evidence of pretext.  Associate Professor Elam continued to excel as a professor even while the University faced financial ruin and public controversy.  The above demonstrates that Associate Professor Elam was qualified and that Defendant UDC's reasons are pretext.

## 4.   INAPPROPRIATENESS OF SUMMARY JUDGMENT IN THIS CASE

### A. Legal Standards for Summary Judgment

In order to obtain summary judgment, the moving party (here the Defendant) must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322

-21-

(1986); Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine what facts are "material," the Court must look to the substantive law on which each count or claim rests. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A "genuine issue" exists if the resolution of that issue "could establish an element of a claim or defense and, therefore affect the outcome of the action." Carter, 180 F.Supp.2d at 102 (citing Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 248).

This Court has stated that "[i]n ruling on a motion for summary judgment, the court must draw all inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true." Carter, 180 F.Supp.2d at 102 (quoting Anderson, 477 U.S. at 248); see also Stewart v. Ashcroft, 211 F.Supp. 166, 169 (D.C. Cir. 2003). Morever, "the D.C. Circuit has directed that because it is difficult for a plaintiff to establish proof of discrimination, the court should view summary-judgment motions in such cases with special caution." Carter, 180 F.Supp.2d at 103; see also Aka v. Washington Hosp. Ctr., 116 F.3d 876, 879–80 (D.C. Cir. 1997) (rev'd on other grounds, 156 F.3d 1284 (D.C. Cir. 1998)(en banc)); Johnson v. Digital Equip. Corp., 836 F.Supp. 14, 18 (D.D.C. 1993). Moreover, establishing a prima facie case is not meant to be an "onerous" burden for the plaintiff. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

**B.    Material Facts Are in Dispute.**

The material facts that form the core of this case are in dispute.  This case can therefore only be decided once an impartial jury has had an opportunity to weigh the evidence and decide the facts.  As stated in <u>Cones v. Shalala</u>, 199 F.3d 512, 518 (D.C. Cir. 2000):  "If reasonable minds could differ as to whether a preponderance of the evidence establishes the facts of a <u>prima facie</u> case, then a question of fact does remain, which the trier of fact will be called upon to answer").  <u>See also</u> <u>Barbour v. Merrill</u>, <u>48 F.3d 1270, 1276</u> (D.C. Cir. 1995) (issue of qualification was question of fact for jury where "the jury reasonably could have determined, from the evidence before it... that Barbour was qualified and that private sector experience was not an absolute prerequisite"); <u>Mitchell v. Baldrige</u>, 759 F.2d 80, 85 n.3 (D.C. Cir. 1985) ("the initial responsibility of explaining the relative qualifications of the plaintiff and the selectee" lies with the defendant, not with the plaintiff as part of his <u>prima facie</u> case.")

The heart of this case is Defendant UDC's cynical and twisted manipulation of its application and selection processes to prevent Associate Professor Elam, a competent, well qualified applicant from being promoted while simultaneously ensuring the promotion of the three African American (or African) individuals, one of whom

was a non-applicant.

As the Supreme Court recognized long ago in McDonnell Douglas Corp. v. Green, most cases of discrimination will have to be proven through circumstantial evidence. See 411 U.S. 792 (1973); see also Carter v. George Washington Univ., 180 F.Supp.2d at 103. Implicit in the McDonnell Douglas three-part burden shifting analysis, in which the plaintiff must demonstrate that a defendant's asserted legitimate, non-discriminatory reason is pretextual, is the recognition that employers who discriminate will attempt to disguise their discriminatory actions. See McDonnell Douglas, 411 U.S. at 802-04. Particularly in cases where the decision-makers are determined to achieve a discriminatory result through what appears to be innocuous conduct, this Court must not assume that those officials' discriminatory actions will be transparent.

