UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSEPH V. ELAM, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 05-1557 (JBD) |
| ) | |
| BOARD OF TRUSTEES OF ) | |
| THE UNIVERSITY ) | |
| OF THE DISTRICT OF COLUMBIA, ) | |
| ) | |
| Defendant. ) | |

**DISPUTED FACTS**

1. Disputed. Plaintiff joined the University of the District of Columbia (UDC) as a Media Relations Specialist in October 1971. He became an Assistant Professor in the Communicative Arts Department (now called the Department of Mass Media, Visual, and Performing Arts) in 1976. Amended Compl.

2. Disputed in part. The University did promote the plaintiff, but only after he filed an EEO Complaint of discrimination. The University finally promoted him after an investigation in 1982, by signing a conciliation agreement. The retroactive promotion was effective from 1980, with back-pay and benefits. Exh. 5

3. Disputed in part. The Plaintiff has two Master's degrees, one in Journalism from the Medill School of Journalism at

      Northwestern University (June, 1967), and the other in English Language and Literature from the University of Kerala, India in 1962. Furthermore, he has an undergraduate degree from the University of Madras in Economics, with a minor in history and political science. Plaintiff has also completed first year of law at the Maharajah's Law College in Kerala, India. Also, earned 15 graduate credits toward Ph.d in English from Howard University. Amended Compl.

4. Disputed in part. It is not true that the plaintiff has never entered a Ph.D. program. He may not have entered a Ph.D. program in Journalism, but has done so in English at the Howard University in 1972. He earned 15 hours of work, with high grades. Howard University did not offer a Ph.D. in Journalism at the time. The UDC recognized the plaintiff's graduate credits as continuing education, or professional development. The terminal degree for the Department of Mass Media, Visual, and Performing Arts is a Master's Degree in his field of specialization and teaching. Exh. 1.

5. Disputed. Plaintiff became the Journalism Area Coordinator in 1980 when Professor Daphne Northington took sabbatical leave and then resigned in 1982. Exh. 7.

6. Disputed in part. Plaintiff was the only full time journalism faculty in the Department since the removal of

      Professor Northington in 1982. This resulted in the plaintiff having to teach Professor Northington's portion of courses as well. His workload increased manifold, since he was not only handling twice the number of courses he should have been, but was also publishing the journalism newspaper, Free Voice. Id. at 43-44.

7. Undisputed.

8. Undisputed.

9. Undisputed.

10. Undisputed.

11. Undisputed. Exh. 4.

12. Undisputed.

13. Undisputed.

14. Undisputed.

15. Undisputed.

16. Disputed. During the 2002-2003 promotion cycle, the College Promotions Committee (CPC) reviewed seven applications, plus an application from the previous cycle of 2001-2002. Associate Professor Nelda Ormond's application had been unauthorizedly held back by Dean Rachel Petty from the 2001-2002 cycle to be included in the next cycle of 2002-2003. This was contrary to the 4th and 5th Master Agreement guidelines. Exh. 14.

17. Undisputed.

18. Disputed. The College Committee assigned points based on qualitative and quantitative analysis of applicants' accomplishments with an objective mathematical scoring system and a critical analytical approach for ranking. Exh. 14.

19. Disputed. The ranking was not solely based on the scores assigned; it was based on the collective academic wisdom of 11 chairs of the Department Committees in the College of Arts and Sciences with an objective, mathematical scoring system and a critical, analytical review for ranking. Id.

20. Disputed.

21. Undisputed.

22. Undisputed.

23. Disputed. Plaintiff created the "Literacy through Journalism" project for the Mary Terrell Elementary School. [From the handout that Elam dropped by yesterday: Dean Petty singled out the department of 'Graphic Communication and Graphic Design' as one which revised its curriculum despite budgetary constraints. However, that is an unfair comparison because the program had five full time faculty members, in addition to some adjunct faculty members and consultants who were assigned especially by Dean Petty herself to revise the

curriculum].

The plaintiff has kept abreast of the legal and ethical issues since his in-class assignments required using the Washington Post, Public Journalism, and Community Journalism. Exh. 1.

