## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOSEPH v. ELAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 05-1557 (JDB) |
| v. | ) | |
| | ) | |
| BOARD OF TRUSTEES OF THE | ) | |
| UNIVERSITY OF THE DISTRICT OF | ) | |
| COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM OPINION

Plaintiff Joseph V. Elam is an Associate Professor of journalism at the University of the District of Columbia ("UDC"), a position and title that he has held since 1982.  In September 2002, plaintiff applied for promotion to the rank of Full Professor.  Two committees within UDC reviewed plaintiff's application and recommended him for promotion.  Despite those endorsements, Dean Rachel Petty made an independent determination that plaintiff's achievements did not warrant the title of Full Professor, the highest rank awarded by the University.  Consequently, she did not recommend plaintiff for promotion.  After reviewing all of his materials, the Provost and Vice President for Academic Affairs concurred with Dean Petty's assessment and denied plaintiff's application for promotion.  Plaintiff subsequently appealed to the President of the University, who agreed with his colleagues in the administration and denied

-1-

plaintiff's appeal.  Believing that he had been the victim of unlawful discrimination, plaintiff, a

person of "Asian Indian" ethnicity, filed suit in the Superior Court of the District of Columbia

seeking relief under both the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§

2-1401 et seq. (2001), and 42 U.S.C. § 1983.  The crux of plaintiff's complaint is that he was

discriminated against on the basis of his ethnicity.  He also claims that UDC created a hostile

work environment.  Defendant removed the case to this Court and has now moved for summary

judgment in its favor.  For the reasons set forth below, the Court will grant defendant's motion.

## BACKGROUND

Although the parties disagree over what to make of them, the operative facts of this case

are not seriously in dispute.  Plaintiff first joined the faculty of Federal City College in 1971.

Pl.'s Opp'n at 5.  In 1977, Federal City College was merged with several other institutions to form

what is now known as UDC.  An alumnus of the Medill School of Journalism, Northwestern

University, where he earned his Master's degree in journalism in 1976, plaintiff was initially a

"Media Relations Specialist" at the University before he became an Assistant Professor in 1976.

Pl.'s Stmt. of Facts ¶¶ 1, 3.  The parties disagree over the exact date, but since 1980 at the latest

plaintiff has served as the "Journalism Program Coordinator" and he was promoted to the rank of

Associate Professor in 1982.  Pl.'s Stmt. of Facts ¶ 3; Def.'s Stmt. of Facts ¶¶ 2, 5.  He has also

been the only full-time faculty member of the journalism program -- which is housed within

UDC's Department of Mass Media, Visual and Performing Arts, Def.'s Stmt. of Facts ¶ 7 -- since

1982.  Pl.'s Stmt. of Facts ¶ 6.  Although he initially enrolled in an English Ph.D degree program

at Howard University, plaintiff did not complete the course-work required to earn that degree,

and it is undisputed that he does not hold a Ph.D in journalism.  Id. ¶ 4; Def.'s Stmt. of Facts ¶ 4.

In September 2002, plaintiff applied for promotion to Full Professor, setting off the chain of events that ultimately culminated in this litigation. The process for promotion review at UDC is multi-tiered. At the outset, when a member of the faculty applies for promotion, the appropriate Department Chair issues an initial recommendation on the application. In this case, Yvonne Carter -- the Chair of the Department of Mass Media, Visual and Performing Arts -- "strongly recommended" plaintiff's application for promotion. Def.'s Stmt. of Facts ¶ 11. Next, the application is passed along to the "Department Evaluation and Promotion Committee" ("Department Committee"), which consists of faculty from within the applicant's department. Id. ¶ 13. Here again, plaintiff's application was received favorably; of the four faculty members on the Committee, three "strongly recommended" plaintiff for promotion and one "recommended" him "but not strongly." Id. ¶¶ 14-15.

Moving along, the next step in the promotion procedure is review by the College Evaluation and Promotion Committee ("College Committee"). Id. ¶ 16. The College Committee consists of the Chairs of each Department Committee within the appropriate college,[1] and it consequently reviews the applications of each faculty member up for promotion from within that college. Id. ¶¶ 16-17. In addition to plaintiff's promotion portfolio, the eleven members of the College Committee reviewed seven other applications that year and ranked each within a numerical hierarchy. Def.'s Stmt. of Facts ¶ 18; Pl.'s Stmt. of Facts ¶ 19. Plaintiff's application was ranked second of eight and given a "strong recommendation." Def.'s Stmt. of Facts ¶ 19.

_____

[1] There are three colleges that make up UDC: the College of Arts and Sciences, the School of Business and Public Administration, and the School of Engineering and Applied Sciences. Def.'s Stmt. of Facts ¶ 9. Plaintiff's department is contained within the College of Arts and Sciences. Id. ¶ 8.

Two other individuals -- ranks #1 and #3, respectively -- were "strongly recommended," one faculty member (rank #4) was "recommended," and the remaining applicants (ranks #5-8) were "not recommended" for promotion.  Id. Ex. F.

After the College Committee issues its recommendation, the applications are then forwarded to the Dean of the appropriate college for an independent assessment.  In this case, Rachel Petty, Dean of the College of Arts and Sciences, performed that appraisal.  Id. ¶¶ 20-21. After completing her review of the applications, Dean Petty concurred with the College Committee's recommendations to promote Professor Harmon-Martin (rank #1) and Professor Brown (rank #3).  Def.'s Mot. Ex. G at 1.  She also concurred with the College Committee's recommendations to promote Professor Ormond (rank #4) and not to promote candidates ranked #5 - 8 from the College of Arts and Sciences.  Id.  Significantly, however, she decided to swap the College Committee's respective ranks of plaintiff and Professor Ormond, for purposes of her recommendation.  Id. at 1-2.  After doing that, Dean Petty then "decided not to recommend plaintiff's promotion."  Def.'s Stmt. of Facts ¶ 21.  She did so, according to defendant, upon her determination that plaintiff had failed to "keep current in his field" and neglected to provide "leadership in curriculum review and development."  Id. ¶ 23.  In addition, she found plaintiff's scholarship lacking.  Plaintiff's application, in her view, displayed a dearth of "'peer-reviewed research [or] . . . writing awards or critical acclaim by other professional writers.'"  Id. at 38. Moreover, plaintiff did not demonstrate that he had ever undertaken any "formal research in his discipline."  Id. ¶ 40.  Those two critical flaws convinced Dean Petty that plaintiff was not entitled to the rank of Full Professor, the highest academic position awarded by UDC.