The Supreme Court has made it clear that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" ruling on a motion for summary judgment. Id. at 255. Thus, when reviewing a motion for summary judgment, a court must

view all of the evidence in the light most favorable to the nonmoving party. Adickes v. S. H. Kress & CO., 398 U.S. 144, 158-59 (1970); Kaempe v. Myers, 367 F.3d 958, 965 (D.C. Cir. 2004).

Associate Professor Elam has set forth facts demonstrating that he is well qualified.  Defendant's claim that he was less qualified than the three selectees and did not have sufficient scholarship is demonstrably false, but in the most generous light to Defendant a matter of genuine dispute, on the record before this Court.  Moreover, misjudging the credentials of the applicants (and the one non-applicant selectee) in as obvious a matter as in this case is evidence of pretext. See Fischbach v. D.C. Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (finding "if the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so.") Associate Professor Elam is an experienced Journalism professor for well over two decades. He has published much more than the three selectees for Full Professor combined.  As a professor of journalism, his scholarship will necessarily be the written word — articles, publications and original research, etc.

Plaintiff notes that selectee Nelda Ormond never applied for the Full Professor promotion at issue and that Defendant UDC violated its own application and selection processes.  See Reeves v. Sanderson Plumbing, 510 U.S. 133, 145 (2000); Burdine, 450 U.S.

at 256; <u>Townsend v. WMATA</u>, 746 F.Supp. 178, 184 (D.D.C. 1990). Defendant bent the rules to the breaking point by evaluating an individual who failed to apply as required by the Fourth Master Agreement. Exh. 14. Associate Professor Ormond did not submit an application to be considered for the September 2002 promotion cycle. Exh. 8, Ormond Dep. at 71-72.

Defendant UDC's manipulation of the process, criteria, and rules supports a showing of pretext. <u>See</u> <u>Krodel v. Young</u>, 748 F.2d 701 (D.C. Cir. 1984). In <u>Krodel</u>, the D.C. Circuit affirmed the District Court's finding that manipulation of selection criteria was evidence of pretext. <u>Id.</u> at 705. The District Court found that the cancellation of one vacancy announcement and reissuance of another which was narrowly tailored to fit the qualifications of the selectee made a "virtual sham" of the selection process. <u>See</u> <u>id.</u> at 708. "[T]he original vacancy announcement was cancelled and . . . the subsequent vacancy announcement appeared to be tailored for [the selectee] who lacked substantial supervisory experience." <u>Id.</u> In the instant case, Defendant made a "virtual sham" of the selection process by considering an individual who did not apply, re-ranking the candidates after formal ranking by the College Promotion and Evaluation Committee, and applying a different standard to Associate Professor Elam's application. Applying these principles to the facts of this case, this Court must deny

Defendant's Motion for Summary Judgment.

**V.    Plaintiff's Hostile Working Environment Case Should Also Be Tried.**

Professor Elam has raised a valid hostile work environment claim that should be decided by a jury.  For a hostile working environment to be actionable, it must be sufficiently "severe or pervasive" to alter the conditions of the victim's employment and create an abusive working environment. See e.g., Meritor Savings Bank v. Vinson, 477 U.S. 57, 66 (1986); Harris v. Forklift Systems, 510 U.S. 17, 20 (1993); Schoen v. Consumers United Group, 670 F.Supp. 367, 374 (D.D.C. 1986).  Plaintiff has pleaded facts that meet this standard.

Plaintiff's Complaint is timely under National Railroad Passenger Corp. v. Morgan, which held that "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." 536 U.S. 101, 117 (2002).  A hostile work environment cannot be said to have occurred on any particular day, and therefore the practice is treated as an "indivisible whole for purposes of the limitations period" even if some misconduct

occurred more than one year before filing a complaint. <u>Lively v. Flexible Packing Assoc.</u>, 830 A.2d 874, 892 (D.C. App. 2003).