24. Disputed. As the Journalism Program Coordinator, the plaintiff was not solely responsible for updating the journalism curriculum. It was the responsibility of the Dean and the Department Chair to update the journalism courses at UDC, taking budgetary constraints into account. Professor Elam had recommended the upgrading of the journalism program, as of 1990 which fell on deaf ears. Exh. 7, 24-37.

25. Disputed. Professor Elam had pleaded with the Department chair as early as 1995 to upgrade and revamp the journalism program, which was ignored by the Chair and the Dean. Exh. 19.

26. Disputed. It was the journalism Coordinator, Professor Elam, who stressed the need for "substantial upgrading and revamping" of the journalism curriculum", not the other way. The Plaintiff concurred with the upgrading of the curriculum which he has been fighting for since 1990. Exh. 19.

27. Disputed. The Plaintiff advocated the need for "substantial upgrading and revamping" of the journalism curriculum which he recommended as early as 1994 when Professor Yvonne Carter became the Chairman of the Department. Exh. 19.

28. Disputed. The Plaintiff had submitted the same proposal as early as 1993 recognizing the need to revise the journalism curriculum to the then Department Chair. But it was ignored. Exh. 19.

29. Disputed. Plaintiff was already briefed by the Chair that the proposed new courses are subject to the constraints of the budgetary limitations. Exh. 19.

30. Disputed. The course was proposed by using current videos on the ethics issues in journalism, because from two decades of personal experience, Professor Elam had learned that the students were not interested in the theory of ethics. This assumption was proved when the ethics course was offered in the Spring of 2007; no one registered for the course. So the Department had to ditch the course. Exh. 19.

31. Undisputed.

32. Disputed. The Plaintiff was not at all responsible unless he got the approval from the Department Chair and the Dean because of Budgetary Constraints. The Plaintiff was not at

     all developing a full-blown syllabus, which requires weeks of consulting with other journalism schools and examining appropriate books for the course for students who need remedial education in English, math and science. Exh. 19.

33. Disputed. The Plaintiff did submit a sample syllabus. Exh. 19.

34. Disputed.

35. Disputed. The Plaintiff did submit a sample syllabus for the computer –assisted reporting course prepared by adjunct faculty Prof. Harvey Johnson. Exh. 19.

36. Disputed. The Plaintiff did not get a positive response from the Department Chair to proceed with the proposed courses. Hence he couldn't submit full-blown syllabi which require so many hours and weeks of work to prepare for students who need remedial education in English, math, science and other areas.

Whereas the Programs like Music had 9 full time faculty members plus several adjuncts; Art had 6 full time faculty members with several adjuncts at one time. Although journalism had one full time adjunct and a part time adjunct, the Journalism Coordinator could not enlist their support since under the Master Agreement, the university cannot charge the adjuncts to do administrative work. Exh. 19.

37. Disputed. Professor Elam had submitted proposals to upgrade the curriculum to the chairs. But the paucity of response from the Chair and the Dean, who always brandished the argument of "budgetary constraints" and "not enough money" Professor Elam abstained from submitting the proposal to the Curriculum Committee.  Still in 2001, he submitted a proposal to the Chair to upgrade the  journalism curriculum by adding 8 new courses which fell on deaf years. Id.

38. Disputed. Prof Elam's extensive portfolio  submitted along with the promotion  application contains more evidence of documented scholarship, professional activity and professional development than all the 8 applicants, particularly the portfolios of the three candidates recommended and promoted to the rank of  full professorship. Exh. 1.

39. Disputed. All  Professor Elam's published articles  in Newspapers and Magazines since 1971 —thru 2007  are voluntary contributions. Even his editorship of the two magazines, METRO MAGAZINE and AMERICAN MAGAZINE  from 1982 thru 1986 was unpaid voluntary work. Exh. 1, 2, 3.

40. Disputed. Professor Elam's LITERACY THROUGH JOURNALISM (LTJ) Project  is an example of original research starting with the hypothesis -- that  reading , writing , and public

    speaking skills of minority students in elementary thru high school—can be improved by using minority publications in class rooms. The pilot project of LTJ was implemented and proved the hypothesis true. As a result Mary Terrell's Principal, presented Associate Professor Elam the Outstanding Teacher Award during the graduation of 19 students in the LTJ Program. Elam wrote the manual for the LTJ Project. Again, it fits with the mission of the university. Exh. 2.