After the appropriate Dean renders an opinion, applications are forwarded to the Vice

-4-

President of the University, who reviews promotion applications from all of the constituent
colleges at UDC.  Def.'s Stmt. of Facts ¶ 44.  In this instance, Wilhelmina Reuben-Cooke,
Provost and Vice President for Academic Affairs, examined plaintiff's application and concurred
with Dean Petty's assessment that plaintiff's portfolio did not warrant promotion to the rank of
Full Professor.  Id. ¶¶ 45-47.  Following that determination, plaintiff filed a written appeal with
the President of the University, Dr. William Pollard.  Id. ¶ 48.  Dr. Pollard held an in-person
meeting with plaintiff to discuss his application but subsequently decided not to promote plaintiff
for substantially the same reasons cited by Dean Petty and Provost Reuben-Cooke.  Id. ¶¶ 51-53.

Exasperated with UDC's promotion process, plaintiff filed this lawsuit.  A native of
Kerala, India, plaintiff believes that his promotion was denied due to his Asian Indian ethnicity.
In support of this claim, plaintiff points out that all three decision-makers who issued adverse
recommendations and decisions regarding his promotion -- Dean Petty, Provost Reuben-Cooke,
and Dr. Pollard -- are "African Americans (or African)."  Pl.'s Opp'n at 2.  So, too, were the three
candidates who were in fact promoted during that same application cycle.  Id.  Plaintiff claims
that he was the victim of "bias against an Asian Indian, non-African American professor," id. at
6, and his complaint seeks relief under the DCHRA (Count I) and § 1983 (Count IV) for
unlawful race discrimination in an employment decision.[2]

In addition, plaintiff also raises a hostile work environment claim under the DCHRA
(Count II), asserting that "UDC has subjected him to a continuous hostile work environment for
nearly two decades."  Id. at 1.  In particular, he claims that he endured the following conditions:

---

[2] Plaintiff also initially brought an age discrimination claim (Count III), but he has since
abandoned that cause of action.  Pl.'s Opp'n at 1-2 ("Plaintiff is no longer pursuing his age
discrimination claim.").

(1) he was denied a key to his department office for nearly ten years; (2) the journalism office was repeatedly relocated, often to undesirable locations and work-spaces without plaintiff's input; (3) he was pressured to change a student's grade from an "F" to a "C"; (4) he was "discriminatorily removed" from his position as Staff Editor of the University's newspaper; (5) the University denied him adequate training and technology to upgrade and improve the journalism program; and (6) former Provost Beverly Anderson attempted to disrupt plaintiff's "Living Legend Award program." See Pl.'s Opp'n at 27-33; Def.'s Stmt. of Facts ¶¶ 85-125.

Plaintiff has requested the following relief: retroactive promotion to the rank of Full Professor dating back to the 2004-05 academic year, full back pay and benefits for the intervening time period, and compensatory and punitive damages appropriate to his various asserted injuries. First Am. Compl. ¶ 44. Defendant has moved for summary judgment and that motion is now ripe for resolution.

## STANDARD OF REVIEW

### I.     Summary Judgment

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by identifying those portions of "the pleadings, the discovery and disclosure materials on file, and any affidavits" which it believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); see Celotex, 477 U.S. at 323.

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

## II.    The McDonnell Douglas Framework

Ultimately, Counts I and IV of the First Amended Complaint will be resolved under the same general legal framework.  The D.C. Court of Appeals has stated that it "often look[s] to cases construing Title VII to aid . . . in construing the [DCHRA]."  See Lively v. Flexible Packaging Ass'n, 830 A.2d 874, 887 (D.C. 2003) (internal citations omitted).  Thus, that court has applied the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), burden-shifting analysis to employment discrimination claims brought under the DCHRA.  See Miller v. Am. Coal. of Citizens with Disabilities, Inc., 485 A.2d 186, 189 (D.C. 1984) (applying the McDonnell Douglas framework to the DCHRA); see also Blackman v. Visiting Nurses Ass'n, 694 A.2d 865, 868-69 (D.C. 1997).  Similarly, federal claims of race discrimination in the employment context brought under § 1981 and § 1983 are also resolved under the same Title VII principles.  See Carter v. Duncan-Huggins, Ltd., 727 F.2d 1225, 1232 (D.C. Cir. 1984) (§ 1981); Randle v. City

of Aurora, 69 F.3d 441, 450 (10th Cir. 1995) (§ 1983); see also Singletary v. Dist. of Colum.,

351 F.3d 519, 529-30 (D.C. Cir. 2003) (entertaining failure to promote claim under § 1983).

Hence, both plaintiff's DCHRA claim under Count I and his § 1983 claim under Count IV[3] will

be examined using the same Title VII disparate treatment framework, to which I now turn.

　　　Disparate treatment and retaliation claims brought pursuant to Title VII are analyzed

under the familiar burden-shifting framework established by the Supreme Court in McDonnell

Douglas.  The first step requires a plaintiff to carry the burden of establishing a prima facie case

by a preponderance of the evidence.  McDonnell Douglas, 411 U.S. at 802; Tex. Dep't of Cmty.

Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  In order to make out a prima facie case of

discrimination, a plaintiff must show that "(1) she is a member of a protected class; (2) she

suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference

of discrimination."  Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting Brown v.

Brody, 199 F.3d 446, 452 (D.C. Cir. 1999)).

　　　Once the plaintiff establishes a prima facie case, the burden shifts to the employer to

articulate a legitimate, non-discriminatory reason for its actions.  McDonnell Douglas, 411 U.S.

at 802.  The employer's burden, however, is merely one of production.  Burdine, 450 U.S. at

254-55.  The employer "need not persuade the court that it was actually motivated by the

proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to

_____

　　　[3] Defendant is correct that the District of Columbia is not strictly subject to the Fourteenth Amendment because it is not a state.  Def.'s Mot. at 1.  Thus, plaintiff's § 1983 claim under the Equal Protection Clause of the Fourteenth Amendment appears to miss the mark.  Nevertheless, that issue is resolved without consequence because the District is bound by the same standards under the Due Process Clause of the Fifth Amendment.  See Bolling v. Sharpe, 347 U.S. 497, 499 (1954).

whether it discriminated against the plaintiff." Id.

If the employer is successful, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination or retaliation.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).  The plaintiff "may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'"  Id. (quoting Burdine, 450 U.S. at 256).  But "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination."  Reeves, 530 U.S. at 147.  Thus, the trier of fact may also "consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'"  Id. (quoting Burdine, 450 U.S. at 255 n.10).  "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors . . . includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."  Reeves, 530 U.S. at 148-49.  As the D.C. Circuit has explained:

> Assuming then that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus of proceedings at trial (and at summary judgment) will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment).

Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc); see also

Waterhouse v. District of Columbia, 298 F.3d 989, 992-993 (D.C. Cir. 2002).