1.    **The University Discriminatorily Removed Associate Professor Elam from His Position as Staff Editor for the <u>Free Voice</u>.**

Beginning in 1998, Defendant began to diminish Associate Professor Elam's professional responsibilities and disparage his character. Dr. Beverly Anderson (African American), former Vice President for Academic Affairs, characterized Associate Professor Elam as a "maverick" with a hidden agenda to a group of Associate Professor Elam's students. Mr. Terry Prescott (African American), Assistant to the Provost and Vice President, was also present at this meeting. On a separate occasion, Dr. Anderson also accused Associate Professor Elam of "misleading and misguiding" his students. Ultimately, she forced Associate Professor Elam out of his faculty editor position on the <u>Free Voice</u>. Compl. ¶ 25.

Associate Professor Elam testified in his deposition that he was forced out of his position as Staff Editor of the <u>Free Voice</u> because Beverly Anderson was extremely hostile toward him, made derogatory statements concerning a <u>Free Voice</u> article, made unfounded accusations concerning a grade he had issued a student editor of the <u>Free Voice</u>, and disparaged his reputation concerning his abilities as a staff editor. Elam Dep. at 106, 120, 138.

2.    **The University Discriminatorily Denied Associate Professor Elam a Key to the Department Offices for Eleven Years.**

Associate Professor Elam was denied the key to his Departmental Offices from 1994 to 2005. He continuously asked for the key, and he asked Acting Department Chairman Charles Belanger three times for the key, as recently as Thursday, May 5, 2005. Associate Professor Elam was not provided a key until after this case was filed in May 2005, before which for 11 years he was unable to access his mailbox, the duplicating machine, and computers for student advising during off-hours. See Compl. ¶ 27.

Associate Professor Elam testified in his deposition that the Departmental Offices are frequently locked as early as 5:00 p.m.; thus, he was unable to use the Department fax machine or to access his students' records. Elam Dep. at 187. Associate Professor Elam was also unable to use the Department copy machine to make handouts for his students and to make copies of tests. Id. at 187. In fact, on many occasions Associate Professor Elam was unable to gain entry into the Department offices at all and was then forced to make copies at his own expense at Kinko's and Office Depot. Id. at 188.

Professor Elam was also forced to ask the security officers to allow him entry on one evening. Elam Dep. at 194. After a 45 minute ordeal, during which the security officers tried several "master" keys, the officers were forced to admit that they did not have a key to the Department at all. Id. Instead, a student who was six feet, eight inches tall volunteered to climb through the

window ledge and open the door from the inside. Id.

3.  **The University Discriminatorily Placed the Journalism Lab in Small, Poorly Ventilated, and Windowless Spaces.**

The Journalism Lab and Associate Professor Elam's office have been repeatedly moved without ever consulting Associate Professor Elam for his thoughts and ideas on how to improve or expand the Journalism program.  The most recent move occurred when Associate Professor Elam was on sick leave for cancer treatment during the fall semester of 2004.  Currently, the Lab is located in a windowless basement and requires an industrial fan to cool the room even in the middle of winter.  The Lab becomes extremely hot and humid when it is full, and as an insulin-dependent diabetic, Associate Professor Elam has great difficulties with excessive heat and highly humid air.  He has repeatedly requested to have the Journalism Lab relocated to a larger, ventilated area, most recently on May 5, 2005, but it has been made clear to Associate Professor Elam that the Lab will not be relocated. See Compl. ¶ 28.

Associate Professor Elam testified in his deposition that between 1998 and 2000, the Journalism Lab was located in an unpainted, poorly ventilated, and incredibly small room in the Van Ness building and that the Lab lacked appropriate technology.  Elam Dep. at 82.  Associate Professor Elam was forced again to spend his own money on paint (nearly $90.00) to paint the walls, and he and two of his students worked for three days to get the space painted.

-30-

Id.  Furthermore, the office was dirty and had no windows, which precluded adequate ventilation and caused many of the students to sneeze on dust and dirt. Id. at 82.  Associate Professor Elam was forced to maintain an office inside this extremely small space that he shared with between 22 and 25 students. Id. at 82.