41. Disputed. Dean Petty uses the term "critical acclaim" when she is describing the criteria for assessing scholarship. She does not say that "Plaintiff has not received any awards or critical acclaim for his writings by professional writers or organizations in his field." Professor Elam has received numerous awards for his journalistic and public relations writings from many organizations. In fact, all the awards Elam received are for the end product of journalistic writing. In fact none of the promoted candidates have received awards and recognitions to the extent Professor Elam has won.

    The republication of Elam's article on Duke Ellington in the Kingmaker Magzine as a legacy feature is the highest honor and recognition a journalist can covet from a National Black

Legacy Magazine. Exh. 14.

42. Disputed. Exh. 1, 2, 3.

43. Disputed.

44. Undisputed.

45. Disputed. Provost Reuben —Cooke  rubber-stamped Dean Petty's recommendation. Exh. 16.

46. Disputed. Again, Provost Reuben-Cooke is  reviewing through the prejudiced or jaundiced eyes of Dean Petty. Exh. 16.

47. Disputed in part. The Plaintiff has presented  and participated in annual Journalism workshops and seminars. He presented  at the university for several years. Further his journalism classes begin  with discussions on the issues in journalism  and coverage anomalies of the current  Press. Exh. 1, 2, 3.


48. Disputed in part. Professor Elam, in his appeal, requested to President Pollard to review his application and portfolio in comparison with the portfolios of  the candidates promoted. Exh. 17.


49. Undisputed.

50. Undisputed .

51. Disputed. In his deposition, President Pollard  found

"Plaintiff's application lacking proof of scholarly works that have "undergone the scrutiny of peers in one's profession." Exh. 16.

52. Disputed.  Exh. 13.

53. Disputed.

54. Disputed.

55. Disputed.

56. Undisputed.

57. Undisputed.

58. Undisputed.

59. Undisputed.

60. Undisputed.

61. Disputed.  Exh. 8.

62. Undisputed.

63. Undisputed.

64. Disputed.  Exh. 8.

65. Undisputed.

66. Disputed.  Exh. 14.

67. Disputed.  Exh. 8.

68. Disputed.

69. Undisputed.

70. Undisputed.

71. Undisputed.

72. Undisputed.

73. Undisputed.

74. Undisputed.

75. Undisputed.

76. Undisputed.

77. Undisputed.

78. Undisputed.

79. Undisputed.

80. Undisputed.

81. Undisputed.

82. Undisputed.

83. Undisputed.

84. Undisputed.

85. Disputed.  Exh. 7.

86. Disputed.  Exh. 7.

87. Disputed.  Exh. 7.

88. Disputed.  Exh. 7.

89. Disputed.  Exh. 7.

90. Disputed.  Exh. 7.

91. Disputed.  Exh. 7.

92. Disputed.  Exh. 7.

93. Disputed.  Exh. 7.

94. Disputed.  Exh. 7.

95. Disputed.  Exh. 7.

96. Disputed.  Exh. 7.

97. Disputed.  Id.

98. Disputed.  Id.

99. Disputed.  Id.

100. Undisputed.

101. Disputed.  Exh. 7.

102. Disputed.  Id.

103. Disputed.  Id.

104. Disputed.  Id.

105. Disputed.  Id.

106. Disputed.  Id.

107. Disputed.  Id.

108. Disputed.  Id.

109. Disputed.  Id.

110. Disputed.  Id.

111. Disputed.  Id.

112. Disputed.  Id.

113. Disputed.  Id.

114. Disputed.  Id.

115. Disputed.  Id.

116. Disputed.  Id.

117. Disputed. Id.

118. Disputed. Id.

119. Disputed. Id.

120. Disputed. Id.

121. Disputed. Id.

122. Disputed. Id.

123. Disputed. Id.

124. Disputed. Id.

125. Disputed. Id.