Although the "intermediate evidentiary burdens shift back and forth" under the McDonnell-Douglas framework, "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Reeves, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 253).  Once the defendant has proffered a legitimate non-discriminatory reason for its action, then, the question is whether that proffered reason is a pretext for discrimination.  At this point, the McDonnell Douglas shifting burdens framework effectively evaporates -- the sole remaining issue is discrimination vel non, and "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003); see Reeves, 530 U.S. at 142-43. Examination of that issue in this setting therefore requires consideration of all the relevant circumstances in evidence, including the strength of the prima facie case, any direct evidence of discrimination, any circumstantial evidence that defendant's proffered explanation is false (which may be enough with the prima facie case to infer unlawful discrimination), and any properly considered evidence supporting the employer's case.  Reeves, 530 U.S. at 147-48; see also Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1151 (D.C. Cir. 2004); Lathram, 336 F.3d at 1089; Waterhouse, 298 F.3d at 993; Aka, 156 F.3d at 1290.

## DISCUSSION

I.    **Race Discrimination in the Decision Not to Promote**

        *a.    The Prima Facie Case*

There is no direct evidence of discrimination in this case.  Thus, the Court turns to the

McDonnell Douglas burden-shifting framework to guide its analysis.  As explained above,

plaintiff must first demonstrate that he can make out a prima facie case of discrimination.

Plaintiff is a member of a protected class.  Here, his asserted adverse employment action is that

his promotion was denied on account of his race.  It is well established that a "failure to promote

is an 'adverse action' for purposes of a prima facie case."  Stella, 284 F.3d at 146 (citing

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).  Hence, the remaining element of a

prima facie case of discrimination is to show that the denial of promotion "gives rise to an

inference of discrimination."  Id. at 145.[4]

---

[4] At times, courts have fashioned slightly different articulations of the requirements of a
prima facie case in the specific context of denial of promotions.  The D.C. Circuit, for instance,
has previously indicated that in the hiring or promotion arena a plaintiff must show that: "(1) he
is a member of a protected class; (2) he applied for and was qualified for an available position;
(3) despite his qualifications he was rejected; and (4) either someone . . . filled the position or the
position remained vacant and the employer continued to seek applicants."  Lathram, 336 F.3d at
1085 (internal citation omitted).  But the Court does not feel that the Lathram gloss is appropriate
here.  Lathram contemplates a vacancy situation where an employer is seeking to fill a position,
often competitively.  The promotion at issue in this case does not fit that mold.  There was not a
"vacancy" at the Full Professor position, so to speak, that plaintiff applied to fill.  Indeed, in some
sense the "position" was not even created until plaintiff applied for it.  Thus, while the first three
prongs of the Lathram approach make sense here, the fourth really has no application to the
academic promotion arena.  It is also worth noting that there is some ambiguity concerning
whether another particularized articulation of the prima facie requirement previously used by this
Court is still good law in the light of recent D.C. Circuit opinions.  In Marshall v. Shalala, 16 F.
Supp. 2d 16 (D.D.C. 1998), the court stated that to demonstrate a prima facie case for a denial of
promotion claim a plaintiff is required to show that: "(1) he belongs to a protected group; (2) he
was qualified for and applied for a promotion; (3) he was considered for and denied the
promotion; and (4) other employees who were not members of the protected group were indeed
promoted at the time plaintiff's request for a promotion was denied."  Id. at 19.  As with Lathram,
the problem here involves the fourth prong.  Specifically, recent D.C. Circuit opinions in
somewhat different but related contexts have explained that a plaintiff is not required to show
that similarly situated employees outside of the protected class did not suffer the same adverse
action.  See Wiley v. Glassman, No. 06-5402, slip op. at 6 (D.C. Cir. Dec. 14, 2007); Mastro v.
Potomac Elec. Power Co., 447 F.3d 843, 850 (D.C. Cir. 2006).  The fourth step of the Marshall
inquiry, then, has been called into question by the D.C. Circuit, if not implicitly disavowed.
Thus, the Court will proceed with the familiar three-part articulation espoused in Stella.

On that point, defendant adamantly maintains that plaintiff was not qualified for the position and that fact -- rather than any discriminatory animus -- was what motivated its decision not to promote plaintiff. The criteria for promotion at UDC is fixed in part by District of Columbia Municipal Regulations. In that regard, 8 D.C.M.R. § 1441.6 provides as follows:

> Eligibility for promotion shall be based on the following criteria: (a) Earned degrees and other appropriate credentials and experience required for the desired rank; (b) Teaching competence, as evidenced by consistent evaluation ratings of not less than "Good"; (c) Sustained scholarship and professional growth during the period of service at the current academic rank, as evidenced by a continuing and increasing quality of scholarship and professional growth; (d) Length of service to the University; and (e) Service to the University, including sustained contributions to department, college, or University committees, department or college academic programs, faculty and institutional governance, and supportive service to student activities for the current academic rank as determined by evaluation.

In addition, a collective bargaining agreement, the so-called "Fourth Master Agreement," further elaborates on the relative weights assigned to an applicant's credentials. That agreement provides that an applicant's "Teaching and Job Related Responsibilities" should be given a weight of 60% in the promotion determination. Pl.'s Opp'n Ex. 14 at 2. Moreover, the document calls for a 25% weight for "Scholarship and Professional Growth," in addition to a 10% weight allocated to "University Service," and finally 5% dedicated to "Public Service." Id. To the Court's knowledge, the Fourth Master Agreement does not specify particular benchmarks that establish whether a candidate's application should be denied or approved. Rather, it merely dictates the appropriate weight that should be assigned to the criteria used to reach that decision.

Against that backdrop, defendant maintains that plaintiff cannot state a prima facie case of non-promotion because he was not qualified for the position of Full Professor. Defendant begins by discounting the recommendation that plaintiff received from the Department Committee. According to Dean Petty's deposition testimony, the Department Committee often

recommends every applicant as a matter of "collegiality." Def.'s Mot. at 4. Next, defendant similarly discounts plaintiff's strong recommendation by the College Committee. According to Dean Petty, the Committee "assign[s] points based on the quantity of an applicant's accomplishments with little or no critical judgment as to the quality of those accomplishments." Def.'s Stmt. of Facts ¶ 18.

After diminishing the significance of the two committee recommendations, defendant maintains that Dean Petty made an independent and nondiscriminatory decision that plaintiff was not qualified to hold the position of Full Professor. She did so, according to defendant, on the basis of two primary determinations: (1) that plaintiff had failed to keep current in the field of journalism, as evidenced by his failure to follow the proper procedures to ensure that new "courses could be approved and added to the regular curriculum"; and (2) that plaintiff's portfolio was devoid of any published writings "about the field of journalism," displayed no "evidence of formal research related to his discipline," and contained no indication that his writings had undergone rigorous peer-review or received critical acclaim "from professionals in his field." Def.'s Mot. at 5. Both of these deficiencies, according to defendant, are significant because they are responsive to express criteria listed in Title 8 of the D.C.M.R. and thus they persuaded Dean Petty not to recommend plaintiff's promotion. Provost Reuben-Cooke and President Pollard concurred in Dean Petty's determinations for substantially the same reasons. Id.