**4.    The University Discriminatorily Placed Associate Professor Elam in a Small and Irregularly-Shaped Office.**

Associate Professor Elam's office is formed by adjustable walls in a room shared with three other faculty members, but his space is the smallest.  In addition, only his space is irregularly shaped (as opposed to the other faculty who have rectangular spaces), indicating once again that Defendant considers Mr. Elam to be different and "lesser" than other faculty. See Compl. ¶ 29.

Associate Professor Elam testified in his deposition that his office is infested with mice.  Additionally, Associate Professor Elam's space is significantly smaller than his three office-mates' spaces and is irregularly shaped. Elam Dep. at 204.  Furthermore, the lock on the office door is broken and the Department refuses to repair it despite Associate Professor Elam's repeated requests. Elam Dep. at 203.

**5.    The University Denied Associate Professor Elam Training Necessary for his Work.**

Despite repeated requests from Associate Professor Elam, Defendant has not granted him any release time for training with

the new Departmental computers and technology introduced since 2001. For example, he has been denied release time for training with Quark Express software, which is essential for newspaper layouts and production. See Compl. ¶ 30.

Associate Professor Elam testified in his deposition that he was not allowed training despite the fact that the software was designed specifically for producing newspapers. Elam Dep. at 180.

**6.    The University Denied the Journalism Lab Even Basic Technology until Recent Years.**

The Journalism program suffers from outdated and inadequate technology and equipment. Associate Professor Elam has been excluded from the Departmental budgeting process since 1994, except for infrequent last minute minor oral assessments. As a result of Associate Professor Elam's exclusion from this vital process, the Journalism program suffers because he is prevented from effectively advocating on behalf of the program. The substandard equipment and conditions, and the fact that other Coordinators in the Department are involved in the budgeting process, casts a negative reflection on Associate Professor Elam as the Journalism Area Coordinator. In addition, he suffered additional humiliation when Defendant would periodically deny funding for the Journalism Lab's newspaper, the Free Voice, when he was the faculty editor, lab instructor, and advisor. See Compl. ¶ 31.

Associate Professor Elam testified in his deposition that the

Journalism Lab had only outdated computers for the students to use that had been handed down from the Department of Housing and Urban Development. Elam Dep. at 80, 84.  Many students were forced to bring their own laptops to work on. Id. at 84.  Perhaps most significantly, the Journalism Lab lacked any Internet connection whatsoever until 2006, including fax machines, making it nearly impossible for students to research their stories and communicate quickly in the fast-paced news environment. Id. at 81.  Perhaps more shocking, Associate Professor Elam himself did not have a functioning computer for his office until 2004. Id. at 185.  Prior to that year, he had only a broken computer that was handed down to him from another department. Id.  Associate Professor Elam did not have a printer until 2006. Id. at 185.

### SUMMARY AND CONCLUSION

In sum, significant material facts are in dispute in this case.  Because Defendant UDC's stated reasons for not promoting Associate Professor Elam mirror its reasons for the non-promotion, the Court must assume a prima facie case and proceed to the pretext inquiry.

For the foregoing reasons, an award of Summary Judgment in this blatant case of discrimination by UDC against its esteemed Asian Indian professor would be wholly unjustified.  This is a case that must go forward to trial and be remedied.  We attach a

proposed Order, and request oral argument on the Motion for Summary

Judgment.

Respectfully submitted,


_____/s/_____

VALENCIA R. RAINEY
(D.C. Bar No. 435254)
JOSEPH D. GEBHARDT
(D.C. Bar No. 113894)
CHARLES W. DAY, JR.
(D.C. Bar No. 459820)
GEBHARDT & ASSOCIATES, LLP
1101 17th Street, N.W.
Suite 807
Washington, DC 20036-4716
(202) 496-0400

August 28, 2007               Attorneys for Plaintiff

LAW STUDENT ASSISTANTS:
Sarah Nasrullah (Lahore University, Pakistan)
Emily Datnoff (University of Maryland)