In response, plaintiff cites a litany of facts that demonstrate, in his view, that he is qualified for the position. Pl.'s Opp'n at 13. First, he takes issue with Dean Petty's characterization of the College Committee's role in promotion recommendations. Rather than performing the robotic function described by defendant, plaintiff insists that the College

Committee assigns points "based on the qualitative and quantitative analysis of applicants' accomplishments with an objective mathematical scoring system and a critical analytical approach for ranking." Pl.'s Stmt. of Facts ¶ 18 (emphasis added). Next, plaintiff takes Dean Petty to task for laying the entire responsibility for curricular development on his shoulders. According to plaintiff, it is "the responsibility of the Dean and the Department Chair to update the journalism courses at UDC, taking budgetary constraints into account." Pl.'s Stmt. of Facts ¶ 24. More importantly, plaintiff insists that he had made several recommendations to update the curriculum dating back to 1990 that had fallen "on deaf ears." Id. ¶¶ 24-25.

With regards to his scholarship, plaintiff argues that his "extensive portfolio . . . contains more evidence of documented scholarship, professional activity and professional development than . . . the three candidates recommended and promoted to the rank of full professorship." Id. ¶ 38. More broadly, plaintiff claims that he has "received numerous awards for his journalistic and public relations writings from many organizations." Id. ¶ 41. He also asserts that he published more written material "than all three selected Full Professors combined." Id. Additionally, plaintiff points to his "excellent" performance and teaching evaluations as proof that he fully satisfied the "Teaching and Job Related Responsibilities" category of the Fourth Master Agreement. Id.

Aside from his factually-based argument that he was qualified for the promotion, plaintiff also offers a legal justification for moving to the next step of the McDonnell Douglas analysis. According to plaintiff, in cases where "defendant's proffered evidence for showing that a plaintiff was not meeting the employer's expectations mirrors the nondiscriminatory reason associated by the employer," other courts have "assumed" that a prima facie case exists and "proceeded to the

pretext inquiry in the interests of fairness and efficiency." Pl.'s Opp'n at 17 (citing Jones v. Giant

Foods, Inc., 2000 WL 1835393 at *2 (D.Md. Nov. 27, 2000)). There is also additional authority

supporting plaintiff's proposition. See, e.g., Bienkowski v. Am. Airlines, Inc., 851 F.2d 1503,

1505 (5th Cir. 1988) (noting that discussing qualifications at both the prima facie stage and

pretext stage is "an unnecessary redundancy").

    Here, defendant's arguments regarding plaintiff's qualifications at the prima facie and

nondiscriminatory explanation stages are essentially identical. Consequently, given the record

evidence produced by plaintiff concerning his qualifications -- putting aside, for the moment,

defendant's take on plaintiff's portfolio -- together with his lengthy period of service at UDC as

an Associate Professor, the Court is satisfied for prima facie purposes that plaintiff has

demonstrated that he is qualified for the position. The Supreme Court's emphatic declaration that

"[t]he burden of establishing a prima facie case of disparate treatment is not onerous" informs the

decision here. Burdine, 450 U.S. at 253; see also Wiley, slip op. at 5. Due to the uniformity of

the defendant's arguments in this instance, the Court finds that defendant's characterization of

plaintiff's qualifications is best addressed at the nondiscriminatory reason and pretext stages of

the McDonnell Douglas test.

    Finally, defendant argues that plaintiff has failed to demonstrate that similarly situated

employees outside of his protected class were promoted during the same application cycle. Def.'s

Mot. at 16-17. The three individuals that were so promoted, according to defendant, are not

similarly situated to plaintiff. Def.'s Mot. at 16-17. As defendant would have it, plaintiff must

show that "all relevant aspects of [his] employment situation were 'nearly identical,'" see Neuren

v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995), to qualify as

"similarly situated" to those three candidates. Def.'s Mot. at 16-17. On this record, defendant maintains that plaintiff cannot surpass that hurdle. To begin with, each of those professors is engaged in a discipline other than journalism, making any comparison with plaintiff difficult from the outset due to the varying nature of scholarly pursuits in different academic contexts. Dr. Harmon-Martin teaches political science, while Dr. Adebayo is a professor of aerospace engineering, and Professor Ormond teaches "vocal performances." Id. at 16.

Defendant also insists that each candidate had academic and professional credentials that set them apart from plaintiff. First, unlike plaintiff, both Dr. Harmon-Martin and Dr. Adebayo hold Ph.D degrees in their respective fields and the D.C.M.R. explicitly notes that degrees earned should factor into the promotion decision. Def.'s Mot. at 16-17; 8 D.C.M.R. § 1441.6. On the issue of scholarship, another relevant consideration under both the Fourth Master Agreement and Title 8 of the D.C.M.R., Dr. Harmon-Martin has published research and performed studies that Dean Petty determined demonstrated her scholarly worth. Id. at 7. Similarly, Dr. Adebayo "had several unpublished manuscripts or works in progress" that Dean Petty determined "constituted original research of high quality." Id. at 8. Although Professor Ormond did not have a Ph.D degree at the time she was promoted, defendant correctly points out that she was concurrently working towards that degree. Id. at 7. And despite her lack of published scholarship, Professor Ormond's public performances -- the relevant body of professional work for a music instructor, in defendant's estimation -- had received favorable critical acclaim. Id. at 7-8. In addition, she had actively "revised the music curriculum" at UDC. Id. at 8. These factors, according to defendant, distinguish the three successful candidates from plaintiff in such a manner that renders them not similarly situated for purposes of his non-promotion prima facie case.

Plaintiff does not attempt directly to rebut defendant's contentions. Instead, he argues that he is not required to show that he was treated differently than similarly situated candidates from outside of his protected class and that defendant "misstates the standard for a prima facie case of non-promotion." Pl.'s Opp'n at 18-19. In support of this position, plaintiff cites George v. Leavitt, 407 F.3d 405 (D.C. Cir. 2005). In George, the D.C. Circuit explained that one "method" that a plaintiff can use to establish an inference of discrimination is to demonstrate "that she was treated differently from similarly situated employees who are not part of the protected class," but, the court cautioned, "this is not the only way." 407 F.3d at 412. Instead, plaintiff asserts, if one can show that the adverse action was not attributable to "'the two most common legitimate reasons'" advanced by employers -- the "'absolute or relative lack of qualifications or the absence of a vacancy in the job sought'" -- then that demonstration alone "'is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one.'" Id. (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 358 n.44 (1977)). Thus, plaintiff insists that he "need only demonstrate facts sufficient to show that he is qualified and that Defendant's reasons are suspect." Pl.'s Opp'n at 19.

Plaintiff is correct in this regard. As explained above, in addition to George, other recent D.C. Circuit opinions have disavowed the strict requirement of a "similarly situated" demonstration at the prima facie stage. See p. 11 n.4 infra. Tellingly, defendant "agrees that, for purposes of a prima facie case, it is not always necessary to show disparate treatment of similarly situated individuals." Def.'s Reply at 1. Instead, defendant again asserts that plaintiff has failed to show that he is qualified for the position in any event. Id. But as detailed above, the Court is satisfied that plaintiff has demonstrated that he was qualified for the position in the context of

establishing a prima facie case. That is sufficient to advance the analysis under the <u>McDonnell Douglas</u> framework.

       *b.*     *Defendant's Nondiscriminatory Reason*

Once the plaintiff has made out a prima facie case of discrimination, the burden shifts to the defendant to identify a non-discriminatory reason for the adverse employment action. In this case, the Court has already discussed defendant's asserted non-discriminatory explanation. In short, defendant maintains that the decision-makers at UDC made an independent determination that plaintiff was not qualified to be promoted to Full Professor on the basis of perceived weaknesses in his application. Specifically, Dean Petty testified in her deposition that she believed that plaintiff had neither kept current in his field (and had correspondingly failed to update UDC's journalism curriculum) nor demonstrated the appropriate type of scholarship worthy of promotion to Full Professor.

Defendant's burden at this stage is only one of production: "defendant must clearly set forth, through admissible evidence, the reasons for the plaintiff's rejection." <u>Burdine</u>, 450 U.S. at 255. Moreover, defendant need not "persuade the court that it was actually motivated by the proffered reasons." <u>Id.</u> at 254. Here, defendant has easily satisfied its burden. The two explanations offered by defendant are amply supported by record evidence, and are free from discriminatory animus. As such, the Court now turns to the final stage of the inquiry.

       *c.*     *Pretext Analysis*

Because UDC has put forward a legitimate nondiscriminatory reason for its action, plaintiff now has the opportunity to establish that the asserted explanation is a mere pretext for unlawful discrimination. As noted above, the <u>McDonnell Douglas</u> burden-shifting framework is

completed and the sole remaining question is discrimination <u>vel non</u>: "to survive summary

judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence

that the adverse employment decision was made for a discriminatory reason." <u>Lathram v. Snow</u>,

336 F.3d at 1088. After careful consideration of the record evidence, and giving particular

weight to the fact that this case arises in the special context of faculty promotion in higher

education, the Court concludes that plaintiff cannot carry his burden.

The Supreme Court has cautioned that courts should be especially solicitous of academic

decisions in the higher education setting. When reviewing a "genuinely academic decision," the

Court has instructed that judges "should show great respect for the faculty's professional

judgment." <u>Regents of Univ. of Mich. v. Ewing</u>, 474 U.S. 214, 225 (1985). The Court has

explained that:

> If a "federal court is not the appropriate forum in which to review the multitude of
> personnel decisions that are made daily by public agencies," <u>Bishop v. Wood</u>, 426
> U.S. 341 (1976) . . . far less is it suited to evaluate the substance of the multitude of
> academic decisions that are made daily by faculty members of public educational
> institutions -- decisions that require "an expert evaluation of cumulative information
> and [are] not readily adapted to the procedural tools of judicial or administrative
> decisionmaking." <u>Board of Curators, Univ. of Mo. v. Horowitz</u>, 435 U.S. [78, 89-90
> (1978)].

<u>Id.</u> at 226. And even within this context of heightened deference, a court must be particularly

wary of second-guessing a university's decisions concerning faculty members: "The academic

setting and complex nature of tenure decisions . . . distinguishes them from employment

decisions generally." <u>Okruhlik v. Univ. of Ark.</u>, 395 F.3d 872, 879 (8th Cir. 2005). Although it

does not appear that the D.C. Circuit has directly addressed this issue, the D.C. Court of Appeals

has recognized that "'courts should not invade, and only rarely assume academic oversight,

except with the greatest caution and restraint, in such sensitive areas as faculty appointment,

promotion, and tenure, especially in an institution of higher learning.'" Brown v. George

Washington Univ., 802 A.2d 382, 385 (D.C. 2002) (quoting Loebl v. New York Univ., 255

A.D.2d 257, 257 (N.Y. App. Div. 1998)).  Faculty appointment and promotion are

"quintessential educational issues that go to the very essence of faculty judgments as to

qualifications for scholastic employment" and should properly be left to the academic institutions

themselves absent a strong showing of improper conduct.  Id. at 387.  Moreover, the D.C. Court

of Appeals recently stated that -- absent a showing of unlawful discrimination -- review of

academic promotion disputes is ordinarily limited to determining "whether there has been

substantial compliance with" the university's own internal rules and procedures for evaluating

applicants for advancement.  Allworth v. Howard Univ., 890 A.2d 194, 202 (D.C. 2006).

      Other circuits that have considered the issue of employment discrimination in university

faculty promotion and tenure decisions have determined that they should proceed with the utmost

caution.  See, e.g., Dobbs-Weinstein v. Vanderbilt Univ., 185 F.3d 542, 545 (6th Cir. 1999)

(acknowledging that tenure decisions are more complex than ordinary employment

discrimination cases); Smith v. Univ. of N.C., 632 F.2d 316, 345-46 (4th. Cir. 1980) ("University

employment cases have always created a decisional dilemma for courts. . . . Unsure how to

evaluate the requirements for appointment, reappointment and tenure, and reluctant to interfere

with the subjective and scholarly judgments which are involved, the courts have refused to

impose their judgment as to whether the aggrieved academician should have been awarded the

desired appointment or promotion."); Lieberman v. Gant, 630 F.2d 60 (2d. Cir. 1980).[5]

---

    [5] But see Abramson v. William Patterson College of N.J., 260 F.3d 265 (3d. Cir. 2001).
In Abramson, the Third Circuit reversed the district court's order granting summary judgment to
the college without any reference to special deference owed to institutions of higher learning.  Id.

The Second Circuit is perhaps the strongest advocate of this approach.  In <u>Zahorik v. Cornell Univ.</u>, 729 F.2d 85 (2d. Cir. 1984), the court explained in some detail why the context of tenure and academic promotion cases will "rarely benefit Title VII plaintiffs seeking to prove that a particular . . . decision was influenced by sex or race." <u>Id.</u> at 93.  Significantly, where an applicant's "file contains . . . <u>conflicting views of specialized scholarship</u>, triers of fact cannot hope to master the academic field sufficiently to review the merits of such views and resolve the differences of scholarly opinion." <u>Id.</u> (emphasis added).  Thus, absent "evidence sufficient to support a finding that" disagreements over an applicant's qualifications and scholarly worth are "influenced by forbidden considerations such as sex or race, universities are free . . . to act upon the good faith judgments of their departmental faculties or reviewing authorities."[6] <u>Id.</u> at 94. This Court finds <u>Zahorik</u>'s reasoning to be sound and generally in accord with the Supreme Court's command in <u>Ewing</u> to accord great respect to academic decisions in higher education.

Against that backdrop, the Court now turns to plaintiff's contention that UDC's asserted nondiscriminatory reason is mere pretext.  To begin with, plaintiff maintains that UDC's reasons were "clearly pretextual" because it promoted Nelda Ormond to the rank of Full Professor "even though she did not even apply when . . . the other candidates did." Pl.'s Opp'n at 20-21.  As

---

at 285.  At the same time, however, the record in <u>Abramson</u> contained strong indicia of anti-Semitic sentiment that may have influenced the decision-making process, which is intolerable under any level of deference. <u>Id.</u> at 281-86.

    [6] Significantly, in a passage relevant to this case, the Second Circuit noted that a trier of fact could not permissibly infer an unlawful discriminatory motive "solely from [the Dean's] rejection of a departmental recommendation" when there was "no evidence that his decision was based on gender." <u>Zahorik</u>, 729 F.2d at 95.  Ultimately, the fact that Dean Petty and subsequent decision-makers did not concur with the two committee recommendations is really the only basis plaintiff has to infer discrimination.  Under <u>Zahorik</u>, that is not sufficient to survive a motion for summary judgment.

plaintiff would have it, this action constitutes "manipulation of the [promotion] process, criteria, and rules" and consequently "supports a showing of pretext." Id. at 26.  But plaintiff's argument is entirely unconvincing.  Admittedly, the Fourth Master Agreement, which establishes certain procedures for UDC's promotion process, provides that: "An applicant for promotion shall submit his or her application with supporting documents to the Department Chair no later than the Second Friday in September." Pl.'s Opp'n Ex. 14 at 3.  Because Professor Ormond did not submit her application by the second Friday in September of 2002, the argument goes, UDC ran afoul of its internal procedures when it promoted her in that year.  In fact, however, Professor Ormond had timely submitted her application for promotion two years earlier, "but her promotion was held up because there was no funding for promotions at the time." Def.'s Reply at 5.  Indeed, as defendant correctly points out, Professor Ormond "easily met" the deadline set out in the Fourth Master Agreement -- "by two years in fact." Id.

Next, plaintiff claims that Dean Petty "re-ranked" the College Committee's order of candidates "without justification," swapping plaintiff and Professor Ormond's respective ranks. Pl.'s Opp'n at 21.  But there is nothing to suggest that Dean Petty was not entitled to make her own independent ranking of the candidates.  In fact, Title 8 of the D.C.M.R. expressly contemplates that the "dean may submit separate recommendations." 8 D.C.M.R. § 1444.4. Moreover, plaintiff's entire application package -- complete with the College Committee's original report ranking plaintiff as the #2 candidate -- was forwarded to the Provost for review. Def.'s Mot. at 5-6.  That is to say, Dean Petty's action did not remove the College Committee's initial recommendation during the subsequent review.

In essence, this argument is effectively a rehash of plaintiff's central contention that he

was plainly qualified for the position of Full Professor.  And that contention, of course, goes to

the core of the tenure and promotion assessment undertaken by the University, which this Court

must respect absent clear evidence that a forbidden consideration such as ethnicity tainted the

decision.  Plaintiff insists that Dean Petty's determination that he was not qualified is pretext for

discriminatory animus, but there is no evidence that was the case.  In an effort to discredit that

decision, plaintiff points out that Dean Petty relied on input from her daughter, who is a mere

"student at Northwestern."  Pl.'s Opp'n at 21.  Impliedly, the Court is supposed to assume that

Dean Petty's daughter was in no position to give informed advice regarding plaintiff's

qualifications.  Whatever the merits of that contention, plaintiff overlooks the fact that Dean

Petty testified that she also consulted with "the Dean of Communications at Howard

[University]," the "Dean at Florida A&M," and a member of the "Association of Black

Journalists" with respect to appropriate qualifications in the field of academic journalism.  Def.'s

Mot. Ex. E at 22.  That she also spoke with her daughter about plaintiff's qualifications is of no

moment to this inquiry.

     Plaintiff is somewhat more persuasive in his attempts to refute defendant's assertion that

he failed to stay current in his field.  The most serious issues in that regard that defendant raised

were that plaintiff failed to update UDC's journalism curriculum to keep abreast of rapid changes

in the field and that he did not adequately incorporate technology into his pedagogy.  Plaintiff has

posed significant questions concerning those two assertions.  The record reflects that plaintiff

wrote a memorandum in 2000 suggesting extensive revisions to the journalism curriculum.  See

Def.'s Mot. Ex. A2.  And although defendant is correct that plaintiff never followed through with

the official procedure of submitting course syllabi to the Curriculum Committee so that his

proposed courses could be approved, plaintiff responds plausibly that "he did not get a positive response from the Department Chair to proceed with the courses," and thus he did not feel that it was worthwhile to put in the substantial work required to create a course outline for what would amount to a futile effort. Pl.'s Stmt. of Facts ¶ 36; see also id. ¶ 35; Pl.'s Opp'n Ex. 19. More generally, plaintiff maintains that he had been advocating to revamp the curriculum for several years but that his advice went unheeded. Def.'s Reply Ex. O at 12-14. On the technology point, plaintiff testified in his deposition that the journalism program was woefully underfunded in that regard -- specifically, he stated that the journalism lab was provided only with inordinately "antiquated computers" and did not receive a fax machine or internet connection until the 2006-07 academic year. Pl.'s Opp'n Ex. 7 at 12-13. Hence, plaintiff has produced evidence that could support an inference that he sought to upgrade the curriculum and incorporate more technology into his teachings but was frustrated by UDC in his attempts to do so. That point has some force in the McDonnell Douglas analysis although it does not amount to clear or direct evidence of a discriminatory intent in this academic setting.

The scholarship issue, however, ultimately stands as an independent grounds for granting summary judgment to defendant. On this question, plaintiff offers little more than a bald assertion that his portfolio conclusively establishes that he was qualified for the position and therefore defendant's proffered reason for the promotion denial must be pretext. To be sure, plaintiff has produced evidence that reveals his lengthy publication history. See Pl.'s Opp'n Ex. 2. But that alone is non-responsive to defendant's contention that plaintiff's written work -- although admittedly voluminous -- does not reflect the sort of rigorous peer-reviewed academic work product that defendant has concluded is appropriate to the Full Professor rank. Moreover,

defendant has powerfully demonstrated that the two academic awards that plaintiff claims to have received were not "based on critical acclaim for his writings by professional writers in his field." Def.'s Reply at 3. Once again, this dispute is squarely within the academic decision-making to which the courts owe special deference.

In short, plaintiff has not proven anything beyond the fact that the parties disagree over the merit of his portfolio in the academic context. But such decisions concerning academic merit are precisely the kind that should be left to administrators of higher education. If this Court (or a jury) were to engage in an independent assessment of plaintiff's academic qualifications, it would hardly show the "great respect for the faculty's professional judgment" that the Supreme Court has demanded in this setting. See Ewing, 474 U.S. at 225. Nor is this Court (again, or a jury) qualified to weigh in on the quality of plaintiff's portfolio in any event. That is just the sort of inquiry that Zahorik cautions judges and triers of fact to avoid. 729 F.2d at 93 (noting that where the record "contains . . . conflicting views of specialized scholarship, triers of fact cannot hope to master the academic field sufficiently to review the merits of such views and resolve the differences of scholarly opinion"). Hence, this Court is persuaded that absent plain evidence of discrimination -- and there is none here -- it would be inappropriate to contravene UDC's ultimate promotion determination.

Even if plaintiff were able to establish that Dean Petty's assessment of his qualifications was erroneous and that he was qualified for the position of Full Professor, that would not be enough to survive summary judgment here. Simply put, taken alone, the fact that the relevant decision-maker was mistaken is unavailing. Instead, plaintiff must demonstrate that the proffered explanation was not defendant's true reason for denying his promotion. Burdine, 450

U.S. at 253.  Here, plaintiff cannot satisfy that requirement.  At best, viewed in the most generous

light possible, plaintiff can only show that he was qualified to be a Full Professor at UDC.  He

cannot, however, establish that defendant did not legitimately believe in its rationale for denying

the promotion.  To do that, he would need to show that defendant's explanation is "unworthy of

credence."  Reeves, 530 U.S. at 142.  Or, as plaintiff himself puts it, he must show that defendant

"made an error too obvious to be unintentional."  Fischbach v. D.C. Dep't of Corrections, 86 F.3d

1180, 1183 (D.C. Cir. 1996).  But the record here will not support such a contention.

Defendant's misgivings about plaintiff's qualifications are grounded in fact: his portfolio contains

neither peer-reviewed material nor detailed research regarding the discipline of journalism (as

opposed to published articles simpliciter).  Plaintiff's argument that those concerns are misguided

simply misses the mark.

      What is conspicuously absent from the record in this case is any hint of racial

discrimination infecting defendant's decision.  As defendant correctly points out, plaintiff "offers

no evidence such as discriminatory statements that would support his burden" on summary

judgment.  Pl.'s Mot. at 21.  Moreover, plaintiff "acknowledges that he never heard at any time

inappropriate comments based on his national origin or age from anyone involved in his

promotional decision."  Id. at 21-22.  Despite those admissions, plaintiff maintained in his

deposition testimony that former Dean Beverly Anderson had a "disparaging attitude towards

foreigners, especially the foreign faculty."  Pl.'s Opp'n Ex. 7 at 18.  Moreover, he stated that Dean

Anderson "was involved in removing many of the Indian faculty at UDC."  Id.  Plaintiff has not

elaborated on those statements or provided any detail or additional corroborating facts.  More

importantly, Dean Anderson was not involved in the deliberations relating to plaintiff's

promotion. Thus, even if plaintiff could have bolstered his bald claims regarding her sentiments towards foreign faculty members, that point is irrelevant because it does not relate to any of the pertinent decision-makers. See, e.g., Swanson v. Leggett & Platt, 154 F.3d 730, 733 (7th Cir. 1998) (discriminatory statements must be made by, or associated in some capacity with, the applicable decision-makers).

Plaintiff's claim that he was discriminated against during his last promotion process at UDC, which took place in 1979 (some 23 years earlier), suffers from the same defect as does the contention regarding Dean Anderson: plaintiff has produced no evidence that the individuals involved in the 1979 decision were also involved in the 2002 decision. Moreover, as defendant correctly notes, the settlement agreement that plaintiff relies upon for proof of such discrimination explicitly states that it does not amount to "an admission" of discrimination. See Def.'s Reply at 6; Pl.'s Opp'n Ex. 5. Finally, at the very least, plaintiff's assertion of discrimination in 1979 is so remote in time that it calls into question the probative value of such evidence at all.

At bottom, plaintiff insists that he "continued to excel as a professor even while the University faced financial ruin and public controversy." Pl.'s Mot. at 21. That may well be true, but it does not mean that he has made a case for discriminatory denial of promotion. The proper focus is not on whether plaintiff was treated "fairly" but on whether UDC's decision was based upon improper and unlawful criteria. In the end, plaintiff has adduced no evidence that would permit a reasonable jury to find that his non-promotion was motivated by discriminatory animus. In the absence of such evidence -- direct, circumstantial, or otherwise -- a jury would be left to infer race discrimination from the mere fact that UDC's decision-makers concluded that

plaintiff's scholarship was not worthy of promotion to the highest academic rank.  Neither a jury

nor this Court is equipped to pass on the merits of that conclusion.  Rather, that debate is best left

for the faculty lounge and academic halls, at least in the absence of any clear evidence of

discrimination.  Defendant's motion for summary judgment with respect to Counts I and IV will

therefore be granted.

## II.     Hostile Workplace Claim

That leaves plaintiff's hostile workplace claim.  To state a prima facie case of hostile

work environment, plaintiff must demonstrate:

> (1) she is a member of a protected class; (2) she was subject to unwelcome
> harassment; (3) the harassment occurred because of her race or disability; (4) the
> harassment affected a term, condition or privilege of employment; and (5) the
> employer knew or should have known of the harassment, but failed to take any action
> to prevent it.

Kilby-Robb v. Spellings, --- F. Supp. 2d ---, 2007 WL 4142750 at *12 (D.D.C. Nov. 23, 2007)

(citing Jones v. Billington, 12 F. Supp. 2d 1, 11 (D.D.C. 1997)).[7]  Moreover, a plaintiff must

demonstrate that the workplace is so "permeated with discriminatory intimidation, ridicule, and

insult that it is sufficiently severe or pervasive to alter the conditions of the victim's employment

and create an abusive working environment."  Oncale v. Sundowner Offshore Servs., Inc., 523

U.S. 75, 78 (1998) (internal citations omitted).  Significantly, the "Supreme Court has made it

clear that 'conduct must be extreme to amount to a change in the terms and conditions of

employment.'"  George, 407 F.3d 416 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788

(1988)).

---

[7] The elements of a hostile work environment claim under the DCHRA mirror the federal
requirements.  See Lively v. Flexible Packaging Assoc., 830 A.2d 874, 889 (D.C. 2003).

-28-

In this case, defendant launches two main assaults against this cause of action, one procedural and one substantive. To begin with, defendant argues that plaintiff's claim is barred by the statute of limitations. Beyond that, defendant maintains that even if timely filed, plaintiff has not stated a hostile work environment claim on the merits. As explained below, defendant is entitled to summary judgment because plaintiff's claim -- even if timely brought -- is entirely without merit.

Defendant forcefully argues that plaintiff's claim falls outside of the limitations period. The DCHRA provides for a one-year statute of limitations period. D.C. Code § 2-1403.16. Section 1983 claims, on the other hand, carry a three-year period. Carney v. American Univ., 151 F.3d 1090, 1096 (D.C. Cir. 1998) (citing D.C. Code § 12-301(8)). Plaintiff filed the instant action in May 2005. Thus, even assuming that all his claims can be articulated under § 1983, the earliest incidents must have occurred in May 2002 or later to be timely.

As defendant points out, a quick glance at many of the factors that plaintiff insists create a hostile workplace did not occur within that timeframe. For instance, plaintiff argues that his "small and irregularly shaped" office is evidence of discrimination against him, but he has resided in that office since 1998. Def.'s Mot. at 22. Likewise, his assertion that former Dean Beverly Anderson compelled him to change a student's grade against his will runs head-first into the statute of limitations because that incident occurred in 1997; so, too, does plaintiff's complaint regarding the "Living Legend Award" delivered in 1999. Id. at 22-23. Finally, plaintiff's assertion that he was unlawfully forced out of his position as staff editor of the "Free Voice" suffers from the same defect because that incident allegedly occurred in 2000. Id. Ex. A at 44-45.

-29-

On the other hand, some of the incidents that plaintiff recites arguably occurred within the three-year limitations period.  For instance, while the journalism lab was moved on several different occasions, most of which were outside of the appropriate limitations period, plaintiff claims that the lab was improperly relocated in 2004 (although he cites no record evidence to confirm this allegation).  Pl.'s Opp'n at 30.  Fortunately for plaintiff, however, defendant has in fact provided record support for that assertion.  Def.'s Stmt. of Facts ¶ 96.  Similarly, with respect to plaintiff's claim that he was improperly denied a key to his office, the record reflects that he made several requests for a copy of the key that were denied, some of which took place within the limitations period.[8]

Ultimately, however, even if the Court assumes that all of plaintiff's assertions of hostile circumstances come within the appropriate limitations period, his claim fails because it is wholly without merit -- indeed, it borders on frivolous.  Simply put, plaintiff's claim suffers from two fatal flaws.  To begin with, as defendant has aptly stated, plaintiff "seems unaware that anti-discrimination laws do not prohibit all workplace harassment, only harassment motivated by a discriminatory criterion."  Def.'s Reply at 8; see also Stewart v. Evans, 275 F.3d 1126, 1133

---

[8] Plaintiff cites to National Railway Passenger Corp. v. Morgan, 531 U.S. 101 (2002), as evidence that his claims are timely.  In Morgan, the Supreme Court made clear that so long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  Id. 117.  Defendant responds that none of the circumstances cited by plaintiff in fact occurred with the period in any event.  Def.'s Reply at 7.  Alternatively, defendant insists that any "alleged harassment" that occurred after 1999 merely constituted "lingering effect[s]" of discrete acts that took place before the appropriate period.  Def.'s Mot. at 23.  Citing Shea v. Rice, 409 F.3d 448 (D.C. Cir. 2005), defendant maintains that incidents that did occur within the limitations period do not restart the clock because plaintiff cannot "breathe new life into discriminatory acts that occurred outside the limitations period . . . by relying on their lingering effects in the present."  Id. at 454.  The Court need not decide this issue because plaintiff's claim fails on the merits.

(D.C. Cir. 2002). Significantly, plaintiff has offered no evidence that the hostile circumstances that he allegedly suffered were caused by discriminatory animus towards him. In fact, the only record evidence even remotely relating to this claim is plaintiff's testimony that former Dean Anderson regarded him as a "maverick" professor. Pl.'s Opp'n Ex. 7-A at 20. At best, this suggests that Dean Anderson may indeed have had it out for plaintiff, but for reasons <u>unrelated</u> to his race or ethnicity.[9]

Defendant has offered legitimate, nondiscriminatory -- and mostly uncontested -- explanations for each of the allegedly "hostile" actions that it has taken with respect to plaintiff. For instance, defendant has cited compelling and un-rebutted deposition testimony that establishes that the journalism lab (as well as plaintiff's office) was repeatedly moved due to university-wide space shortages. Pl.'s Mot. at 26. Similarly, defendant maintains that many professors do not have keys to their offices and that plaintiff in particular was known to permit students to utilize his workspace, which concerned the Department Chair thus prompting her to withhold the key. <u>Id.</u> Furthermore, defendant disputes plaintiff's characterizations of the "forced" grade change (Dean Anderson, in defendant's view, merely requested that plaintiff "reconsider" the grade) and the so-called interference with the Living Legend Award (once again, Dean Anderson simply requested that plaintiff change the name of the award -- which he did not -- according to defendant). <u>Id.</u>

In any event, the second critical flaw in plaintiff's argument is that the hostile circumstances he allegedly had to endure do not even remotely approach the high threshold of

---

[9] As discussed earlier, plaintiff's bare allegation that Dean Anderson had a "disparaging attitude towards foreigners, especially the foreign faculty," Pl.'s Opp'n Ex. 7 at 18, is insufficient to support his claim at the summary judgment stage.

"severe" or "extreme" conditions that would give rise to an actionable hostile work environment claim. The Supreme Court has indicated that courts should consider, among other things, the following factors in analyzing a hostile work environment claim: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). Moreover, the Court has also emphasized that the circumstances must be genuinely "severe" and pervasive. Faragher, 524 U.S. at 787-88.

Measured against those strict requirements, it is clear that plaintiff's claim falls well short of a sufficient showing, even if the Court accepts every one of his allegations. The alleged harassment suffered by plaintiff was never "physically threatening or humiliating." Nor was there even a mere "offensive utterance" relating to his race or ethnicity. The inconvenience of not having a key to one's office aside, such burdens hardly amount to harassment, let alone severe harassment. Characterizing these conditions in the light most generous to plaintiff, they merely remain (as defendant put it) "relatively minor matters." Def.'s Mot. at 27.

In sum, plaintiff's hostile work environment claim suffers from several profound defects. On this record, it cannot survive a motion for summary judgment. Hence, the Court will grant defendant's motion with respect to Count II.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment will be granted in its entirety. A separate Order accompanies this Memorandum Opinion.

/s/     John D. Bates         
John D. Bates
United States District Judge

Dated:   December 18, 2007     

-33-